IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WENZEL O. TAYLOR, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 05-2169 (RCL) |
| TEAM BROADCAST, LLC, | ) |
| Defendant. | ) |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO
WHICH THERE IS NO DISPUTE**

Defendant Team Broadcast, LLC ("Team"), through its undersigned counsel and pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), submits this statement of material facts as to which it contends there is no genuine dispute (hereafter "SOMF"):

1. Defendant, Team Broadcast Services LLC, is a full-service television production, distribution and rights management company. Declaration of Michael Marcus ("Marcus Decl.") ¶ 6.[1]

2. Plaintiff Wenzel Taylor ("Taylor"), was hired by Team on or about December 13, 2003, as a master control technician to provide technical operations support of the Middle East Television Network ("MTN"), a fast-paced 24/7, 365 day a year news and entertainment broadcast network. Deposition of Wenzel Taylor ("Pl. Dep.") at 47-51[2]; Pl. Dep. Ex. 6 (Job Offer Letter) and 9 (Position Description for Master Control Technician).

3. On December 13, 2003, Taylor signed an employment agreement ("Agreement") with Team which acknowledged his at-will status and provided for a six (6) month probationary

---

[1] Attached hereto as Exhibit A.

[2] References to relevant excerpts of Taylor's deposition and the exhibits used therein are attached hereto as Exhibits B and C respectively.

period. Pl. Dep. at 52-53; Marcus Decl. Ex. 1 (Employment Agreement). Team reserved the right to terminate Taylor at any time during this six (6) month probationary period if Taylor was not performing to Team's expectations. Pl. Dep. Ex. 6; Marcus Decl. Ex. 1.

4. At the time that Taylor was hired by Team, Taylor had no physical limitations that would have affected his ability to perform his work as a master control technician. Pl. Dep. at 71, 82-83.

**Taylor's Position as Master Control Technician**

5. As a master control technician, Taylor was responsible for providing technical operations support for the MTN and was required to primarily report to Michael Marcus, Studio/Master Control Operations Manager. Pl. Dep. at 39; Pl. Dep. Ex. 6.

6. Among other things, Taylor was responsible for configuring and optimizing multiple broadcast and satellite feeds for MTN, monitoring and adjusting on air signals using state of the art equipment, and monitoring and executing the playout of air materials throughout the program day according to the program log. Pl. Dep. at 75-83; Pl. Dep. Ex. 6.

7. Taylor's position also included working in Team's intake department where the master control technician would take video signals sent to the network and disseminate them to reporters, editors, and others. Pl. Dep. at 61, 81-82.

8. Taylor worked in Team's intake department in February 2004 and reportedly was responsible for teaching others in the department on how to perform this work. Pl. Dep. at 76, 78, 81, 114-15.

9. After initially being assigned to the intake department, Taylor worked in Team's master control room where he primarily performed video shading. The master control room was approximately 10 feet by 10 feet in dimension and was kept completely dark, by tradition and necessity, to enable the master control technician to best see the equipment he utilized. Pl. Dep. at 68-69.

2

**Employee Manual and Standards of Conduct**

10. On or about January 5, 2004, Taylor received a copy of the Asgard Entertainment Group[3] Employee Manual ("Employee Manual") which contained various policies related to Taylor's employment with Team. Pl. Dep. at 54-55; Pl. Dep. Ex. 7 (Asgard Entertainment Group Employee Manual) and 8 (Acknowledgment of Receipt).

11. Among the individual policies contained in the Employee Manual is a policy entitled "Standard of Conduct" which sets forth the employee's responsibility to adhere to certain rules of behavior and conduct and lists various types of misconduct for which an employee may be disciplined or terminated. Pl. Dep. at 55-56; Pl. Dep. Ex. 7 at 11-12.

12. Among these types of misconduct for which an employee may be disciplined or terminated is "failing to conform to professional image standards." Id.

13. Taylor admits that sleeping on the job would be a violation of these standards of conduct. Pl. Dep. at 57.

14. Also contained in the Employee Manual is a policy on Team's "Procedure for Discipline." This policy establishes that when a standard of conduct issue does arise, the manager will first attempt to counsel the employee and put them on notice on what must happen to correct it. Any reoccurrence of the problem after the written warning can lead to the immediate discharge of the employee. Pl. Dep. Ex. 7 at 13.

15. Taylor understood that this was Team's policy for discipline and did not have any questions about the standards of conduct or these disciplinary procedures during his tenure with Team. Pl. Dep. at 57.

---

[3] While Taylor was employed by Team, it is a subsidiary of Asgard Entertainment Group.

3

**Taylor's Sleeping on the Job**

16.     In February and March 2004, Taylor began demonstrating unacceptable conduct at work, as witnessed by his supervisor, Michael Marcus and other managers. Marcus Decl. ¶ 7.

17.     During this time, Mr. Marcus and other managers observed, on at least 3 separate occasions, that Taylor appeared to be asleep while at his video shading workstation in the master control room. Id.; Pl. Dep. at 96.

18.     On or about March 15, 2004, Michael Marcus spoke to Taylor about his sleeping on the job and noted that other managers had observed him asleep as well. Id. Mr. Marcus issued Taylor a written warning and reminded him that sleeping on the job, and even the appearance of sleeping on the job, was not acceptable behavior and could result in further disciplinary action up to and including his termination. Pl. Dep. at 84-85, 92; Pl. Dep. Ex. 10 (Letter of Warning); Marcus Decl. ¶ 8.

19.     At the time, Taylor told Mr. Marcus that he was not asleep. Taylor stated that he only had his eyes closed and was thinking about personal things he had to do. Pl. Dep. at 93-94; Pl. Dep. Ex. 10; Marcus Decl. ¶ 9.

20.     Taylor acknowledged that having his eyes closed while working would still relate to violating Team's policy about maintaining a professional appearance. Pl. Dep. at 93-94.

21.     Despite these denials, Taylor has subsequently admitted that he told his physician, Dr. Muhammad Shibli, that he may have fallen asleep at work several times at work. Pl. Dep. at 133; Pl. Dep. Ex. 12.

22.     Taylor also subsequently admitted that he did sleep while at work. ranscript of November 15, 2006 Status Hearing[4] ("Stat. Hear.") at 10. He blamed his long work hours, two-hour commute, and his job, which required him to sit for long periods of time in the dark

---

[4] Attached hereto as Exhibit D.

4

listening to an Arabic language he did not understand for causing him to fall asleep on the job. Id. at 10. ("You're going to fall asleep, and that is what happened.").

**Taylor's Leave of Absence**

23.	On or about April 22, 2004, Mr. Marcus informed Taylor that management was concerned about his continued instances of sleeping on the job and the potential impact that future incidents could have on Team's operations. Marcus Decl. at ¶ 10. Therefore, Mr. Marcus instructed Taylor that he needed to make a medical appointment to determine whether there was a medical reason that was causing him to fall asleep on duty or was otherwise preventing him from performing his job as a master control technician[5]. Id. at ¶ 11.

24.	Mr. Marcus informed Taylor that he would approve his use of sick leave until Taylor was able to obtain this medication evaluation. Id. at ¶ 12.

25.	As a result, Team carried Taylor on a combination of sick and annual leave from approximately April 22, 2004 to May 7, 2004. Id. at ¶ 13; Marcus Decl. Ex. 2 (Time and Attendance Records).

26.	At this time, Taylor claims that he was not experiencing any symptoms of sleep apnea and did not express any concern to Mr. Marcus about being tired, fatigue or exhausted. Pl. Dep. at 94-95, 97-98.

**Taylor's Return to Work**

27.	On or about May 7, 2004, Taylor returned to work with a note from his physician, Dr. Reer Zonozi, dated May 5, 2004, indicating that Taylor was diagnosed with sleep apnea disorder and needed further sleep studies. Pl. Dep. at 107; Pl. Dep. Ex. 11 (Note from Dr. Zonozi).

---

[5] Team notes that Plaintiff claims that had decided to go see his doctor on his own and not at the direction of Mr. Marcus. Pl. Dep. at 97; Stat. Hear. at 6.

5

28.     This note from Dr. Zonozi was the only medical documentation submitted by Taylor to Team about his diagnosed medical condition. Pl. Dep. at 109. Dr. Zonozi did not place Taylor on any medications or require any work restrictions or limitations. Pl. Dep. at 94-95, 97-98, 107-108.

29.     Taylor testified that he had not experienced any symptoms of sleep apnea prior to May 2004. Pl. Dep. at 94-95, 97-98.

30.     When Taylor returned to work he indicated to Mr. Marcus that "he was feeling much better after some time off" and was able to resume all the duties and responsibilities of his master control technician position. Pl. Dep. at 108-109; 118-119; Marcus Decl. at ¶ 15; Marcus Decl. Ex. 3 (E-mail dated May 7, 2004).

31.     Taylor also indicated that after he was diagnosed with sleep apnea on May 5, 2004, "I was not…in a condition where I couldn't do my job, which I never was." Stat. Hear. at 6.

32.     Taylor admitted that he did not discuss the specifics of his treatment with Mr. Marcus when he returned to work. Pl. Dep. at 118.

33.     In addition, Taylor stated that he never asked for, nor was ever denied a reasonable accommodation of this diagnosed medical condition. Pl. Dep. at 111; Interrogatory No. 3.

**Taylor's Continued Sleeping on the Job and Termination of Employment**

34.     Upon Taylor's return to work, Mr. Marcus assigned Taylor to work in the intake department, an area that Taylor had previously been assigned to in February 2004. Pl. Dep. at 114-115; Marcus Decl. at ¶ 16; Marcus Decl. Ex. 3.

35.     The intake department was a busier atmosphere than the video shading area and was thought to be potentially less conducive to sleep. Marcus Decl. at ¶ 16; Pl. Dep. at 110-111.

6

36. While working in the intake department, Taylor was supervised by Mr. Vernon Herald, Studio Manager. Marcus Decl. at ¶ 17; Declaration of Vernon Herald ("Herald Decl.") at ¶ 5.

37. Less than two weeks after Taylor's return to duty, Mr. Herald observed Taylor asleep at his work station in the intake department on both May 19, 2004 and May 20, 2004 for brief moments during his shift. Herald Decl. at ¶ 6; Marcus Decl. at ¶ 18; Marcus Decl. Ex. 4 (E-mail dated May 28, 2004). Mr. Herald reported that he could see Taylor's eyes closed and hear him breathing heavily. Id.

38. As a result of Taylor's numerous and continued instances of falling asleep on duty, in direct violation of Team's policies which prohibited sleeping on the job, Team decided that it had no choice but to terminate Taylor employment during his probationary period effective May 28, 2004. Marcus Decl. at ¶ 19 ; Marcus Decl. Ex. 5 (Memorandum dated May 28, 2004).

**Post-Termination Medical Treatment**

39. On June 9, 2004, after being terminated by Team, Taylor was treated at a sleep clinic at Providence Hospital and fitted with a continuous positive airway pressure ("CPAP") device. Pl. Dep. at 132, 139; Pl. Dep. Ex. 12 and 13.

40. This CPAP device resolved any symptoms that Taylor reportedly had from his sleep apnea and Taylor did not seek any further medical treatment after June 9, 2004. Pl. Dep. at 142-44, 159.

41. Taylor has indicated that he is no longer impaired by his sleep apnea. Pl. Dep. at 131.

42. Taylor also admits that he was not limited in any way by his sleep apnea and this impairment did not affect any of his daily or nightly activities or his ability to work. Pl. Dep. at 145.

Date: December 18, 2006                Respectfully submitted,

TEAM BROADCAST, LLC

By: _____/s/_____
Jessica R. Hughes, DC Bar 468853
Eric J. Janson
SEYFARTH SHAW, LLP
815 Connecticut Avenue, NW, Suite 500
Washington, DC 20006-4004
(202) 463-2400
Counsel for Defendant Team Broadcast, LLC