**Defendant Team Broadcast, LLC - Motion for Summary Judgment**

**Exhibit B – Taylor Deposition Transcript Excerpts**

**Civil Action No. 05-2169 (RCL)**

ORIGINAL

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---------------------x

WENZELL O. TAYLOR,　　　:

　　　　　　　　　　　　:

　　　Plaintiff, :

　　　　　　　　　　　　:

　　　v.　　　　　　　: No. 05-2169-RCL

　　　　　　　　　　　　:

TEAM BROADCAST, LLC,　:

　　　　　　　　　　　　:

　　　Defendant. :

---------------------x

　　　　　　　　　　　　　　Washington, D.C.

　　　　　　　　　　　Thursday, October 12, 2006

Deposition of

　　　WENZELL O. TAYLOR

Plaintiff, called for examination by counsel for

Defendant pursuant to notice and agreement of

counsel, beginning at approximately 9:41 a.m. at the

law offices of Seyfarth Shaw, LLP, 815 Connecticut

Avenue, NW, Washington, D.C., before Christine Allen

of Beta Court Reporting, notary public in and for

the District of Columbia, when were present on

behalf of the respective parties:

2

```
 1   APPEARANCES:
 2        On behalf of Plaintiff:
 3             WENZELL O. TAYLOR Pro Se
               2306 Ainger Place, SE
 4             Washington, D.C.  20020
               (202) 889-2989
 5
          On behalf of Defendant:
 6
               JESSICA R. HUGHES, ESQUIRE
 7             Seyfarth Shaw, LLP
               815 Connecticut Avenue, NW, Suite 500
 8             Washington, D.C.  20006-4004
               (202) 463-2400
 9
10                  C O N T E N T S
11   EXAMINATION BY:                         PAGE
12      Counsel for Defendant                  4
13   DEPOSITION EXHIBITS:
14   No.   1 - Notice of Deposition            5
15   No.   2 - Plaintiff's Response to        12
                Defendant's Interrogatories
16
        No.   3 - Complaint                   12
17
        No.   4 - Taylor Résumé               28
18
        No.   5 - December 5, 2003,           37
19              Application for Employment
20   No.   6 - December 10, 2003, Letter,     47
                Simons to Taylor
21
        No.   7 - Asgard Employee Manual      54
22
```

3

| | DEPOSITION EXHIBITS (CONT'D): | PAGE |
|---|---|---|
| 1 | | |
| 2 | No.  8 – January 5, 2004, | 54 |
| | Acknowledgement | |
| 3 | | |
| | No.  9 – Master Control Technician | 74 |
| 4 | Job Description | |
| 5 | No. 10 – March 15, 2004, Letter, | 89 |
| | Marcus to Taylor | |
| 6 | | |
| | No. 11 – May 5, 2004, | 107 |
| 7 | Dr. Zonozi Note | |
| 8 | No. 12 – June 2004, History and | 131 |
| | Physical Examination | |
| 9 | | |
| | No. 13 – Sleep Test Results | 138 |
| 10 | | |
| | No. 14 – July 5, 2005, Letter, | 175 |
| 11 | Clarke to Taylor | |

12

13                          *   *   *   *   *

14

15

16

17

18

19

20

21

22

39

1   Tracey Thompson?

2    A   No, it wasn't.

3    Q   Was the woman that was supposed to

4  interview you someone in operations or

5  someone in human resources?

6    A   I believe she was someone in human

7  resources.

8    Q   Is it correct Michael Marcus would

9  be in operations?

10    A   I don't know what he was at that

11  time.

12    Q   Michael Marcus, once you worked for

13  Team, he was your supervisor; correct?

14    A   Once we started the employment?

15    Q   Correct.

16    A   Yes.

17    Q   So Mr. Marcus had actual knowledge

18  of the work that you performed as an MCO;

19  correct?  The technical aspects.

20    A   What do you mean by "had actual

21  knowledge?"  As I far as I know, he did not.

22    Q   Okay.  But --

47

1    physical abilities to perform the job of

2    master control operator?

3        A    It's possible he could have.

4        Q    Did you have any physical

5    limitations and provide --

6        A    Only what I told you I have right

7    now.

8        Q    I just want to make clear.  You

9    don't recall if he did or did not ask you,

10   but you know if he had asked you, you would

11   have told him what you've told me previously?

12       A    That's correct.

13            MS. HUGHES:  If you could mark this

14   as Taylor 6.

15                  (Deposition Exhibit No. 6 was

16                  marked for identification.)

17            BY MS. HUGHES:

18       Q    Again, Mr. Taylor, take as much

19   time as you need to review this document, and

20   let me know when you've completed your

21   review.

22       A    Okay.

48

1    Q    Do you recognize this document?

2    A    Yes, I believe I do.

3    Q    Is this your signature on the

4    document?

5    A    Yes, it is.

6    Q    So this is the offer letter

7    provided to you by Team that you signed to

8    show your acceptance; is that correct?

9    A    I believe so.

10    Q    Is Sue Lee the woman that you were

11    supposed to meet with originally rather than

12    Mr. Marcus?

13    A    I don't believe so.  I'm not -- it

14    may have been, yes.  I think Sue Lee was the

15    person.

16    Q    At any time during you employment

17    with Team, did you ever meet Sue Lee?

18    A    At any time what?

19    Q    At any time while you were employed

20    with Team, did you meet Sue Lee?

21    A    Yes, I did.

22    Q    In what context did you meet

49

1    Ms. Lee?

2         A    Team gave the company a -- a night

3    out at a facility in Springfield Mall, or the

4    Springfield area one night -- and she was the

5    coordinator of it.  And that's when I

6    actually met her face-to-face.

7         Q    After that, did you have any

8    dealings with her professionally?

9         A    Maybe on the phone with -- and I

10   did see her a couple of times walking through

11   the facility.  But that's about it.

12        Q    So you never went to her with any

13   sort of human resources complaint or issue?

14        A    I don't recall.  I may have, but I

15   don't recall.

16        Q    This letter also appears to be

17   signed by Brad Simons, the general manager;

18   is that correct?

19        A    Yes.

20        Q    Now, is it correct to say that Brad

21   Simons was Michael Marcus's direct

22   supervisor?

50

1       A    I guess he was.  I'm not sure.

2       Q    Did you interview with Mr. Simons

3  at all?

4       A    No, I didn't.

5       Q    At some point during your

6  employment, did you meet Mr. Simons?

7       A    Yes.

8       Q    And in what context did you first

9  meet Mr. Simons?

10      A    Well, when we first appeared on the

11  job site, he introduced himself to everyone.

12      Q    Was Mr. Simons the highest ranking

13  Team person on the operations side?

14      A    As far as I know, yes.

15      Q    Did you ever approach Mr. Simons

16  with any sort of issues about your

17  employment?

18      A    No, I didn't.

19      Q    Referring to the first paragraph

20  here, it says "We are pleased to extend an

21  offer to join Team Broadcast Systems, LLC

22  (Team) in the full-time, non-exempt position

51

1    of Master Control Technician."

2         Do you see that?

3    A    Yes.

4    Q    Is that the position for which you

5    were applying?

6    A    Initially, no.  I applied for

7    studio manager, and during my interview,

8    with Mike Marcus, he informed me that he was

9    going to be studio manager and that I -- that

10   he was offering me the master control

11   position.

12   Q    So the master control position

13   was --

14   A    What I accepted.

15   Q    What you accepted, and that was a

16   lesser position than studio manager?

17   A    Yes.

18   Q    In comparison to your previous

19   employment, was the master control technician

20   similar to any of those previous jobs?

21   A    Yes.

22   Q    And to which job was it the most

52

1     similar?

2          A     Practically all of them.

3          Q     Practically all?  Okay.  And it

4     says "Your compensation for this position is

5     $21.63 per hour, which is equivalent to an

6     annual salary of $45,000.00."

7                Is that correct?

8          A     That's what it says, yes.

9          Q     To your knowledge, were you paid

10    the $21.63 per hour while you worked at Team?

11         A     To my knowledge, yes.

12         Q     Were you eligible for overtime when

13    you worked at Team?

14         A     Yes.

15         Q     Did you ever work overtime?

16         A     Practically three or four times a

17    week.

18         Q     Do you see the fifth paragraph

19    down, where it says "Employment at Team is

20    'at-will,' which means that either you or

21    Team may terminate the employment

22    relationship at any time for any reasons not

53

1    prohibited by law with or without prior

2    notice"?

3        A    Yes.

4        Q    Did you understand that at the time

5    you signed this agreement?

6        A    At the time, I didn't understand

7    it.  But later on, I did.

8        Q    What made you understand it later

9    on?

10        A    Because I did some research to find

11    out what this was about, what "at-will"

12    meant, and what it meant in the law.

13        Q    Did you research this before or

14    after your employment with Team ended?

15        A    Before.

16        Q    What prompted you to research it?

17        A    The fact that I signed this and saw

18    it.

19        Q    Had you ever seen anything like

20    that in your previous employment?

21        A    No.

22            MS. HUGHES:  If you could mark this

54

1    as Taylor 7.

2                 (Deposition Exhibit No. 7 was

3                 marked for identification.)

4         BY MS. HUGHES:

5    Q    Again, please take all the time you

6    need to review this document, and let me know

7    when you completed your review.

8    A    It looks familiar, let me say that.

9    I'm not going to read it, but --

10   Q    Yes.

11        Do you generally recognize this as

12   the Team employee manual?

13   A    Yes.

14        MS. HUGHES:  If you could mark this

15   as Taylor 8.

16                 (Deposition Exhibit No. 8 was

17                 marked for identification.)

18        BY MS. HUGHES:

19   Q    Do you recognize this document?

20   A    Only because my signature -- or it

21   appears that my signature is at the bottom.

22   Q    So you don't have a reason to

55

1    question that this is your signature?

2        A    No.

3        Q    Do you see that this document

4    purports to be an acknowledgment of your

5    receipt of the employee manual that was

6    marked as Taylor No. 7?

7        A    Yes.

8        Q    And you see under number 3, where

9    it reiterates your status as an at-will

10    employee?

11        A    I guess I see it, yeah.

12            Wait a minute.  Would you repeat

13    that last question?

14        Q    Sure.  Do you see under number 3,

15    where it repeats the point made in the offer

16    letter that it says "Unless I am covered by

17    an individual employment contract with the

18    Company, I am employed as an at-will

19    employee"?

20        A    Yeah, yes.

21        Q    If you could please turn to page 11

22    of the manual, which is also marked as

56

1    TEAM000015.

2         A    Okay.

3         Q    Do you see where it says "Standards

4    of Conduct?"

5         A    Oh, yes.

6         Q    Were you aware that Team had

7    certain standards of conduct?

8         A    Yes.

9         Q    Do you see the next page, page 12,

10   which is a continuation of the standards,

11   where it says "Failure to conform to

12   professional image standards?"

13        A    Failure to what?

14        Q    "Conform to professional image

15   standards."

16        A    Okay.  Yes, I see that.

17        Q    And would you understand sleeping

18   on the job to be a violation of the standards

19   of conduct?

20        A    Yes.

21        Q    If you could turn to page 13, the

22   "Procedure for Discipline."

57

1          Do you see the fourth paragraph

2    down, it says "If the problem persists, a

3    second meeting will be held and a written

4    warning will be given?"

5          A    Yes.

6          Q    And then the next paragraph down

7    says "Any reoccurrence of the problem after

8    the written working" -- I think that should

9    be "warning" -- "has been given can lead to

10   the immediate discharge of the employee?"

11         A    Yes.

12         Q    Did you understand this to be

13   Team's policy for discipline?

14         A    Yes.

15         Q    At anytime when you were working

16   for Team, did you have any questions about

17   what met the standards of conduct or what the

18   discipline policy was?

19         A    No.

20         Q    If you could turn to page 22 of

21   this manual.

22         Do you see where it says "Sick

61

```
 1        A    22 days longer than I worked there.

 2             MS. HUGHES:  Do you need a break,

 3   Mr. Taylor?

 4             THE WITNESS:  No.

 5             BY MS. HUGHES:

 6        Q    Can you describe your job duties at

 7   Team?

 8        A    Well, my job duties at Team were to

 9   perform the duties as a master control

10   operator, which included working in the

11   injust (?) department as well as video

12   operations.  And anything else I was asked to

13   do in television production.

14        Q    If I understand correctly --

15        A    Team.

16        Q    Team is a contractor and helps

17   produce television programming --

18        A    Yes.

19        Q    For certain networks; correct?

20        A    Yeah.  That's what I believe they

21   do.

22        Q    Were you assigned to multiple
```

68

1      A     Yes.

2      Q     We'll talk about that later.  I

3  just want to go chronologically.  But up

4  until that point, were you in the same

5  physical location?

6      A     Up until what point?

7      Q     When you were moved to intake after

8  your sick leave.

9      A     Was I in -- I was in the master

10  control room.

11      Q     The master control room.

12      A     Yes.

13      Q     How big was the master control

14  room?

15      A     About the size of this room.

16      Q     So we'll say --

17      A     Maybe half -- half of this room.

18  On this half that I'm sitting on.

19      Q     So maybe about 10 feet by 10 feet?

20      A     Yeah, you could say.

21      Q     Was the room kept dim or dark?

22      A     Completely dark.  It was dark.

69

1    Q    And that would be so that --

2    A    It's for several reasons.

3    Q    What are they?

4    A    Well, visibility.  The visibility

5    is basically the number one reason.

6    Q    That's visibility into the studio

7    itself?

8    A    No.  Visibility of our equipment.

9    Q    Any other reasons that you know why

10   the room was kept completely dark?

11   A    Well, that's the number one reason;

12   it's traditional in master control to be in a

13   dark area.

14   Q    Am I correct that this is a

15   completely interior room with no windows to

16   the outside?

17   A    Normally it is, but in this

18   particular room, it had a window.

19   Q    But it was covered, correct, to

20   keep it dark?

21   A    No -- well, sometimes it was

22   covered, sometimes it wasn't.  It had -- it

71

```
1        Q    So you didn't have to stand

2   excessively?

3        A    No.

4        Q    And you did not have to lift

5   anything over 50 pounds?

6        A    No.

7        Q    So there were no physical

8   limitations to you doing the job?

9        A    No.

10       Q    How many other people were in the

11  master control room with you during your

12  shift?

13       A    Unnecessarily, dozens.

14       Q    Too many?

15       A    Yes.

16       Q    So you were not alone?

17       A    No.   In fact, it inhibited us to

18  do -- perform our jobs.

19       Q    In the master control room, do you

20  have to keep quiet or abstain from

21  conversation?

22       A    Yes, you should.
```

75

1    correct that you never saw this document?

2        A    I don't really -- I don't remember

3    seeing it.

4        Q    Do you remember ever asking for a

5    copy of your job description?

6        A    No, I don't.

7        Q    And you don't recall anyone

8    specifically handing you a document and

9    saying this is your job description?

10       A    I don't remember it, no.

11       Q    Understanding that you have not

12   seen this document before, I just want to

13   sort of compare this to what you understood

14   your job to be.  It says "DUTIES AND

15   RESPONSIBILITIES."  Under the first bullet

16   point, it says "Configure and optimize

17   multiple broadcast and satellite feed/receive

18   links for audio and video quality."

19            Do you see that?

20       A    Yes.

21       Q    Is that something that you did?

22       A    No.  Well, I -- yes, I did.

76

1      Q      And you described jobs earlier as

2      injust, video ops, and robotic camera.

3      A      Yeah, yes.

4      Q      Where would this first bullet point

5      fit under?

6      A      That would be in the injust.

7      Q      Injust.  Did you ever do this

8      particular job?

9      A      I was the very first person to do

10     this job for Team.

11     Q      For Team.  And approximately how

12     much of your time, percentage-wise, was spent

13     doing the configure and optimize bullet point

14     there.

15     A      Well, that's what the job is.  You

16     do it constantly.

17     Q      Okay, constantly.  Well, when

18     you're doing it constantly, is that when

19     you're working injust?  Would you be doing

20     that when you were working as robotic camera?

21     A      You can't do both jobs at the same

22     time.

1      Q    So you would do this constantly

2  while working --

3      A    In injust.

4      Q    In injust; correct?

5      A    That's right, right.

6      Q    Percentage-wise of your time

7  working for Team, how much time were you at

8  injust?

9      A    Just at the end.  Well, at the

10  beginning, I was -- what happened was when

11  Team actually -- when MTN actually went on

12  the air, I believe it was Saturday morning, I

13  was called that previous Friday evening after

14  going home if I could work overtime the very

15  next day, Saturday morning, in injust.  So I

16  was -- I showed up to work at 9:00 a.m. that

17  Saturday morning, the morning that they went

18  on the air.  And I worked there -- well, I

19  was the first person to -- well, when I got

20  there, a supervisor was there who had been

21  there since 6:00 a.m.  He didn't know how to

22  do the job.  When I showed up, he left, and I

78

1    took over the position.  And from thereon, I

2    was -- I taught everybody else how to do it.

3         Q    I understand. I guess I'm just

4    looking for overall during your tenure with

5    Team, what percentage of the time would you

6    say that you were doing injust jobs?  Fifty

7    percent, twenty percent?  I'm just trying to

8    gauge that.

9         A    Not at all.  Only -- maybe 1

10   percent.

11        Q    One percent.

12        A    Yes.

13        Q    But you were the first person to do

14   it.

15        A    I was the first person, and I

16   taught the rest of them initially.

17        Q    The second bullet point says -- and

18   you're giving me an education

19   here -- "Monitor and adjust on air signals

20   using state of the art equipment such as

21   spectrum analyzers, video waveform monitors,

22   and audio/video/data analyzers."

79

1              Do you see that?

2        A    Yes.

3        Q    Did you do that?

4        A    Yes, I did.

5        Q    And going back to what you

6    described before:  Injust, robot camera, and

7    video ops, where would that fall under?

8        A    This description can be -- some of

9    those jobs can be done in video ops and

10   master control.

11       Q    Did you do that job?

12       A    Yes.

13       Q    Again, what percent of the time do

14   you think you were doing --

15       A    About 90 percent.

16       Q    About 90 percent?  Okay.  So that

17   was the major part.

18            The third one is "Monitor and

19   execute the playout of air materials

20   throughout the program day according to

21   program log."

22            Is that something that you did?

80

1       A       No, I didn't.

2       Q       Who did that?

3       A       Master control.

4       Q       But you never did that?

5       A       No.

6       Q       The fourth one down is "Document

7    quality standards, system anomalies --"

8       A       "Anomalies."

9       Q       "Operational procedures, and

10   reference materials."

11              Did you do that?

12      A       No.

13      Q       Who did that?

14      A       I don't know.

15      Q       But that was just something you

16   were asked to do?

17      A       No.

18      Q       The next one says "Record" --

19      A       Record.

20      Q       "Record, dub, cache, and verify the

21   quality of commercial, promotions,

22   interstitials, public service announcements,

81

```
 1    and program or related material in order to

 2    prepare it for broadcast on the network."

 3              Did you do that?

 4        A    It's possible.  Some of those jobs

 5    couldn't be done unless I did my job as a

 6    video operator.

 7        Q    And then the last one says "Ensure

 8    program material back-up and perform

 9    standards conversion of material as needed."

10        A    No, I didn't do that.

11        Q    Not that.  And in addition, you're

12    telling me that you also did robotic camera

13    operator?

14        A    Yes.

15        Q    Any other positions that you

16    performed?

17        A    No.

18        Q    What exactly is "intake?"

19        A    Intake is the receiving of signals

20    or -- could be fiberoptics, satellite, just

21    from another tape -- you intake information

22    that's sent to the station or the network so
```

82

1    it can be used and disseminated among whoever

2    needs it, reporters.  Editors.

3        Q    So intake is different than injust?

4        A    No, it's the same thing.

5        Q    Same thing, okay.

6        A    Yeah.  It's just various names,

7    that's all.

8        Q    Do you see down here under "Master

9    Control Technician," the last line here, it

10    says "TEAM is an Equal Opportunity Employer?"

11        A    Yeah, yes.

12        Q    And there is nothing in this job

13    description that you could not perform;

14    correct?

15        A    That's correct.  Only speaking

16    Arabic.  I couldn't do that.

17        Q    Well, it says "highly desirable,"

18    so we're going to skip that.  I thought you

19    would have put that on your résumé, so.

20            At any time, did you inform anyone

21    at Team that there was a portion of your job

22    that you could not perform or needed help

83

1    performing?

2        A    Nope.

3            MS. HUGHES:  Can we go off the

4    record?

5                (Recess)

6            BY MS. HUGHES:

7        Q    Mr. Taylor, we're back on the

8    record.  You understand you're still under

9    oath; correct?

10       A    Yes.

11       Q    I think we discussed earlier that

12   you reported to Michael Marcus; correct?

13       A    Yes.

14       Q    And he was the studio manager?

15       A    Yes.

16       Q    During your employment at Team, was

17   there anyone else to whom you reported?

18       A    Yes.  I can't recall his name.  But

19   he was the scheduler.  They scheduled us.

20   They were the people that gave us our

21   schedules and told us when we worked and when

22   we didn't.

84

1       Q      And that was in addition to

2    Mr. Marcus; correct?

3       A      Yeah.

4       Q      But there wasn't anyone else you

5    reported to in terms of substance of your job

6    or discipline?

7       A      Just Brad Simmons.

8       Q      Brad Simmons.

9       A      I never had an occasion to approach

10   him, but Mike took me to him a couple of

11   times with a complaint.  But that

12   (inaudible).

13      Q      When you say with "a complaint,"

14   with Mr. Marcus's complaint about you?

15      A      Yes.

16      Q      Do you remember what those

17   complaints were about?

18      A      He claims I was sleeping on the

19   job.

20      Q      Do you remember this happening

21   twice?

22      A      Yes.  Going to Mike -- Brad?

85

1    Q    Correct.

2    A    Yes.

3    Q    Do you recall when this was?

4    A    What you mean when it was?

5    Q    In period of time.  I'm not sure I

6    would expect you to remember a specific date,

7    but perhaps a month, or when it happened in

8    terms of relationship to other things at

9    Team.

10    A    I think it had to happen in like

11    late February or March of '04.

12    Q    So Mr. Marcus took you to meet with

13    Mr. Simons because Mr. Marcus thought you

14    were sleeping on the job?

15    A    Yes.

16    Q    What did Mr. Marcus say was the

17    reason he thought you were sleeping on the

18    job?

19    A    He said that he saw me with my eyes

20    shut and that it sounded like I was snoring.

21    Q    Do you deny that you were sleeping

22    on the job?

93

1       Q    Do you recall him saying that the

2  appearance of sleeping was as bad as sleeping

3  itself?

4       A    He didn't say that.  He didn't

5  mention that at all.  The only thing he

6  approached me about was that he thought I was

7  sleeping -- or he came in the room in master

8  control one day and I was sitting there with

9  my eyes closed, and he thought I was asleep.

10      Q    Why were your eyes closed?

11      A    Because I was -- I had 50 minutes,

12 we were only on the air for 10 minutes at a

13 time initially, and I sat -- I was ordered to

14 stay at my workstation, and I sat there for

15 50 minutes listening to a Arabic language I

16 didn't understand, so I closed my eyes and

17 just thought about things that I had to take

18 care of, domestic duties that I had to take

19 care of.  I wasn't asleep; I was just

20 thinking.  And he says that I was asleep.

21          Now, I understand this to be about

22 this appearance crap that's in the manual.

94

1    The professional appearance.   Nobody -- if

2    they -- well, I ain't going -- just go on,

3    you ask the questions.

4        Q    When you had this meeting with

5    Mr. Marcus about this discipline, did you say

6    anything to him about having any problems

7    with being tired or being exhausted?

8        A    Did I ask him what?   Say it again.

9        Q    When you were presented with this

10   written warning, did you say anything to

11   Mr. Marcus that you were particularly tired

12   or having problems with fatigue or

13   exhaustion?

14       A    No, I didn't.

15       Q    Did you mention anything at about

16   your physical health?

17       A    No, I didn't.

18       Q    Did Mr. Marcus ask you if you were

19   having any problems with tiredness, fatigue,

20   or any physical problems?

21       A    Yes.

22       Q    What did you say to him?

95

1      A    I told him no, I didn't.  He

2  accused me -- he asked me did I have sleep

3  apnea, and I told him no.

4      Q    So he actually used the term "sleep

5  apnea"?

6      A    Yes.

7      Q    Had you ever heard that term

8  before?

9      A    Yes.

10      Q    In what context had you heard that

11  term?

12      A    What you mean?  I knew what it was.

13      Q    You knew what it was.

14      A    Yeah.

15      Q    At that point, had you ever been

16  diagnosed with sleep apnea?

17      A    No, I hadn't.

18      Q    So Mr. Marcus thought that you had

19  sleep apnea, and you said that you did not?

20      A    Right.

21      Q    And you denied any other physical

22  problems.

96

1    A    Right.

2    Q    Do you recall a time at the

3  beginning of March, approximately March 1,

4  where you were spoken to because you got to

5  the master control room at 11:56 when the

6  broadcast was supposed to begin at noon?

7    A    That happened several times.

8    Q    Was it always Michael Marcus that

9  spoke to you?

10    A    Yes.

11    Q    Is correct that you never received

12  any sort of formal written warning the way

13  you did for this alleged sleeping --

14    A    That's correct.

15    Q    I think you spoke earlier about how

16  you were "forced to take sick leave."

17         Is that correct?

18    A    Uh-huh.

19    Q    Can you explain to me when that

20  happened and how that came about?

21    A    I notified Mike Marcus I had made a

22  doctor's appointment to see whether or not I

97

1    had sleep apnea.

2        Q    Why?  Were you having problems with

3    being tired?

4        A    No.

5        Q    So was it because Mr. Marcus

6    suggested that you might have it?

7        A    Yes.

8        Q    So based on Mr. Marcus's suggestion

9    at your March 15 or so meeting about the

10   alleged sleep apnea --

11       A    No, it wasn't.  The March 15

12   meeting had nothing to do with me making a

13   doctor's appointment.  On my own, I decided

14   to see whether or not I had sleep apnea, and

15   I made a doctor's appointment and notified

16   Mike Marcus.  He immediately ordered me to

17   stay off from work and use up my leave until

18   I had an appointment.

19       Q    You said on your own, you decided

20   to see the doctor.

21       A    Yes.

22       Q    Were you having any symptoms?

98

1       A       No, I was not.

2       Q       So if there were no symptoms, what

3   made you decide to go see the doctor?

4       A       Just his accusations.

5       Q       And at that time, were you under

6   the care of an internist or any kind of

7   general practitioner?

8       A       No, I was not.  Not for anything

9   like that.

10      Q       Before you went to see anyone for

11  any sort of sleep apnea, did you have a

12  regular general practitioner, internal

13  medicine doctor?

14      A       No.

15      Q       So you made an appointment with the

16  doctor because of this accusation of the

17  sleep apnea; correct?

18      A       I made an appointment because I

19  wanted to find out.

20      Q       Okay, you wanted to find out.  What

21  doctor did you make an appointment with?

22      A       Dr. Zonozi.

107

```
 1    as Taylor 11.

 2                    (Deposition Exhibit No. 11 was

 3                    marked for identification.)

 4            BY MS. HUGHES:

 5        Q    Take a moment to review this and

 6    let me know when you've completed your

 7    review.

 8        A    I have.  Okay.

 9        Q    Do you recognize this document?

10        A    Yes.

11        Q    Is this the doctor's note that you

12    provided to Team when you returned from your

13    sick leave?

14        A    Yes.

15        Q    And I believe it says -- doctors

16    not having the best handwriting -- "To whom

17    it May Concern, Mr. Taylor is suffering from

18    sleep apnea disorder and will need sleep

19    studies."

20            Is that correct?

21        A    Yes.

22        Q    Did Dr. Zonozi put you on any
```

108

1    medication at this time?

2         A    No, he didn't.

3         Q    Did he restrict your activities at

4    all?

5         A    No, he didn't.

6         Q    So as far as you and Dr. Zonozi

7    were concerned, you could return to work

8    fully able to do your job without any

9    restrictions?

10        A    He did not say that, no.

11        Q    Did Dr. Zonozi have any

12   restrictions for you for work?

13        A    At that time, no, he didn't.  He

14   was more concerned with -- no, he didn't.

15        Q    So no restrictions.

16        A    No.

17        Q    Did you understand yourself to have

18   any restrictions or limitations from work?

19        A    No, I didn't.

20        Q    So when you returned, did you tell

21   Team that you were able to, again, resume all

22   of your job duties and responsibilities?

109

```
 1        A    No, I didn't.  I didn't tell them

 2    that.

 3        Q    You didn't tell them that.  All

 4    right.  Did they ask if you had any

 5    restrictions when you returned?

 6        A    No, they didn't.

 7        Q    And you did not volunteer any?

 8        A    I didn't have any.

 9        Q    Didn't have any.  So --

10        A    I didn't know what -- I could --

11        Q    So basically, when you returned, it

12    was your understanding that you could go back

13    to your master control position the same as

14    before?

15        A    As far as I was concerned, yes.

16        Q    Is this the only doctor's note that

17    you provided to Team?

18        A    Yes.  Initially, yes.

19        Q    Was there a later time that you

20    provided more information to them?

21        A    No, because I was fired before I

22    had the opportunity.
```

110

1    Q    And it says "need sleep studies."

2    Did you have those "sleep studies?"

3    A    Yes.

4    Q    Did they occur before or after your

5    termination?

6    A    After.

7    Q    Am I correct that after you

8    returned to work, you were assigned to intake

9    or injust?

10    A    Yes.

11    Q    Is that correct?  All right.  And

12    that's in a different physical location than

13    the master control room; correct?

14    A    Yes.

15    Q    Is that room also dark?

16    A    Not as dark, no.

17    Q    Is it as quiet as the master

18    control room?

19    A    No, it's not.  The master control

20    wasn't quiet because all the unnecessary

21    traffic flowing through.

22    Q    Was intake --

111

1        A      Same conditions.

2        Q      Same conditions.  So it was just as

3    loud?

4        A      Yeah.  And unnecessary traffic

5    rolling in and out.

6        Q      Did you ever suggest to anyone at

7    Team that it would be better if you worked in

8    a room that was less dark?

9        A      At intake?

10       Q      No.  At any time at Team, did you

11   say "I think it would be better if I worked

12   in a room that was less dark"?

13       A      No.

14       Q      Did anyone at Team suggest it would

15   be better for you if you worked in a room

16   that was less dark?

17       A      No.

18       Q      I know that you sort of disagreed

19   with how Team classifies master control, but

20   in Team's scheme of things, was injust/intake

21   part of master control?

22       A      I don't think they considered it,

114

1    you said they considered everyone master

2    control.

3        A    Yeah.  I didn't see what they

4    consider a job description for injust.  Or a

5    camera operator.  I never saw those job

6    descriptions.

7        Q    You said the first day you reported

8    to work, they had you do injust, though;

9    correct?

10        A    The first day we went on the air in

11    February.

12        Q    In February.

13        A    That wasn't the first day I

14    reported for work.  The first few days

15    we -- the first couple of months we reported

16    for work, we did absolutely nothing but sit

17    in a room every day for eight hours.  Did

18    absolutely nothing.

19        Q    Other than the first couple of days

20    when you went on the air, until they moved

21    you to intake when you came back, did you do

22    intake/injust at all?

115

1      A    When we went on the air, I was

2   initially in intake.  Intake was the first

3   thing that went -- and it came about.  Intake

4   was first because intake had to receive

5   something for everybody else to do.

6      Q    Exactly.  Okay.

7      A    So -- and I was the second person

8   to do the job, but the first person didn't

9   know what he was doing.  In fact, he didn't

10  do any of the job the first couple of

11  hours (?) when I -- before I got there.

12     Q    But other than that day, did you

13  work in injust again until you came back from

14  your sick leave?

15     A    Repeat the question again.

16     Q    You did that the first day they

17  went on the air.

18     A    That was in February.

19     Q    February.  And then you were placed

20  in intake when you came back from your sick

21  leave; correct?

22     A    That was back in May.

118

1    period of sick leave and you saw the

2    doctor, was it Mr. Marcus to whom you handed

3    the note that has been marked as Taylor 11?

4         A    Yes.

5         Q    Did he ask you anything further

6    about your medical condition or your health?

7         A    No.   He -- what he -- we discussed

8    what I was going -- what was going to happen.

9    I told him that I had to be treated for it,

10   and that was about it.

11        Q    Did you discuss what the specifics

12   of the treatment were to him?

13        A    No, I didn't.   No.

14        Q    No.   And he didn't ask you?

15        A    No.

16        Q    Whatever the treatment was at that

17   time, it didn't limit you in doing your work?

18        A    Again?

19        Q    So even without the treatment, you

20   could come back and do your job?

21        A    Yes.   I was doing my job before I

22   went to the doctor.   They didn't -- let me

119

1    say that nobody at Team had any problems with

2    me performing my job.

3         Q    Other than what they perceived to

4    be your sleeping on the job.

5         A    Right.

6         Q    After you handed Michael the note

7    and came back to work, was there a time that

8    you had another conversation with Mr. Marcus

9    in which he told you that sleeping on the

10   job, or perceived sleeping on the job,

11   continued to be a problem for you?

12        A    No, no.

13        Q    Not until the termination?

14        A    Yeah, I didn't -- we didn't hardly

15   speak at all that following week.  Because I

16   was too busy in intake or in injust, and we

17   just didn't have a opportunity to speak.

18        Q    So the next time you really spoke

19   with Mr. Marcus about this problem --

20        A    Was the day he fired me.

21        Q    Do you remember a man named Vernon?

22        A    Yes.

131

1    correct?

2        A    Yeah.

3        Q    And yours is apparently a reason

4    that you still have the sleep apnea?

5        A    You're going to always have sleep

6    apnea.

7        Q    Yes.  But you can also recover from

8    it if you have certain reasons --

9        A    And I have, yes.  I've been treated

10   for my sleep apnea and I no longer am

11   impaired by it.

12       Q    No longer?  Okay.

13       A    I'll say that.

14            MS. HUGHES:  If you could mark this

15   as Taylor 12.

16                (Deposition Exhibit No. 12 was

17                marked for identification.)

18            BY MS. HUGHES:

19       Q    Take a moment to review that

20   document, and let me know when you've

21   completed your review.

22       A    Okay.

132

1     Q     Do you recognize this document?

2     A     No, I don't.

3     Q     If you'll see at the top, it says

4     patient name, Wenzell Taylor.

5     A     Uh-huh, yes.

6     Q     And it was at the Sleep Disorders

7     Institute of Providence Hospital.

8     A     Okay.

9     Q     Do you remember going to the Sleep

10    Disorders Institute of Providence Hospital on

11    or about June 8, 2004?

12    A     Yes.

13    Q     Was it Dr. Zonozi that referred you

14    to the Sleep Disorders Institute?

15    A     Yes, it was.

16    Q     I'm going to represent to you that,

17    to my knowledge, these were records provided

18    by Dr. Zonozi pursuant to our subpoena, and

19    that you had also signed a release of medical

20    records.  So to my understanding, these are

21    copies of your medical records.

22    A     And Dr. Zonozi sent them to you?

133

1    Q    Correct.

2    A    You didn't get them straight from

3    Providence?

4    Q    No.

5    A    Okay.

6    Q    This study was done after your

7    termination of employment from Team; correct?

8    A    Yes.

9    Q    Do you see in the section that says

10    "HISTORY OF PRESENT ILLNESS," about a third

11    of the way down, it says "In addition, he is

12    having daytime fatigue and sleepiness."

13    A    Mm-hmm.  Yes, I do.

14    Q    Do you remember reporting that to

15    Dr. Shibli?

16    A    Yes, I do believe.

17    Q    Did you ever report to anyone at

18    Team that you were having "daytime fatigue

19    and sleepiness?"

20    A    No, I didn't.

21    Q    Do you see further down, it says

22    "The patient describes that he occasionally

134

1    feels drowsy there and he might have fallen

2    asleep a few times during work?"

3        A    Yes.

4        Q    "He thinks that he might have lost

5    his job due to that."

6            Do you see that?

7        A    Yes.

8        Q    Do you remember reporting all of

9    that to Dr. Shibli?

10       A    No, I did not say that to

11   Dr. Shibli.

12       Q    Do you know where Dr. Shibli would

13   have gotten such information?

14       A    He could have assumed that, but I

15   did not tell him that.

16       Q    Did you ever tell him that you

17   occasionally felt drowsy at work and that you

18   might have fallen asleep a few times there?

19       A    Yes.

20       Q    At this time on June 8, did

21   Dr. Shibli perform any tests other than doing

22   a physical examination of you?

135

1    A    At the time this was done?  This --

2    Q    Yes.  On June 8.

3    A    I don't think so, no.

4    Q    Did he say to you that he agreed

5    with Dr. Zonozi's diagnosis of sleep apnea?

6    A    Yes, he did.

7    Q    Did he offer any other diagnoses?

8    A    Yes, he did.

9    Q    What other diagnoses --

10   A    Was -- I had to come to the

11   hospital to be examined for it.

12   Q    At this time, did Dr. Shibli place

13   you on any medications or other treatment?

14   A    No, he didn't.

15   Q    Did he put you on any restrictions

16   or limitations?

17   A    No, he didn't.

18   Q    Do you remember anything else about

19   this visit with Dr. Shibli?

20   A    Like what?

21   Q    Were there any recommendations

22   about what to do to avoid problems with sleep

139

1   Dr. Shibli?

2        A    No, it was like a week or so.

3        Q    You'll notice that on the Sleep

4   Disorders Institute exhibit that's marked as

5   Taylor 12, the date of admission is June 8,

6   2004.

7             Do you see that?

8        A    Yes.

9        Q    And the date of this study on

10  Taylor 13 is June 9, 2004.

11       A    Okay.

12       Q    Do you have any reason to think

13  that the dates on these medical records are

14  incorrect?

15       A    It could be.  I don't know.  But it

16  wasn't -- the day that I saw Dr. Shibli -- I

17  don't remember the day after seeing

18  Dr. Shibli, that I started this treatment.  I

19  don't remember doing that.  I think it was a

20  couple of days later, or like a week later or

21  something.  Because they had to schedule me

22  in.

142

1    treatment; correct?

2        A    I guess.  I don't know.  I don't

3    know what they got out of it.

4        Q    Is the CPAP treatment -- it's a

5    physical mask that you wear while sleeping,

6    correct, that's hooked up to a machine?

7        A    Yes.

8        Q    Do you have one of those at home?

9        A    Yes, I do.

10        Q    Do you use it to sleep every night?

11        A    Yes.

12        Q    And that resolves the symptoms of

13    your sleep apnea?

14        A    Yes.

15        Q    And you still have that?

16        A    Yes.

17        Q    Did you get that machine shortly

18    after having this consultation with

19    Dr. Shibli in the sleep test?

20        A    I got it after my treatment at the

21    hospital.

22        Q    When was the last time you saw any

143

1    physician or healthcare provider about

2    continuing your CPAP treatment or about your

3    sleep apnea?

4         A    Well, this was the last.  This --

5         Q    So basically, you were having this

6    issue --

7         A    I was being treated.

8         Q    Treated.

9         A    And abruptly, we discovered Team

10   had cut the insurance benefits off.  Prior.

11   Like I say, I contacted Tracey on the 31st of

12   May, she told me I had 30 days left; then we

13   discovered in the middle of being treated

14   that Team had terminated my health benefits.

15   That's why I no longer saw anybody.

16        Q    But you do have the CPAP machine,

17   and it's your testimony here that it's

18   keeping your sleep apnea symptoms in check;

19   correct?

20        A    Yes.  Yes.

21        Q    So you're now covered under, I

22   think you said earlier, like a public

144

1    program?

2         A    Yes.

3         Q    Have you had to seek out any

4    continuing treatment or advice about your

5    sleep apnea?

6         A    No.

7         Q    So this treatment is working for

8    you and you haven't seen any need to rock the

9    boat; is that correct?

10        A    Right.

11        Q    Did you report to the neurosurgeon

12   that you use the CPAP machine or that you

13   have sleep apnea?

14        A    Yes.

15        Q    Did he make any comment about that?

16        A    No, he wasn't interested.  That had

17   nothing to do with the sciatica.

18        Q    So it wasn't issue.  All right.

19   And the CPAP machine is the only treatment

20   you've had for the sleep apnea; correct?

21        A    Yes.

22        Q    No medications?

145

1      A    No.

2      Q    No physical therapy?

3      A    No.

4      Q    Nothing else?

5      A    (No audible response)

6      Q    Are you limited in any way by your

7  sleep apnea?

8      A    No.

9      Q    So it doesn't affect any of your

10  daily activities?

11     A    No.

12     Q    Any of your night activities?

13     A    Nope.

14     Q    Ability to work?

15     A    Nope.

16     Q    And we've covered that you just saw

17  Dr. Zonozi and Dr. Shibli.

18          Sitting here today, to your

19  knowledge, did either Dr. Zonozi, Dr. Shibli,

20  or Providence Hospital claim that you owe

21  them any money?

22     A    Yes.

159

1    over the last few years, have you had any

2    treatment for any mental impairment or

3    stress?

4         A    No, I haven't.

5         Q    Let's return to your complaint,

6    which I believe we've marked as Taylor 3.

7         A    Uh-huh.  Yes.

8         Q    Is it correct that your prior

9    counsel drafted this document?

10        A    As far as I know, yes.

11        Q    And you did not draft it?

12        A    No.

13        Q    Do you see in number 4, it says

14   "Plaintiff suffers from sleep apnea, a

15   chronic medical condition that substantially

16   limits one or more major life activities,

17   including the ability to sleep and stay

18   awake"?

19        A    Yes.

20        Q    Am I correct that with the CPAP

21   treatment, that you are able to sleep and

22   stay awake properly?