# Defendant Team Broadcast, LLC - Motion for Summary Judgment

# Exhibit D – Status Conference Transcript

Civil Action No. 05-2169 (RCL)

```
                                                                    1

 1                  UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3   WENZEL TAYLOR,                   :
                                      :
 4              Plaintiff,            :  Civil Action No. 05-2169
                                      :
 5       v.                           :
                                      :  Washington, D.C.
 6   TEAM, BROADCAST, L.L.C.,    ,    :  Wednesday, November 15, 2006
                                      :  10:00 a.m.
 7              Defendant.            :
                                      :
 8   - - - - - - - - - - - - - - - - -x

 9
                     TRANSCRIPT OF STATUS HEARING
10              BEFORE THE HONORABLE ROYCE C. LAMBERTH
                    UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the Plaintiff:     WENZEL TAYLOR, PLAINTIFF
                            Pro se
14

15   For the Defendant:     JESSICA R. HUGHES, ESQUIRE
                            SEYFARTH SHAW, L.L.P.
16                          815 Connecticut Avenue, N.W.
                            Suite 500
17                          Washington, D.C.  20006-4004
                            (202)  463-2400
18

     Court Reporter:        Theresa M. Sorensen, CVR-CM
19                          Official Court Reporter
                            U.S. Courthouse, Room 4800-H
20                          333 Constitution Avenue, N.W.
                            Washington, D.C.  20001
21                          (202)  273-0745

22


23
                       Pages 1 through 12
24

25
```

P R O C E E D I N G S

THE DEPUTY CLERK: Civil Action 05-2169, Wenzel Taylor versus Team Broadcast, L.L.C. Mr. Taylor representing himself, pro se, Ms. Hughes for the defendant.

THE COURT: Where does the defendant is stand in terms of your discovery?

MS. HUGHES: Good morning, Your Honor, Jessica Hughes for Defendant Team Broadcast. I believe that we are ready to proceed with our motion for summary judgment. I anticipate filing that before the end of the year.

THE COURT: Give me a date.

MS. HUGHES: How about December 18th because that's the last day I'm working this year.

THE COURT: Okay. And absent the summary judgment, you've got all of the discovery you need to set it for trial then?

MS. HUGHES: I think so. We might have to do an additional subpoena to one of Mr. Taylor's doctors, but I think that we have the information that we need.

THE COURT: Okay. Are you seeking any additional discovery, Mr. Taylor, yourself for your case?

MR. TAYLOR: Your Honor, I'm not sure because I'm -- I don't understand the practice of law, so I really couldn't tell you at this moment.

THE COURT: Well, tell me about your case and what

```
 1   you think you're going to try to prove.
 2           MR. TAYLOR:  I want to prove that I was illegally
 3   fired from my job.  The defendant has already admitted to
 4   illegally firing me.
 5           THE COURT:  What was illegal about it?
 6           MR. TAYLOR:  I was fired from my job because I
 7   brought a note from the doctor stating that I had sleep
 8   apnea.
 9           THE COURT:  I'm sorry?
10           MR. TAYLOR:  I said I was fired from my job after
11   bringing a note back from the doctor stating that I had sleep
12   apnea and would be treated for it.  There was no other reason
13   to fire me.
14           THE COURT:  All right.  And you were not an at-will
15   employee?
16           MR. TAYLOR:  I'm sorry, I didn't hear you.
17           THE COURT:  You were not an at-will employee?
18           MR. TAYLOR:  Yes, I was.
19           THE COURT:  You were?
20           MR. TAYLOR:  Yes.
21           THE COURT:  Then why can't they fire you?
22           MR. TAYLOR:  I was fired because I have a
23   disability.
24           THE COURT:  Okay.
25           MR. TAYLOR:  Because he perceived I had a disability
```

4

1   and he admitted to that.
2           THE COURT:  Anyone present when it was admitted?
3           MR. TAYLOR:  Yes.
4           THE COURT:  Who?
5           MR. TAYLOR:  My former attorney, an associate of my
6   former attorney, Ms. Hughes' predecessor, and my supervisor,
7   mediator, and the owner of the company.
8           THE COURT:  Okay.  All right, let me talk to
9   Ms. Hughes a little more.
10          What is the defendant's position regarding that?
11          MS. HUGHES:  Your Honor, I was not the first
12  associate in the case, but my understanding of what
13  Mr. Taylor is saying, what he said in his deposition, that
14  this alleged admission by his former supervisor occurred in
15  the context of an EEOC mediation.  And even if it occurred,
16  and we dispute that that occurred, it certainly would not be
17  admissible either in summary judgment or at trial.
18          Our view is that Mr. Taylor was fired for repeatedly
19  sleeping on the job, or the belief that the company had that
20  he was sleeping on the job, and that he's not disabled.
21          THE COURT:  What was his job?
22          MS. HUGHES:  What?
23          THE COURT:  What was his job?
24          MS. HUGHES:  He was a master control operator,
25  essentially did a lot of things in the cameraman running and

1    videoing just for a contractor that provides programming for
2    the Middle East television network.
3             THE COURT:  Did he bring to his employer a diagnosis
4    of sleep apnea?
5             MS. HUGHES:  He did bring a doctor's note written on
6    one those prescription type pads that said he had sleep apnea
7    and needed further studies.  There were no restrictions on
8    his ability to perform work, and we didn't perceive there to
9    be any.  And, in fact, through discovery and Mr. Taylor's
10   deposition it's quite clear that he was not limited in any
11   way in his capacity to perform the essential function of the
12   job, and that he violated the company's policy about sleeping
13   on the job or having an unprofessional appearance if he
14   appeared to be sleeping on the job.
15            THE COURT:  All right, so you're going to raise all
16   of that in a summary judgment motion --
17            MS. HUGHES:  Correct.
18            THE COURT:  -- saying that you properly discharged
19   him?  He was an at-will employee?
20            MS. HUGHES:  He was an at-will employee.
21            THE COURT:  So the only question then is whether it
22   violates the Disability Act?
23            MS. HUGHES:  Exactly, and our view is that he was
24   neither disabled nor perceived to be disabled, and that
25   the -- there was a legitimate, non-protectional reason for

6

1  terminating his employment, which was the sleeping on the job
2  and/or the violation of the professional appearance because
3  Mr. Taylor did admit there were times with when he did have
4  his eyes closed. He disputes that it was sleeping, but did
5  say how he could see how a supervisor could perceived that as
6  being sleeping because his eyes were closed.
7           THE COURT: All right.
8           Mr. Taylor, tell me a little more about what your
9  medical evidence would be about whether you were disabled.
10          MR. TAYLOR: Everything she says is not true. My
11 supervisor had been accusing me of having sleep apnea for at
12 least six weeks or so prior to me going to the doctor. I
13 took it upon myself to go to the doctor -- he didn't even
14 know I was going -- and got diagnosed, and the doctor did
15 diagnose me with sleep apnea, and he said that I would have
16 to attend a sleep apnea clinic and be treated for it, and
17 which I did. Which now, after I got back, sure, I was not --
18 I was not in a position or I could say in a condition where I
19 couldn't do my job, which I never was. I did my job expertly
20 the entire time I worked there. I was complimented daily
21 during my work. It's just that my supervisor accused me of
22 having it. And I had to go see on my own, and that's what I
23 did. Two doctors diagnosed me with it.
24          THE COURT: Do you have copies of those?
25          MR. TAYLOR: Yes, I do.

7

1       THE COURT:  Do you have them here?

2       MR. TAYLOR:  Yes, I do.

3  **(Brief pause in proceedings.)**

4       THE COURT:  What was the date of termination.

5       MR. TAYLOR:  May 28th, 2004.  The one that has the
6  prescription, it has the May 5th on it.

7       THE COURT:  Right.

8       MR. TAYLOR:  I did not give it to him until
9  May 21st.  I didn't receive it until May 19th.

10      THE COURT:  After you were terminated is when you
11 did this Providence Hospital study?

12      MR. TAYLOR:  Yes, sir.  I was terminated the 28th.
13 I contacted Human Resources on the 31st, which was the
14 following Monday, to find out whether or not I still had
15 health benefits.  I was told yes, and so I continued on and
16 got treated.  In July bills started coming, and so I
17 contacted Human Resources again, and then they tell me, no,
18 your benefits were cut off on the 28th when you were
19 terminated.  It was after the fact.

20      THE COURT:  Now, what happened with your first
21 attorney?

22      MR. TAYLOR:  I didn't understand.

23      THE COURT:  What happened with your first attorney?

24      MR. TAYLOR:  Alan Lesch, he and I had a dis-
25 agreement.  We -- several times he had me come down to his

1  office on appointments. This last time was to go over the
2  discovery questions. I remember for a fact twice I came down
3  to his office -- now, I'm unemployed, and I was having a hard
4  time getting to his office -- I used to get rides -- and I
5  got down there and he would get on the phone and start
6  talking personal business to his friends for 40, 50 minutes
7  at a time, and I'm just sitting there in the office watching
8  him. So I brought this to his attention the last time I came
9  down to do discovery, and he got mad at me. He told me, "I
10 don't do that. I've never done that."
11         I said, "Well, you've done it twice, and you also
12 don't get the facts right when you write the briefs up," or
13 whatever it is I need to sign and have notarized.
14         He Said, "Well, if you're not satisfied with the way
15 I'm handling the case, we'll terminate the agreement." He
16 said this like three or four times, so I got the indication
17 he wanted out and so I agreed to it.
18         THE COURT: I take it the defendants never had a
19 doctor examine you?
20         MR. TAYLOR: No, sir.
21         THE COURT: And, Ms. Hughes, is there some medical
22 evidence you're going to use with your summary judgment?
23 What are you going to --
24         MS. HUGHES: I don't think there's any dispute that
25 Mr. Taylor has received a diagnosis of sleep apnea. I do

1   think that under the ADA, though, that that only satisfies
2   the physical impairment, and he then has to prove by a
3   preponderance of the evidence that he's substantially limited
4   in a major life activity. And I think that Mr. Taylor's own
5   testimony in his deposition, as well as the rest of the
6   medical documentation, shows that certainly even before
7   treatment and certainly after treatment that he's not
8   substantially limited in a major life activity so that he
9   does not satisfy the criteria for a qualified individual
10  under the ADA. And, alternatively, argue that if he does,
11  that he couldn't meet an essential function of the job, that
12  is, staying awake on the job. So I don't think this is going
13  to be any sort of dueling medical type analysis, a very
14  straightforward analysis under the ADA.
15          MR. TAYLOR: Your Honor, I've contacted
16  approximately 200 attorneys since I've terminated my
17  agreement with Mr. Lesch. Each one of them -- and I've also
18  contacted the Justice Department and several other doctors,
19  and they all find that sleep apnea is a life altering
20  condition.
21          The circumstances on my job, I used to work from
22  9:00 in the morning to midnight at least three or four times
23  a week, and then I had a two-hour commute home, and to get
24  there in the morning, through traffic around the beltway at
25  the clover -- Springfield. That's exhausting. I was

10

1   exhausted when I got to work in the morning.  So it is a life
2   altering condition.  You're going to fall asleep.  I'm
3   sitting in a dark room listening to an Arabic language I
4   don't know, I don't understand.  I'm sitting there for 50
5   minutes at a time doing absolutely nothing.  You're going to
6   fall asleep, and that's what happened.
7           THE COURT:  Okay.  Well, I guess the next step is,
8   I'll look at their summary judgment motion.
9           You're going to attach his deposition?
10          MS. HUGHES:  Yes, your Honor.  Also, we -- I
11  provided him -- when we did the deposition, we paid for a
12  copy, so he also has a full copy of his deposition.
13          THE COURT:  Okay.
14          MS. HUGHES:  I know normally in this court it's 14
15  days to respond to a summary judgment motion, and if it's
16  amenable to you, we're more than happy to give Mr. Taylor
17  additional time because I know he is proceeding pro se, but I
18  would like to set a date certain so that we would know when
19  our reply brief is going to be due.
20          THE COURT:  Well, I think, Mr. Taylor, if you --
21  you'll have to respond in writing to her summary judgment
22  motion by January 18th.  That will give you 30 days.
23          MR. TAYLOR:  What is it?
24          THE COURT:  I'm sorry?
25          MR. TAYLOR:  What is it?

```
                                                          11

 1              THE COURT:  Thursday, January --
 2              MR. TAYLOR:  No, what is it?
 3              THE COURT:  She is going to file a motion supported
 4    by documents saying that there is no way that you can make
 5    the case; it shouldn't be allowed to go to a jury; that you
 6    weren't disabled, and the disability did not, what she just
 7    said, threaten a major life activity.  I'll look at the facts
 8    that they allege and any facts that you allege in response,
 9    and I'll figure out whether the law would allow this to go to
10    a jury or not.  But the main thing you need to do -- I'll
11    worry about the law, but the main thing you need to do is set
12    forth all of the facts in your response to her motion, and do
13    that in writing by January 18th.
14              MR. TAYLOR:  Okay.
15              THE COURT:  I'll ask that the reply be filed by
16    January 29th, and then what I would like to do is go ahead
17    and set a hearing time, January 31st at 4:30, so that I get
18    you back to argue and I can question you about any facts that
19    there are in connection with that motion.  Does that work for
20    you?
21              MR. TAYLOR:  Yes, sir.
22              THE COURT:  Okay.
23              MS. HUGHES:  That works for me as well, your Honor.
24              THE COURT:  Okay.  Let me hand you these back so
25    you -- you need to attach these to what you file on
```

1   January 18th, and I'll see you all back January 31st at 4:30.

2       MR. TAYLOR:  All right.

3       THE COURT:  Thank you very much.

4       MS. HUGHES:  Thank you, your Honor.

5       MR. TAYLOR:  I have a problem with my mail, so I --

6   I just got notified of this yesterday because he called me.

7       THE COURT:  Okay.  Did you check with him what the

8   address is we have on the --

9       MR. TAYLOR:  It's the right address.

10      THE COURT:  Okay.

11      MR. TAYLOR:  We verified it.

12      THE COURT:  Okay.  Thank you, Mr. Taylor.

13      Thank you, Ms. Hughes.

14  **(Whereupon, the proceedings in the above-entitled matter**

15  **were concluded at 10:14 a.m.)**

16

17

18                  **CERTIFICATE OF REPORTER**

19      I certify that the foregoing is a correct transcript

20  from the record of proceedings in the above-entitled matter.

21

22                  _/s/ Theresa M. Sorensen_

23                  Theresa M. Sorensen, CVR-CM

24                  Official Court Reporter

25