UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

----------------------x
WENZELL O. TAYLOR,    :
                      :
        Plaintiff, :
                      :
        v.        : No. 05-2169-RCL
                      :
TEAM BROADCAST, LLC,  :
                      :
        Defendant. :
----------------------x


Washington, D.C.

Thursday, October 12, 2006

Deposition of

    WENZELL O. TAYLOR

Plaintiff, called for examination by counsel for

Defendant pursuant to notice and agreement of

counsel, beginning at approximately 9:41 a.m. at the

law offices of Seyfarth Shaw, LLP, 815 Connecticut

Avenue, NW, Washington, D.C., before Christine Allen

of Beta Court Reporting, notary public in and for

the District of Columbia, when were present on

behalf of the respective parties:

2

1   APPEARANCES:

2     On behalf of Plaintiff:

3       WENZELL O. TAYLOR Pro Se
         2306 Ainger Place, SE
4        Washington, D.C.  20020
         (202) 889-2989
5
      On behalf of Defendant:
6
         JESSICA R. HUGHES, ESQUIRE
7        Seyfarth Shaw, LLP
         815 Connecticut Avenue, NW, Suite 500
8        Washington, D.C.  20006-4004
         (202) 463-2400
9

10              C O N T E N T S

11   EXAMINATION BY:                PAGE

12     Counsel for Defendant        4

13   DEPOSITION EXHIBITS:

14   No.  1 - Notice of Deposition        5

15    No.  2 - Plaintiff's Response to          12
            Defendant's Interrogatories
16
      No.  3 - Complaint                        12
17
      No.  4 - Taylor Résumé                    28
18
      No.  5 - December 5, 2003,                37
19          Application for Employment

20    No.  6 - December 10, 2003, Letter,       47
            Simons to Taylor
21
      No.  7 - Asgard Employee Manual           54
22

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

3

1    DEPOSITION EXHIBITS (CONT'D):          PAGE

2    No.  8 - January 5, 2004,                 54
            Acknowledgement
3
      No.  9 - Master Control Technician        74
4          Job Description

5    No. 10 - March 15, 2004, Letter,          89
            Marcus to Taylor
6
      No. 11 - May 5, 2004,                    107

7      Dr. Zonozi Note

8    No. 12 - June 2004, History and        131
           Physical Examination
9
       No. 13 - Sleep Test Results          138
10
       No. 14 - July 5, 2005, Letter,       175
11         Clarke to Taylor

12

13                    *  *  *  *  *

14

15

16

17

18

19

20

21

22


                BETA COURT REPORTING
                 www.betareporting.com
           202-464-2400              800-522-2382

1        P R O C E E D I N G S

2    Whereupon,

3            WENZELL O. TAYLOR

4    was called as a witness and, having been first duly

5    sworn, was examined and testified as follows:

6            EXAMINATION BY COUNSEL FOR DEFENDANT

7            BY MS. HUGHES:

8        Q    Mr. Taylor, we were introduced

9    informally before we were on the record, but

10    could you please state and spell your full

11    name for the record?

12        A    Wenzell Taylor.  W-e-n-z-e-l-l.

13    Last name is T-a-y-l-o-r.

14        Q    My name is Jessica Hughes.  I'm an

15    attorney with Seyfarth Shaw, and I'm a

16    lawyer, and part of the law firm that's been

17    represented to defend Team Broadcast in the

18    lawsuit that you have brought against them.

19    The other person in the room today is the

20    court reporter.

21        Am I correct that you're currently

22    not represented by an attorney?


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382



5


1     A    That's correct.

2     Q    And just to be clear on the record,

3    if that should change, if you should become

4    represented by an attorney, I can no longer

5    contact you directly except in an instance

6    like this deposition, and I would ask that

7    you have any such attorney contact me as soon

8    as possible.

9        Do you understand?

10    A    Yes, I do.

11        MS. HUGHES:  If you could mark this

12    as Defendant's Exhibit No. 1.

13            (Deposition Exhibit No. 1 was

14          marked for identification.)

15          BY MS. HUGHES:

16     Q    Mr. Taylor, please take a moment to

17    review this document, and let me know when

18    you've completed your review.

19     A    Mm-hmm.  Okay.

20     Q    Do you recognize this document?

21     A    Yes, I do.

22     Q    Is it a copy of the Notice of


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


6


1    Deposition that I sent to you for your

2    deposition today?

3     A    It appears to be.

4     Q    Just so you know, periodically

5    through your deposition, I'm going to be

6    showing you several documents that have been

7    marked as exhibits.

8        A    Mm-hmm.

9        Q    This is just the first.  So you

10   understand that we requested your deposition

11   pursuant to the court's rules and

12   regulations.

13       A    Mm-hmm.

14           REPORTER:  Is that a yes?

15           THE WITNESS:  Yes.

16           BY MS. HUGHES:

17       Q    Have you ever been deposed before?

18       A    Do what?

19       Q    Have you ever been deposed before?

20       A    What do you mean by that?

21       Q    Have you ever been in a proceeding

22   like this before where an attorney is asking

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

7

1    you questions and --

2        A    Oh, yes, I have.

3        Q    I'll get more details about that

4    before -- when was the last time you were

5    deposed?

6        A    It's got to be about 20 years ago.

7        Q    Given that it's been such a long

8    time, and just to make sure we're clear on

9    the record, I'm going to go over some of the

10    ground rules.

11        A    Mm-hmm.

12        Q    The purpose of your deposition is

13    to give me an opportunity to ask you

14    questions to learn information that you have

15    or aware of regarding the allegations in your

16    complaint against Team Broadcast.

17            Do you understand that?

18        A    Say that again.

19        Q    All right.  The purpose of your

20    deposition is to give me an opportunity to

21    ask you questions to learn information that

22    you have, or information that you are aware

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

8

1    of, regarding the allegations in your

2    complaint against Team Broadcast.

3        A    Okay.

4        Q    Do you understand that?

5        A    Yes.

6        Q    Your testimony today is under oath

7    and constitutes evidence in this case, which

8    means it can be introduced at trial or cited

9    in motions filed in this matter if necessary.

10            Do you understand that?

11        A    Yes, I do.

12        Q    Great.  If at any time you do not

13    understand the question that I am asking or

14    do not hear me, please let me know.

15    Otherwise, I will assume that you understand

16    the question or have heard me correctly.

17        Do you understand?

18    A    Yes.

19    Q    If during the course of your

20    deposition you want to modify any of your

21    answers or change your answer in any way,

22    feel free to do that.  In fact, you should

BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382

9

1    try to do that before we end the deposition

2    today.

3        Do you understand?

4    A    Yes.

5        Q    Good.  We have a court reporter

6    here today, and she is taking down your

7    testimony, so your answers must be audible.

8    You must answer my questions with spoken

9    words.  The stenographer cannot take down a

10    nod or if you say uh-huh.  It is difficult to

11    see from a written transcript whether that

12    mean an affirmative or negative answer.

13        Do you understand?

14        A    Yes.

15        Q    Please try to speak slowly and

16    audibly, and I will try to do the same.

17        Do you understand that?

18        A    Yes.

19        Q    And let me finish my questions

20    before you answer, and I will extend the same

21    courtesy to you.  It will make it much easier

22    for the court reporter to record the

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

10

1    proceedings accurately.

2        Do you understand?

3    A   Yes.

4    Q   We can take a break whenever you

5    feel it's needed.  Just let me know.  The

6    only thing I ask is that you not take a break

7    when a question is pending, that if you need

8    a break, you answer whatever question I've

9    asked, and then we can take a break

10    afterwards.

11        Is that okay with you?

12    A   Yes, it is.

13    Q   All right.  Have you taken any

14    medications today that would affect your

15    memory or your ability to tell the truth?

16    A   No, I haven't.

17    Q   Have you taken any medications that

18    would make it difficult for you to hear,

19   understand, or answer my questions?

20      A   No, I haven't.

21      Q   Do you suffer from any medical

22   conditions that would affect your memory or


BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382


11


1   make it difficult for you to tell the truth?

2      A   No.

3      Q   Do you suffer from any medical

4   conditions that would make it difficult for

5   you to hear, understand, or answer my

6   questions?

7      A   No.

8      Q   In preparation for today's

9   deposition, did you review any documents?

10     A   Yes.

11     Q   What documents did you review?

12    A    My petition and some other papers

13    that my attorney -- my former attorney

14    returned to me.

15    Q    Those documents that were returned

16    to you, were those documents that have been

17    produced, or were they the internal notes or

18    documents prepared by your former attorney?

19    A    Produced?  What do you mean by

20    "produced?"

21        MS. HUGHES:  If you could mark this

22    as Taylor 2.


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


12


1        (Deposition Exhibit No. 2 was

2            marked for identification.)

3        BY MS. HUGHES:

4      Q    Again, just take a moment to --

5      A    Actually -- actually, the only

6    real -- only document that I scanned over was

7    the petition this morning.  The rest of them,

8    I saw them, but I didn't take the time to

9    read them or anything.

10      Q    We'll be referring to the document

11    that's been marked as Taylor 2 later, so just

12    keep a hold of that.

13      A    Okay.

14          MS. HUGHES:  If you can mark this

15    as Taylor 3.

16              (Deposition Exhibit No. 3 was

17              marked for identification.)

18          BY MS. HUGHES:

19      Q    Please take a moment to review this

20    document, and let me know when you've

21    completed your review.

22              (Pause)

BETA COURT REPORTING
www.betareporting.com

13

1    A    Okay.

2    Q    Do you recognize this document?

3    A    Yeah.

4    Q    And is this the petition to which

5    you were referring that you reviewed before

6    your deposition today?

7    A    Yes.

8    Q    Am I correct that you did not bring

9    any documents with you today?

10    A    That's correct.

11    Q    At any time have you been convicted

12    of any misdemeanor or felony?

13    A    Nope.

14    Q    Other than this lawsuit, have you

15    ever been a plaintiff or defendant in another

16    civil lawsuit?

17    A    Yes.

18    Q    How --

19    A    20 years ago.

20    Q    20 years ago.  Were you the

21    plaintiff or the defendant?

22    A    Plaintiff.


BETA COURT REPORTING
www.betareporting.com
202-464-2400                    800-522-2382


14


1    Q    And what kind of lawsuit was it?

2    A    It was -- it was a workman's -- I

3    was injured on a job.

4    Q    Did you sue your former employer

5    then?

6    A    Yes.

7    Q    Was that in Washington, D.C.?

8    A    Yes, it was.

9    Q    And was that the case for which you

10    were deposed previously?

11     A   Yes.

12     Q   What was the outcome of that case?

13     A   I won it.

14     Q   You won it.  Did you get a

15   settlement, or did it actually go to some

16   kind of trial?

17     A   No, it was a settlement.

18     Q   A settlement?

19     A   Yes.  It was a workman's

20   compensation case.

21     Q   What type of injury was it for?

22     A   A back injury.


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


15


1     Q   Has that back injury fully

2   resolved?

3      A   If you mean have I recovered from

4   it completely?

5      Q   Correct.

6      A   No, I haven't.

7      Q   What was the nature of the back

8   injury?

9      A   Two ruptured vertebrae and a

10   herniated disk.

11     Q   Are you presently receiving any

12   treatment for your back?

13     A   Not for my back, but symptoms that

14   are related to the injury.

15     Q   And what are those symptoms?

16     A   Sciatica.  In the left -- left

17   sciatica.

18     Q   Are you limited in any of your

19   daily activities because of your back?

20     A   Yes, I am.

21     Q   What daily activities are you

22   limited in?

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

16

1    A   Lifting, a lot of walking.

2   Excessive walking, let me say -- lifting

3   things over 50 pounds.

4    Q   50, five-zero?

5    A   Yes.  Just in a lot of pain, you

6   know?

7    Q   Do you take any pain medications

8   for your back?

9    A   Yes, I do.  Not for my back, for

10   the sciatica.

11    Q   The sciatica, okay.  Any what pain

12   medications do you take?

13    A   Actually, up until now, it was

14   Vicodin.  Yesterday -- I had an appointment

15   yesterday, neurosurgeon, and he downgraded me

16   to Naprosyn.

17    Q    Am I correct that Vicodin is a

18    narcotic?

19    A    Yes.

20    Q    And you have not taken any today?

21    A    Yes, I have.

22    Q    You took some today?

BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382

17

1    A    Yes.

2    Q    Will the Vicodin affect your

3    ability to participate in this deposition --

4    A    No, it doesn't.

5    Q    In any way?

6    A    No, it doesn't.

7    Q    Did you also take Naprosyn today?

8    A    No, I didn't.

9    Q    You said you saw a neurosurgeon; is

10    that correct?

11        A    Yes.

12        Q    What was the name of that doctor?

13        A    Dr. Dennis.  Gary Dennis, I believe

14    it is.

15        Q    Did you see him in the office or at

16    a hospital?

17        A    At his office in the hospital.

18        Q    Which hospital is that?

19        A    Howard University.

20        Q    Howard.  Have you seen Dr. Dennis

21    before?

22        A    Oh, yes.


BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382




18


1        Q    How long has Dr. Dennis been

2  following you?

3      A   Oh, just -- probably a year.  I was

4  sent to him -- actually, I went to him a year

5  ago because -- I was being treated at GW, and

6  my doctor at GW left the country and I had to

7  find a new doctor.

8          Actually, what happened was I was

9  being treated at GW's pain management clinic.

10  And my doctor there left the country, and

11  they couldn't take -- the other doctors in GW

12  could not take on another patient.  So I went

13  to the pain clinic at Howard University, who

14  would have referred me to Dr. Dennis in

15  neurosurgery.

16      Q   Other than recommending you take

17  Naprosyn, did Dr. Dennis recommend any other

18  course of treatment for your back?

19      A   Well, what was happening, we were

20  being -- I was being tested, I was

21  being -- what can I say?  What they were

22  suggesting was surgery.  And I was being

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

19

1   evaluated by him and to -- for surgery for my

2   back for the sciatica.

3      Q   Are you planning to undergo surgery

4   for the sciatica?

5      A   No, we came to the conclusion that

6   I should not have the surgery.

7      Q   Was there any medical reason given

8   for this decision?

9      A   I'm not sure.  He didn't say.  He

10  just said that he didn't think I needed

11  surgery right now.  And to just wait.

12     Q   Does this back condition prevent

13  you from working or seeking work in any way?

14     A   No, it doesn't.

15     Q   And does it limit you from working

16  in any way?

17     A   Depending on what type of job it

18  is.  I used to be a mailman.  No, I can't

19  serve mail anymore.

20     Q   Would it prevent you from holding

21  the type of position that you held with Team

22  Broadcast?


BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382



20


1     A   No, it wouldn't.

2     Q   When you were employed with Team

3  Broadcast, you were eligible for medical

4  insurance; correct?

5     A   Yes.

6     Q   Do you still have medical

7  insurance?

8     A   Yes, I do.

9      Q    Who is that medical insurance

10    through?

11     A    Charter Health Plan.  D.C. Health

12    Alliance.  Charter Health.

13     Q    Charter Health.

14     A    It's Medicaid, you know?

15     Q    So it's in connection with a public

16    program?

17     A    Yes.

18     Q    We'll probably talk more about your

19    medical conditions later on.  This is sort of

20    a little bit of sidetrack from your worker's

21    compensation.

22          Other than the worker's

BETA COURT REPORTING
www.betareporting.com
202-464-2400                    800-522-2382

21

1    compensation case that we described, have you

2    ever been a plaintiff in any other lawsuits?

3        A    No.

4        Q    Have you ever been a defendant in

5    any other lawsuits?

6        A    No.

7        Q    Have you ever been a witness in any

8    lawsuit?

9        A    No.

10       Q    Have you ever filed for bankruptcy?

11       A    Yes.

12       Q    When did you file for bankruptcy?

13       A    It was back in the '70s sometime.

14   I believe it was the '70s.  Late in -- it was

15   the late '70s, I think.

16       Q    But you have not declared a

17   subsequent bankruptcy since the year 2000?

18       A    No.

19       Q    Have you ever been the defendant or

20   respondent in any sort of tax proceeding?

21       A    Ask that question again.

22       Q    Have you ever been a defendant or a

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

22

1   respondent in any sort of tax proceeding?

2      A   Yes.

3      Q   Can you describe the details of

4   that for me, please?

5      A   At -- well, at the present time,

6   I'm a petitioner in a tax case.

7      Q   And you're still a petitioner?

8      A   Yes.

9      Q   Where is that case pending?

10      A   Right here in D.C. in the tax

11   court.

12      Q   In the tax court?  Okay.

13      A   Mm-hmm.

14      Q   Are you represented by an attorney

15   in that matter?

16      A   No, I'm not.

17      Q   And if you're a petitioner, are you

18   filing for a refund of taxes paid?

19      A   No.  I'm filing for a

20   re-determination.

21      Q   A re-determination of what?

22      A   Of a determination.


BETA COURT REPORTING
www.betareporting.com
202-464-2400                 800-522-2382


23


1      Q   Do you know what the case number

2   is?

3      A   454 -- 4504-06.

4      Q   Have you been involved in any other

5   tax proceedings?

6      A   Yes, something similar earlier --

7      Q   Early when?

8      A    In the 2000s.  I'm not exactly what

9    year 2000s, but earlier in the 2000s.

10      Q    But you've not been deposed in

11    connection with the tax case?

12      A    Nah.

13      Q    Am I correct that on the other side

14    is the IRS?

15      A    Yes.

16      Q    Is it the IRS's position that you

17    owe them a certain amount of taxes that have

18    not been paid?

19      A    Yes.

20      Q    Do you know if the IRS has issued

21    any sort of tax lien against you?

22      A    They have a notice of federal tax

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

24

file:///A|/AATAYLOR.txt

1    lien, yes.

2        Q   What is your understanding of what

3    that means?

4        A   Exactly what it says it is.  They

5    want to bring a lien against me.

6        Q   So their contention is that you owe

7    a certain amount in taxes, which you argue

8    that you do not owe, and their view is that

9    if you collect any monies through income or

10   other gains, that you would owe them a

11   certain portion of that money?

12       A   Would you repeat what you said?

13       Q   I just want to make sure I

14   understand what you understand to be the

15   federal tax lien.  So it's the IRS's position

16   that you owe them a certain amount of money

17   in taxes?

18       A   Uh-huh.

19       Q   Which you dispute; correct?

20       A   Yes.

21       Q   But they've issued a notice of tax

22    lien; correct?

BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382

25

1        A    Yes.

2        Q    Meaning that if you were to gain a

3    certain sum of money, whether by employment

4    or winning the lottery or however it came

5    into being, it's the IRS's position, that you

6    dispute, that you would owe them a certain

7    portion of that money?

8        A    Yes.

9        Q    Do you know if you have any

10    upcoming court dates or filing dates in the

11    tax case?

12        A    Yes.

13        Q    What are --

14    A    The court date is January 22.

15    Q    Of 2007?

16    A    '07, yes.

17    Q    What is your understanding of

18    what's going to be determined at that court

19    date?

20    A    I don't know what they're going to

21    determine.  But that's the date of our trial.

22    Q    Trial.  Okay, so it's a trial.


BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382


26


1    A    Mm-hmm.

2    Q    Are you trying to obtain an

3    attorney in that case?

4    A    Yes.

5    Q    Am I correct that you are not

6    married?

7    A    Right.

8    Q    And I'm correct that you do not

9    have any children?

10    A    Right.  Are we going to ever talk

11    about what's the subject here?

12    Q    These are background questions,

13    Mr. Taylor.

14    A    This sounds like all -- everything

15    you've asked, it sounds irrelevant to what

16    we.

17    Q    Do you want to interpose a

18    relevance objection on the record?  That's

19    fine.  I appreciate your cooperativeness so

20    far, and I ask that it continue.  Later on,

21    if this deposition is ever used in trial or

22    in a motion and you have an objection, at

1   that point, you could ask the judge to rule

2   on it.

3        Do you understand?

4     A   Yes, I do.

5     Q   What is your current residence?

6     A   It's 2306 Ainger Place, SE, D.C.

7   20020.  Ainger is spelled A-i-n-g-e-r.

8     Q   How long have you resided there?

9     A   All my life, practically.

10    Q   Do you own that property?

11    A   No, I don't.

12    Q   Do you know who does own that

13  property?

14    A   Yes, I do.

15    Q   Who is that?

16    A   My mother.

17    Q   Does she also reside there?

18    A   Yes, she does.

19    Q   Is that Ms. Hazel Taylor?

20    A   Yes, it is.  How did you know here

21   name?

22      Q   You had listed her as your


BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382


28


1   beneficiary and your emergency contact --

2      A   Okay.

3      Q   In Team Video files, which I do

4   have, and I will ask you about this.

5      A   All right.

6      Q   I'm not dragging your mother into

7   this; I just need to make sure I understand

8   who may have an interest in this lawsuit.

9      A   All right.

10        MS. HUGHES:  If you could mark this

11   as Taylor 4.

12            (Deposition Exhibit No. 4 was

13          marked for identification.)

14          BY MS. HUGHES:

15      Q   Do you recognize that document,

16   Mr. Taylor?

17      A   Yes, I do.

18      Q   What is this document?

19      A   My résumé.

20      Q   Is this the résumé you submitted to

21   Team Broadcast?

22      A   I suppose it is.


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


29


1      Q   It says at the bottom here, from

2   1996 to 2002, you were a Master Control

3   Operator (MCO) Studio Supervisor at

4   Telefutura.

5          Is that correct?

6    A   Yes.

7    Q   Do you recall why you left that

8  job?

9    A   Yes.  We were all released from

10  that position -- from that job in favor of

11  automation.  The entire staff.

12    Q   So this was a downsizing type of

13  issue?

14    A   It wasn't downsizing, they decided

15  to use a different -- an automation format.

16  So there was no work to be done.  What I mean

17  by that is they -- everything went automatic.

18    Q   Your résumé lists you having that

19  job until 2002; correct?

20    A   Yes.

21    Q   Am I correct that you were hired

22  with Team Broadcast somewhere around December

BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382

30

1   15, 2003?

2        Is that correct?

3    A   Yes.

4    Q   Were you unemployed between

5   Telefutura and the Team Broadcast job?

6    A   Yes.

7    Q   How did you hear about the Team

8   Broadcast opportunity?

9    A   I believe I saw it in the paper.

10    Q   Would that be the Washington Post?

11    A   Yes.

12    Q   So you sent them your résumé and a

13   cover letter; is that correct?

14    A   Well, hold on a second.  That's not

15   what happened.  I had applied for a position

16   with C-SPAN.  Was it C-SPAN or -- I applied

17   for a position with -- I think it was with

18   C-SPAN, and the lady who -- who interviewed

19   me sent my résumé or -- or referred me to

20   Team.  I think Team was looking for people at

21   that time, and she sent me over to them.

22   That's what -- that's how I found out about

BETA COURT REPORTING
www.betareporting.com
202-464-2400                    800-522-2382

31

1   it.

2       Q   All right.  And --

3       A   I believe it was C-SPAN.

4       Q   At any of the jobs listed in your

5   work history, were you ever terminated for

6   cause from any of them?

7       A   Would you say that -- repeat that?

8       Q   At any of the jobs listed in your

9   work history --

10      A   Mm-hmm.

11      Q   On your résumé, which is the

12    exhibit that's been marked as Taylor 4, were

13    you ever terminated for cause from any of

14    them?

15        A    Yes.

16        Q    Which one was that?

17        A    The bottom one, TCI/District

18    Cablevision.

19        Q    What was the reason they gave you

20    for termination?

21        A    It was allegations that I used

22    drugs.  Or a drug abuse allegation.


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


32


1    Allegation.

2        Q    Which I assume that you denied;

3    correct?

4        A    That's correct.

5      Q    Did you ever bring a lawsuit

6    against TCI or District Cablevision?

7      A    No, I didn't.

8      Q    So then after that, you worked at

9    America's Voice?

10     A    After -- yes, I did, yeah.

11     Q    That's listed from --

12     A    Actually, after -- after District

13   Cablevision, I went to -- yeah, I believe so.

14     Q    Did you have any jobs in any

15   industry between TCI and America's Voice?

16     A    Did I have any jobs when now?

17     Q    This is between TCI and America's

18   Voice.  Your résumé lists a two-year gap.

19     A    Yeah.  Actually, America's Voice, I

20   was working at WTMW simultaneously at -- at

21   America's Voice.  Both of them at the same

22   time.  I left District Cablevision, I went to

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

33

1    WTMW.  Which was --

2        Q    What was your position there?

3        A    Master control operator and studio

4    supervisor.

5        Q    Do you know why that job is not

6    on --

7        A    It's on here.

8        Q    The work history?

9        A    It's -- if you look under

10   Telefutura.  Telefutura bought WTNW.  And

11   changed it.

12       Q    Okay, I see that then.

13       A    Yeah.

14       Q    But you listed it above because --

15       A    Because I --

16       Q    You stayed there --

17       A    Actually, in 1970s -- in 1996 it

18   was at WTMW, and in 2000 -- might have been

19   2002 or 2003, somewhere around there,

20   Univision bought them and changed the name to

21   Telefutura.

22      Q   So am I correct that --


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382



34


1      A   I left District --

2      Q   You were working at Telefutura, or

3   its predecessor, WTMW, while you also had

4   those other jobs that are listed on your

5   résumé, other than TCI?

6      A   No.  I left District Cablevision,

7   went to WTMW, and while at WTMW, I acquired a

8   job at America's Voice.  So I was working

9   both of those jobs simultaneously.  And then

10   I left both of them and went to Atlantic

file:///A|/AATAYLOR.txt

11   Video.  Then Renaissance Network later.

12      Q    And then you went back to --

13      A    Yes, yes.

14      Q    So you were not employed

15   continuously at WTMW --

16      A    No.

17      Q    And Telefutura for that entire

18   period?

19      A    Right.  You're right.

20      Q    While you were working at any of

21   the jobs listed on your work history, were

22   you limited in any anything you could do for

BETA COURT REPORTING
www.betareporting.com
202-464-2400                  800-522-2382

35

1   work because of a physical condition?

2      A    No.  Other than what I told you

3   about my back injury.

4    Q    Which was lifting more than 50

5    pounds and excessive walking.

6    A    Right.

7    Q    Would you describe excessive

8    walking as walking for more than an hour at a

9    time?

10    A    I'm saying like standing and

11    walking for -- well, walking -- I definitely

12    wouldn't walk a quarter of a mile or -- in

13    one period without a break.

14    Q    If you need to walk, do you ever

15    use a cane or any kind --

16    A    No, I don't.

17    Q    Of assisted device?  Okay.  And you

18    mentioned standing.  You have problems if you

19    stand for a certain amount --

20    A    Yeah, if I stand -- standing for

21    long periods of time --

22    Q    What would you describe as a long

BETA COURT REPORTING

file:///A|/AATAYLOR.txt

Case 1:05-cv-02169-RCL    Document 20-14    Filed 12/18/2006    Page 48 of 249
www.betareporting.com
202-464-2400                    800-522-2382

36

1    period of time?

2        A    I don't know; it varies.  Depends

3    on how I feel or -- or, you know, what's

4    going on with my -- the conditions I have.

5    Sometimes, I can stand long or longer than I

6    could the day before.  It varies.

7        Q    On average, would you say that you

8    can stand for more than a half hour?

9        A    I'd say no more than that.

10    Definitely, I would be in pain in my

11    lower-back area.  But sometimes I can bear

12    the pain and go on a little past that.

13        Q    But you were able to perform the

14    jobs in your work history without --

15        A    Yes, I have.

16        Q    Any sort of -- great.

17            And we discussed the termination

18    from TCI District Cablevision.  At any of the

19    other jobs, were you ever disciplined for any

20    reason?

21        A   Nope.

22            MS. HUGHES:  If you could mark this


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


37

1    as Taylor 5.

2            (Deposition Exhibit No. 5 was

3            marked for identification.)

4        BY MS. HUGHES:

5        Q   Mr. Taylor, take a moment to review

6    this document, and let me know when you've

7    completed your review.

8        A   Okay.

9        Q   Do you recognize this document?

10      A    It appears to be the application I

11    filled out at Team Broadcast.

12      Q    I see at the top, there is

13    handwriting that says "2 references."

14          Do you see that?

15      A    Yes, I do.

16      Q    Is that your handwriting?

17      A    Nope.

18      Q    Do you know whose handwriting it

19    is?

20      A    It possibly was Mike Marcus's.

21      Q    Is the other handwriting on this

22    first page yours?


BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382


38


1      A    Yes.

2      Q    When did you complete this

3    application?

4      A    Sometime -- it was -- it says

5    December of '03 on the --

6      Q    Well, let's try to break that down.

7    Do you remember completing this application

8    after you had provided your résumé and cover

9    letter to Team Broadcast?

10     A    I believe so.

11     Q    Did you interview with anyone at

12   Team Broadcast?

13     A    Mike Marcus.

14     Q    Mike Marcus.  Do you recall whether

15   Mike called you to set up the interview or

16   whether you called him?

17     A    I believe I got a letter.  Somebody

18   else -- he was not supposed to interview me.

19   There was another lady who was supposed to

20   interview me, but she couldn't make it that

21   day, and he interviewed me in place of her.

22     Q    Do you remember if that woman was

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

39

1   Tracey Thompson?

2       A   No, it wasn't.

3       Q   Was the woman that was supposed to

4   interview you someone in operations or

5   someone in human resources?

6       A   I believe she was someone in human

7   resources.

8       Q   Is it correct Michael Marcus would

9   be in operations?

10      A   I don't know what he was at that

11  time.

12      Q   Michael Marcus, once you worked for

13  Team, he was your supervisor; correct?

14      A   Once we started the employment?

15      Q   Correct.

16      A   Yes.

17    Q    So Mr. Marcus had actual knowledge

18    of the work that you performed as an MCO;

19    correct?  The technical aspects.

20    A    What do you mean by "had actual

21    knowledge?"  As I far as I know, he did not.

22    Q    Okay.  But --

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

40

1    A    In fact, he even notified me that

2    he didn't.

3    Q    But he was in your work area;

4    correct?

5    A    What do you mean?  What are you

6    asking me?

7    Q    I'm just trying to distinguish

8    between human resources and sort of support

9    staff versus someone directly involved with

10    your chain of command in the job that you

11    actually did.

12        A    I'm -- would you repeat that?

13        Q    All right.  I think -- and maybe

14    I'm wrong and you need to correct me -- but

15    there's a distinction between sort of the

16    people in human resources and the

17    administrative support for Team and its

18    employees versus someone like you that was

19    actually helping produce the programming and

20    it wasn't sort of the actual business of what

21    Team Broadcast did.

22        A    Uh-huh.


BETA COURT REPORTING
www.betareporting.com
202-464-2400                    800-522-2382


41


1        Q    Do you understand that?

2    A    Yeah, yes.

3    Q    And I'm asking if Michael is with

4    you in sort of the production --

5    A    And operations, yes.  Yes, okay.

6    Q    Operate.

7    A    I was under -- I didn't understand.

8    I thought you were asking me did he have

9    knowledge of what the work was, or -- but

10    you're asking me was he in my actual -- was

11    he in operations with me and not in human

12    resources, administration, yes.

13    Q    Correct, okay.  And you're right, I

14    did ask the question wrong, and I appreciate

15    what you did.  If you don't understand what

16    I'm asking you, please do seek

17    clarification, because I may not be perfectly

18    clear in all my questions, despite my best

19    attempts.

20    So your understanding was

21    originally, you were supposed to be

22    interviewed by someone who was more on the

BETA COURT REPORTING
www.betareporting.com
202-464-2400                   800-522-2382

42

1   human resources/administrative side of

2   things; correct?

3       A   That's correct.

4       Q   But you wound up by interviewed by

5   Michael Marcus?

6       A   That's correct.

7       Q   Was anyone else at that interview?

8       A   No, it wasn't.

9       Q   So it was just a one-on-one?

10      A   Yes.

11      Q   Was it in-person or over the

12   telephone?

13      A   In-person.

14      Q   Did you fill out the application

15   that's been marked as Taylor 5 at that

16    interview?

17        A    I really can't -- I can't remember.

18        Q    How long, if you remember, did your

19    interview with Mr. Marcus last?

20        A    Approximately a half an hour.

21        Q    Did Mr. Marcus offer you the job on

22    the spot, or were you contacted later with a


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


43


1    job offer?

2        A    I was contacted the -- I think it

3    was later that day or even the next day.  He

4    told me at that meeting that I was the -- I

5    fit the bill, that I was the person for the

6    job, and that they would get back with me

7    with an official offer of the job.  And I

8    believe they contacted me -- it was either

9    later that evening or the next day -- and

10   told me I had the job.  He was quite

11   impressed with my résumé and the answers I

12   gave at the interview.

13       Q    Referring to your actual

14   application of employment, am I correct that

15   a high school diploma is your highest formal

16   level of education?

17       A    I actually did go to college for a

18   little while, for part of a semester.

19       Q    But you do not have a college

20   degree; correct?

21       A    No, I don't.

22       Q    Do you have, through your industry

BETA COURT REPORTING
www.betareporting.com
202-464-2400               800-522-2382

44

1  work, any kind of certifications or licenses?

2      A   Yes, I do.  I've been to Sony

3  Institute in New Jersey for training.  And

4  that's more like a certification, I guess.

5      Q   Are you a member of any

6  professional organizations?

7      A   No.

8      Q   Are you a member of any union or

9  guild?

10     A   Any what?

11     Q   Union or guild?

12     A   No, I'm not.

13     Q   If you could turn to the second

14  page of this document.  Do you see where it

15  says 41.600 --

16     A   Yes.

17     Q   In the right-hand column?  Am I

18  correct that is not your handwriting?

19     A   That's correct.

20     Q   If you'll turn to the third page,

21  it's an applicant's statement.

22      Is that your handwriting and your

BETA COURT REPORTING
www.betareporting.com
202-464-2400               800-522-2382

45

1    signature?

2       A   Yes.

3       Q   If you'll note that this document,

4    like the ones I've previously shown you, have

5    markings in the lower right-hand corner that

6    say "TEAM," and then have a series of numbers

7    after them.

8          Do you see that?

9       A   Yes, I do.

10      Q   I will tell you that they are what

11   we call Bates labels.  These were documents

12   that were produced to your former counsel in

13   this case in response to your requests to

14   production of documents from Team Broadcast.

15    A    Okay.

16    Q    Do you have a copy of all these

17    documents?

18    A    I don't remember seeing this, no.

19    Q    Did you --

20    A    In the ones I have at home.

21    Q    Did you receive from your former

22    counsel a file or set of documents?


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


46


1    A    Yes, I did.

2    Q    So you don't specifically recall

3    seeing this one, but you think you did get

4    some documents?

5    A    I did get documents, but not this

6    one.  This one not included.  Primarily, the

7    documents that I have are the -- what you

8    have here as Taylor No. 2.  And just some

9    documents that he produced to send to you, I

10   believe, in the paperwork for the court.

11       Q   To your knowledge, has your former

12   counsel, Mr. Lescht, turned over to you his

13   complete file and all documents in this case?

14       A   To my knowledge.

15       Q   Basically, Mr. Taylor, I'm not

16   trying to hide the ball.  All of these

17   documents were produced to your counsel, and

18   if you do not have a copy, we will get you a

19   set of them.

20       A   Okay.

21       Q   During your interview with

22   Mr. Marcus, did he ask you about your

BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382

1    physical abilities to perform the job of

2    master control operator?

3        A    It's possible he could have.

4        Q    Did you have any physical

5    limitations and provide --

6        A    Only what I told you I have right

7    now.

8        Q    I just want to make clear.  You

9    don't recall if he did or did not ask you,

10   but you know if he had asked you, you would

11   have told him what you've told me previously?

12       A    That's correct.

13           MS. HUGHES:  If you could mark this

14   as Taylor 6.

15               (Deposition Exhibit No. 6 was

16               marked for identification.)

17           BY MS. HUGHES:

18       Q    Again, Mr. Taylor, take as much

19   time as you need to review this document, and

20   let me know when you've completed your

21   review.

22      A   Okay.


BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382


48


1      Q   Do you recognize this document?

2      A   Yes, I believe I do.

3      Q   Is this your signature on the

4   document?

5      A   Yes, it is.

6      Q   So this is the offer letter

7   provided to you by Team that you signed to

8   show your acceptance; is that correct?

9      A   I believe so.

10      Q   Is Sue Lee the woman that you were

11   supposed to meet with originally rather than

12   Mr. Marcus?

13      A   I don't believe so.  I'm not -- it

14    may have been, yes.  I think Sue Lee was the

15    person.

16        Q    At any time during you employment

17    with Team, did you ever meet Sue Lee?

18        A    At any time what?

19        Q    At any time while you were employed

20    with Team, did you meet Sue Lee?

21        A    Yes, I did.

22        Q    In what context did you meet


BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382


49


1    Ms. Lee?

2        A    Team gave the company a -- a night

3    out at a facility in Springfield Mall, or the

4    Springfield area one night -- and she was the

5    coordinator of it.  And that's when I

6    actually met her face-to-face.

7        Q    After that, did you have any

8    dealings with her professionally?

9        A    Maybe on the phone with -- and I

10   did see her a couple of times walking through

11   the facility.  But that's about it.

12       Q    So you never went to her with any

13   sort of human resources complaint or issue?

14       A    I don't recall.  I may have, but I

15   don't recall.

16       Q    This letter also appears to be

17   signed by Brad Simons, the general manager;

18   is that correct?

19       A    Yes.

20       Q    Now, is it correct to say that Brad

21   Simons was Michael Marcus's direct

22   supervisor?

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

50

1     A    I guess he was.  I'm not sure.

2     Q    Did you interview with Mr. Simons

3   at all?

4     A    No, I didn't.

5     Q    At some point during your

6   employment, did you meet Mr. Simons?

7     A    Yes.

8     Q    And in what context did you first

9   meet Mr. Simons?

10     A    Well, when we first appeared on the

11   job site, he introduced himself to everyone.

12     Q    Was Mr. Simons the highest ranking

13   Team person on the operations side?

14     A    As far as I know, yes.

15     Q    Did you ever approach Mr. Simons

16   with any sort of issues about your

17   employment?

18     A    No, I didn't.

19     Q    Referring to the first paragraph

20    here, it says "We are pleased to extend an

21    offer to join Team Broadcast Systems, LLC

22    (Team) in the full-time, non-exempt position


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


51


1    of Master Control Technician."

2        Do you see that?

3    A    Yes.

4    Q    Is that the position for which you

5    were applying?

6    A    Initially, no.  I applied for

7    studio manager, and during my interview,

8    with Mike Marcus, he informed me that he was

9    going to be studio manager and that I -- that

10    he was offering me the master control

11    position.

12    Q    So the master control position

13    was --

14        A    What I accepted.

15        Q    What you accepted, and that was a

16    lesser position than studio manager?

17        A    Yes.

18        Q    In comparison to your previous

19    employment, was the master control technician

20    similar to any of those previous jobs?

21        A    Yes.

22        Q    And to which job was it the most


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


52


1    similar?

2        A    Practically all of them.

3        Q    Practically all?  Okay.  And it

4    says "Your compensation for this position is

5  $21.63 per hour, which is equivalent to an

6  annual salary of $45,000.00."

7      Is that correct?

8      A   That's what it says, yes.

9      Q   To your knowledge, were you paid

10  the $21.63 per hour while you worked at Team?

11     A   To my knowledge, yes.

12     Q   Were you eligible for overtime when

13  you worked at Team?

14     A   Yes.

15     Q   Did you ever work overtime?

16     A   Practically three or four times a

17  week.

18     Q   Do you see the fifth paragraph

19  down, where it says "Employment at Team is

20  'at-will,' which means that either you or

21  Team may terminate the employment

22  relationship at any time for any reasons not

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

53

1    prohibited by law with or without prior

2    notice"?

3        A    Yes.

4        Q    Did you understand that at the time

5    you signed this agreement?

6        A    At the time, I didn't understand

7    it.  But later on, I did.

8        Q    What made you understand it later

9    on?

10        A    Because I did some research to find

11    out what this was about, what "at-will"

12    meant, and what it meant in the law.

13        Q    Did you research this before or

14    after your employment with Team ended?

15        A    Before.

16        Q    What prompted you to research it?

17        A    The fact that I signed this and saw

18    it.

19    Q   Had you ever seen anything like

20   that in your previous employment?

21    A   No.

22       MS. HUGHES:  If you could mark this

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

54

1   as Taylor 7.

2           (Deposition Exhibit No. 7 was

3           marked for identification.)

4       BY MS. HUGHES:

5    Q   Again, please take all the time you

6   need to review this document, and let me know

7   when you completed your review.

8    A   It looks familiar, let me say that.

9   I'm not going to read it, but --

10    Q   Yes.

11       Do you generally recognize this as

12    the Team employee manual?

13        A    Yes.

14            MS. HUGHES:  If you could mark this

15    as Taylor 8.

16                (Deposition Exhibit No. 8 was

17                marked for identification.)

18        BY MS. HUGHES:

19        Q    Do you recognize this document?

20        A    Only because my signature -- or it

21    appears that my signature is at the bottom.

22        Q    So you don't have a reason to


BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382


55


1    question that this is your signature?

2        A    No.

3        Q    Do you see that this document

4    purports to be an acknowledgment of your

5    receipt of the employee manual that was

6    marked as Taylor No. 7?

7        A    Yes.

8        Q    And you see under number 3, where

9    it reiterates your status as an at-will

10    employee?

11        A    I guess I see it, yeah.

12            Wait a minute.  Would you repeat

13    that last question?

14        Q    Sure.  Do you see under number 3,

15    where it repeats the point made in the offer

16    letter that it says "Unless I am covered by

17    an individual employment contract with the

18    Company, I am employed as an at-will

19    employee"?

20        A    Yeah, yes.

21        Q    If you could please turn to page 11

22    of the manual, which is also marked as


BETA COURT REPORTING
www.betareporting.com

56

1    TEAM000015.

2        A    Okay.

3        Q    Do you see where it says "Standards

4    of Conduct?"

5        A    Oh, yes.

6        Q    Were you aware that Team had

7    certain standards of conduct?

8        A    Yes.

9        Q    Do you see the next page, page 12,

10   which is a continuation of the standards,

11   where it says "Failure to conform to

12   professional image standards?"

13       A    Failure to what?

14       Q    "Conform to professional image

15   standards."

16       A    Okay.  Yes, I see that.

17       Q    And would you understand sleeping

18    on the job to be a violation of the standards

19    of conduct?

20      A   Yes.

21      Q   If you could turn to page 13, the

22    "Procedure for Discipline."


BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382


57


1        Do you see the fourth paragraph

2    down, it says "If the problem persists, a

3    second meeting will be held and a written

4    warning will be given?"

5      A   Yes.

6      Q   And then the next paragraph down

7    says "Any reoccurrence of the problem after

8    the written working" -- I think that should

9    be "warning" -- "has been given can lead to

10     the immediate discharge of the employee?"

11    A    Yes.

12    Q    Did you understand this to be

13    Team's policy for discipline?

14    A    Yes.

15    Q    At anytime when you were working

16    for Team, did you have any questions about

17    what met the standards of conduct or what the

18    discipline policy was?

19    A    No.

20    Q    If you could turn to page 22 of

21    this manual.

22        Do you see where it says "Sick


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


58


1    Leave" at the bottom?

2    A    Yes.

3      Q    Were you eligible for sick leave at

4   any time during your employment --

5      A    Yes.

6      Q    At Team?  Yes?

7           Did you ever use sick leave while

8   you were employed with Team?

9      A    Yes.

10     Q    I'm on page 23 now.  The third or

11  fourth paragraph down says "The company may

12  require a doctor's statement for any and all

13  sick leave usage."

14     A    What are you -- what are you

15  referring to again here?

16     Q    The third full paragraph down.  It

17  says "If you will need to use sick leave, you

18  are required to notify your manager at least

19  two hours prior to your scheduled starting

20  time.  The company may require a doctor's

21  statement for any and all" --

22     A    Yes, I see it.

BETA COURT REPORTING
www.betareporting.com
202-464-2400                    800-522-2382

59

1     Q    Were you aware that that was the

2     policy before or while you were taking sick

3     leave?

4     A    That's practically the policy on

5     every job, so you just take it for granted

6     that that's the policy.

7     Q    So you didn't think there was

8     anything out of the ordinary when you were

9     asked for a doctor's note when you returned

10    from sick leave?

11    A    I was never asked for a doctor's

12    note when I came in from sick leave.

13    Q    Did you ever provide any sort of

14    doctor's note?

15    A    Yes, I did.

16    Q    You just did that on your own

17    initiative?

18        A    Yes.

19        Q    So you were never requested to

20    bring in a doctor's note, you just handed

21    them one, thinking that that was what you did

22    when you came back?


BETA COURT REPORTING

www.betareporting.com

202-464-2400            800-522-2382



60


1        A    No, I was ordered to stay off from

2    the job using my sick leave and my annual

3    leave.  I didn't apply or request sick leave,

4    I was ordered to use it.

5        Q    So you didn't --

6        A    And as my doctor examined me, he

7    gave me the note to bring back to my job.

8        Q    Thank you for clarifying.

9            So you did not initiate the sick

10  leave, you --

11      A    No, I did not.

12      Q    Were told to take sick leave?

13      A    I was ordered to take sick leave.

14      Q    Were you paid for that time on sick

15  leave?

16      A    Yes, I believe I was.  In fact, I

17  believe the point was to use -- for me to

18  intentionally use all of my sick leave and

19  annual leave.  That was the purpose of him

20  ordering me to.

21      Q    How long was your probationary

22  period at Team?

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

61

1      A    22 days longer than I worked there.

2          MS. HUGHES:  Do you need a break,

3    Mr. Taylor?

4          THE WITNESS:  No.

5          BY MS. HUGHES:

6      Q    Can you describe your job duties at

7    Team?

8      A    Well, my job duties at Team were to

9    perform the duties as a master control

10   operator, which included working in the

11   injust (?) department as well as video

12   operations.  And anything else I was asked to

13   do in television production.

14     Q    If I understand correctly --

15     A    Team.

16     Q    Team is a contractor and helps

17   produce television programming --

18     A    Yes.

19     Q    For certain networks; correct?

20     A    Yeah.  That's what I believe they

21   do.

22     Q    Were you assigned to multiple

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

62

1    contracts, or were you only working on one?

2        A    I wasn't assigned to any contract;

3    I was an employee of Team Broadcast.

4        Q    Correct.  The --

5        A    I'm not under contract.

6        Q    The programming that you were

7    helping to produce, was it all the same

8    program, or were you working on different

9    programs?

10       A    Television -- television programs?

11   Are you asking me different television shows

12   or -- in that manner of program?  Was I

13   working on one -- just television show or

14   different television shows?

15       Q    Yes, let's start there.

16    A    Yes.  Multiple television shows.

17    Q    Multiple television shows.  Were

18    they all television shows for the same

19    channel?

20    A    Yes.

21    Q    What channel is that?

22    A    Middle East Television Network.


BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382


63


1    Q    Do you know if Middle East

2    Television Network was either part of the

3    government or sponsored by the government?

4    A    I was told that it was sponsored by

5    the government?

6    Q    And does Middle East Television

7    Network broadcast as Al Hurra, the Free One?

8    A    Yes.

9      Q   Am I correct that you helped

10    produce multiple television shows for Middle

11    East Television Network?

12      A   That's correct.

13      Q   What was your normal work schedule?

14      A   Time-wise?

15      Q   Yes.  Days of the week and hours.

16      A   Well, it changed almost weekly.

17    But basically, I worked Monday through

18    Friday, from -- anywhere from -- sometimes

19    from -- anywhere from between 8:00 and 9:00

20    in the morning until midnight.

21      Q   How far in advance would you get

22    knowledge of your schedule?

BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382

64

1    A    It was basically daily.

2    Q    Who gave you your schedule?

3    A    We got it from -- I believe it was

4    Mike -- I think Mike Marcus; I'm not sure,

5    but sometime -- I'm not exactly sure -- we

6    got it through communications -- e-mail

7    communications.  You would check your e-mail

8    every morning or several times a day to find

9    out where you had been assigned and what your

10    assignment was.

11    Q    Were there other master control

12    operators?

13    A    Yes.

14    Q    How many?

15    A    Oh, I couldn't tell you.  A number

16    of us.

17    Q    Did you always work in the same

18    physical location, or did you report to

19    different places?

20    A    Depending -- different places.

21    Q    Were they different studios within

22    the same building, or are they different

BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382

65

1  buildings with different physical locations?

2      A   Different locations in the same

3  building.  I'd like to also point out that

4  Team Broadcast, for some reason, incorrectly

5  uses a broad definition of the word master

6  control and master control operator.  And so

7  they -- what they do is include jobs and job

8  titles under master control which are not

9  normally done.

10     Q   But that's up to Team to decide how

11  they want to define the position; correct?

12     A   Right.

13     Q   But you're just saying that in your

14  experience, Team --

15     A     In traditional -- in traditional

16     television, some of the jobs that they have

17     included under master control are not

18     actually master control jobs.

19     Q     What kind of jobs are they?

20     A     Whatever they (inaudible) like

21     injust operator.  Video operations is not a

22     master control position, and which I did; I


BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382


66


1     worked -- robotic camera operator is not a

2     master control position.

3     Q     So as a master control technician,

4     would you be in the studio, or would you be

5     in a separate room off the studio sort of

6     seeing that studio production go on?

7     A     That's correct.

8    Q    The second one?

9    A    Yes.

10    Q    The second one.

11    A    Yeah, the second one.

12    Q    And if I understand correctly,

13  you're saying that there were several studios

14  at the Team location where you worked, and

15  depending on where you were assigned that

16  day, you might be in any one of those various

17  rooms?

18    A    No.  For my position, let's say

19  working as video operator, which was the

20  longest job that I did there, I could oversee

21  both studios.

22    Q    So there were two studios?

BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382

1     A    There were two studios, and I

2   regulated what went on to some extent in both

3   studios from my position.

4     Q    So --

5     A    From my physical position.

6     Q    So did you report then to the same

7   place to work each day?

8     A    Yes.  Until I was reassigned to

9   some other position.

10    Q    Is that the intake position?

11    A    At that particular -- I don't know.

12   It depends on when you talking about.  Are

13   you talking about the time -- at the point

14   that I was terminated?

15    Q    Well, I understand that when you

16   came back from sick leave --

17    A    I was --

18    Q    In May of 2004, you were reassigned

19   to intake.

20    A    That's correct.

21    Q    Was that in a different physical

22    location than your previous job?


BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382


68


1      A    Yes.

2      Q    We'll talk about that later.  I

3    just want to go chronologically.  But up

4    until that point, were you in the same

5    physical location?

6      A    Up until what point?

7      Q    When you were moved to intake after

8    your sick leave.

9      A    Was I in -- I was in the master

10    control room.

11      Q    The master control room.

12      A    Yes.

13      Q    How big was the master control

14    room?

15    A    About the size of this room.

16    Q    So we'll say --

17    A    Maybe half -- half of this room.

18    On this half that I'm sitting on.

19    Q    So maybe about 10 feet by 10 feet?

20    A    Yeah, you could say.

21    Q    Was the room kept dim or dark?

22    A    Completely dark.  It was dark.


BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382


69


1    Q    And that would be so that --

2    A    It's for several reasons.

3    Q    What are they?

4    A    Well, visibility.  The visibility

5    is basically the number one reason.

6    Q    That's visibility into the studio

7    itself?

8    A    No.  Visibility of our equipment.

9    Q    Any other reasons that you know why

10    the room was kept completely dark?

11    A    Well, that's the number one reason;

12    it's traditional in master control to be in a

13    dark area.

14    Q    Am I correct that this is a

15    completely interior room with no windows to

16    the outside?

17    A    Normally it is, but in this

18    particular room, it had a window.

19    Q    But it was covered, correct, to

20    keep it dark?

21    A    No -- well, sometimes it was

22    covered, sometimes it wasn't.  It had -- it

BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382

file:///A|/AATAYLOR.txt

70

1    could be covered -- let's say that -- if we

2    desired to do so.

3        Q    What did you do if you needed the

4    room to be dark for the visibility of

5    equipment and you had the window?

6        A    Well, the window didn't produce

7    that much light through it that would affect

8    doing the job.  The hallway outside the

9    window was dark.  Or fairly -- let's say it

10   was dimly lit.

11       Q    We'll come back to it, but intake

12   was in a different physical location, but --

13       A    Yeah.

14       Q    For robotic camera, injust, and

15   video ops, you were in the master control

16   room?

17       A    For master control, video

18   operations, robotic cameras, we were in that

19   master control room.

20       Q    Were you seated in the master

21   control room?

22     A   Yes.

BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382

71

1     Q   So you didn't have to stand

2   excessively?

3     A   No.

4     Q   And you did not have to lift

5   anything over 50 pounds?

6     A   No.

7     Q   So there were no physical

8   limitations to you doing the job?

9     A   No.

10     Q   How many other people were in the

11   master control room with you during your

12   shift?

13    A    Unnecessarily, dozens.

14    Q    Too many?

15    A    Yes.

16    Q    So you were not alone?

17    A    No.  In fact, it inhibited us to

18    do -- perform our jobs.

19    Q    In the master control room, do you

20    have to keep quiet or abstain from

21    conversation?

22    A    Yes, you should.


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


72


1    Q    I think we already touched on this

2    when you say it was too busy, but did

3    sometimes -- what I'm going to call VIPs,

4    very important persons -- were they brought

5    into the master control room to see

6    operations?

7        A    Not brought -- actually brought in

8    the room.  I can only remember one incident

9    when a person was brought into the room.

10   Usually, it was management or fellow

11   employees in and out of the room

12   unnecessarily.

13       Q    Why do you say "unnecessarily?"

14       A    Well, master control -- a master

15   control operator needs to concentrate solely

16   on what's he's doing, as well as video ops

17   and robotic camera operations.  Management

18   knew this, but for some reason, they would be

19   in and out of the room distracting employees

20   and distracting you from doing your job.  And

21   it was unnecessary.

22       Q    And you say --

BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382

73

1    A    Traditionally, those are operation

2   areas that are fairly sealed off from any

3   unnecessary traffic.  And if you don't -- if

4   you're not working in there, you're not

5   supposed to be in there.

6    Q    You say you remember one instance

7   of someone coming in that wasn't management.

8   A    Yeah.

9    Q    Do you remember who that person

10  was?

11   A    I don't know who he was, but I

12  was -- my understanding was he was some kind

13  of prince or something from overseas.  Or a

14  king or something like that.

15   Q    Do you remember when that was,

16  approximately?

17   A    I don't believe I was there.  I

18  don't believe I was at that workstation that

19  day.  Or maybe I was on a break or something

20    when he came through there.

21         MS. HUGHES:  If you could mark this

22    as Taylor 9.



BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382



74


1         (Deposition Exhibit No. 9 was

2              marked for identification.)

3         BY MS. HUGHES:

4    Q    Again, if you could take a moment

5    to review this document and let me know when

6    you completed your review.

7    A    Okay.

8    Q    Do you recognize this document?

9    A    No, I don't.

10    Q    I'm going to tell you that this is

11    the job description for Team's master control

12    technician.

13       A   Okay.

14       Q   And you'll see that it was marked

15    as TEAM000072.

16       A   Okay.

17       Q   So I'm going to tell you that this

18    was provided to your prior attorney during

19    discovery in this case.

20       A   Okay.

21       Q   But I guess my question is, during

22    your actual employment with Team, is it


BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382


75


1    correct that you never saw this document?

2       A   I don't really -- I don't remember

3    seeing it.

4       Q   Do you remember ever asking for a

5    copy of your job description?

6        A    No, I don't.

7        Q    And you don't recall anyone

8    specifically handing you a document and

9    saying this is your job description?

10       A    I don't remember it, no.

11       Q    Understanding that you have not

12   seen this document before, I just want to

13   sort of compare this to what you understood

14   your job to be.  It says "DUTIES AND

15   RESPONSIBILITIES."  Under the first bullet

16   point, it says "Configure and optimize

17   multiple broadcast and satellite feed/receive

18   links for audio and video quality."

19          Do you see that?

20       A    Yes.

21       Q    Is that something that you did?

22       A    No.  Well, I -- yes, I did.


BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

76

1    Q    And you described jobs earlier as

2    injust, video ops, and robotic camera.

3    A    Yeah, yes.

4    Q    Where would this first bullet point

5    fit under?

6    A    That would be in the injust.

7    Q    Injust.  Did you ever do this

8    particular job?

9    A    I was the very first person to do

10   this job for Team.

11    Q    For Team.  And approximately how

12   much of your time, percentage-wise, was spent

13   doing the configure and optimize bullet point

14   there.

15    A    Well, that's what the job is.  You

16   do it constantly.

17    Q    Okay, constantly.  Well, when

18   you're doing it constantly, is that when

19    you're working injust?  Would you be doing

20    that when you were working as robotic camera?

21        A    You can't do both jobs at the same

22    time.


BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382


77


1        Q    So you would do this constantly

2    while working --

3        A    In injust.

4        Q    In injust; correct?

5        A    That's right, right.

6        Q    Percentage-wise of your time

7    working for Team, how much time were you at

8    injust?

9        A    Just at the end.  Well, at the

10    beginning, I was -- what happened was when

11    Team actually -- when MTN actually went on

12    the air, I believe it was Saturday morning, I

13    was called that previous Friday evening after

14    going home if I could work overtime the very

15    next day, Saturday morning, in injust.  So I

16    was -- I showed up to work at 9:00 a.m. that

17    Saturday morning, the morning that they went

18    on the air.  And I worked there -- well, I

19    was the first person to -- well, when I got

20    there, a supervisor was there who had been

21    there since 6:00 a.m.  He didn't know how to

22    do the job.  When I showed up, he left, and I

BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382

78

1    took over the position.  And from thereon, I

2    was -- I taught everybody else how to do it.

3        Q    I understand. I guess I'm just

4    looking for overall during your tenure with

5    Team, what percentage of the time would you

6    say that you were doing injust jobs?  Fifty

7    percent, twenty percent?  I'm just trying to

8    gauge that.

9        A    Not at all.  Only -- maybe 1

10    percent.

11        Q    One percent.

12        A    Yes.

13        Q    But you were the first person to do

14    it.

15        A    I was the first person, and I

16    taught the rest of them initially.

17        Q    The second bullet point says -- and

18    you're giving me an education

19    here -- "Monitor and adjust on air signals

20    using state of the art equipment such as

21    spectrum analyzers, video waveform monitors,

22    and audio/video/data analyzers."

BETA COURT REPORTING

file:///A|/AATAYLOR.txt

Case 1:05-cv-02169-RCL    Document 20-14    Filed 12/18/2006    Page 106 of 249
www.betareporting.com
202-464-2400          800-522-2382

79

1       Do you see that?

2    A    Yes.

3    Q    Did you do that?

4    A    Yes, I did.

5    Q    And going back to what you

6   described before:  Injust, robot camera, and

7   video ops, where would that fall under?

8    A    This description can be -- some of

9   those jobs can be done in video ops and

10   master control.

11    Q    Did you do that job?

12    A    Yes.

13    Q    Again, what percent of the time do

14   you think you were doing --

15    A    About 90 percent.

16    Q    About 90 percent?  Okay.  So that

17   was the major part.

18          The third one is "Monitor and

19    execute the playout of air materials

20    throughout the program day according to

21    program log."

22          Is that something that you did?

BETA COURT REPORTING
www.betareporting.com
202-464-2400                    800-522-2382

80

1      A    No, I didn't.

2      Q    Who did that?

3      A    Master control.

4      Q    But you never did that?

5      A    No.

6      Q    The fourth one down is "Document

7    quality standards, system anomalies --"

8      A    "Anomalies."

9      Q    "Operational procedures, and

10    reference materials."

11        Did you do that?

12    A    No.

13    Q    Who did that?

14    A    I don't know.

15    Q    But that was just something you

16    were asked to do?

17    A    No.

18    Q    The next one says "Record" --

19    A    Record.

20    Q    "Record, dub, cache, and verify the

21    quality of commercial, promotions,

22    interstitials, public service announcements,

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

81

1    and program or related material in order to

2    prepare it for broadcast on the network."

3        Did you do that?

4     A   It's possible.  Some of those jobs

5   couldn't be done unless I did my job as a

6   video operator.

7     Q   And then the last one says "Ensure

8   program material back-up and perform

9   standards conversion of material as needed."

10    A   No, I didn't do that.

11    Q   Not that.  And in addition, you're

12   telling me that you also did robotic camera

13   operator?

14    A   Yes.

15    Q   Any other positions that you

16   performed?

17    A   No.

18    Q   What exactly is "intake?"

19    A   Intake is the receiving of signals

20   or -- could be fiberoptics, satellite, just

21   from another tape -- you intake information

22   that's sent to the station or the network so

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

82

1   it can be used and disseminated among whoever

2   needs it, reporters.  Editors.

3       Q    So intake is different than injust?

4       A    No, it's the same thing.

5       Q    Same thing, okay.

6       A    Yeah.  It's just various names,

7   that's all.

8       Q    Do you see down here under "Master

9   Control Technician," the last line here, it

10   says "TEAM is an Equal Opportunity Employer?"

11       A    Yeah, yes.

12       Q    And there is nothing in this job

13   description that you could not perform;

14   correct?

15       A    That's correct.  Only speaking

16   Arabic.  I couldn't do that.

17    Q    Well, it says "highly desirable,"

18    so we're going to skip that.  I thought you

19    would have put that on your résumé, so.

20         At any time, did you inform anyone

21    at Team that there was a portion of your job

22    that you could not perform or needed help

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

83

1    performing?

2    A    Nope.

3         MS. HUGHES:  Can we go off the

4    record?

5         (Recess)

6         BY MS. HUGHES:

7    Q    Mr. Taylor, we're back on the

8    record.  You understand you're still under

9    oath; correct?

10    A   Yes.

11    Q   I think we discussed earlier that

12    you reported to Michael Marcus; correct?

13    A   Yes.

14    Q   And he was the studio manager?

15    A   Yes.

16    Q   During your employment at Team, was

17    there anyone else to whom you reported?

18    A   Yes.  I can't recall his name.  But

19    he was the scheduler.  They scheduled us.

20    They were the people that gave us our

21    schedules and told us when we worked and when

22    we didn't.


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


84


1    Q   And that was in addition to

2    Mr. Marcus; correct?

3      A    Yeah.

4      Q    But there wasn't anyone else you

5    reported to in terms of substance of your job

6    or discipline?

7      A    Just Brad Simmons.

8      Q    Brad Simmons.

9      A    I never had an occasion to approach

10   him, but Mike took me to him a couple of

11   times with a complaint.  But that

12   (inaudible).

13     Q    When you say with "a complaint,"

14   with Mr. Marcus's complaint about you?

15     A    Yes.

16     Q    Do you remember what those

17   complaints were about?

18     A    He claims I was sleeping on the

19   job.

20     Q    Do you remember this happening

21   twice?

22     A    Yes.  Going to Mike -- Brad?

BETA COURT REPORTING
www.betareporting.com
202-464-2400                    800-522-2382

85

1       Q   Correct.

2       A   Yes.

3       Q   Do you recall when this was?

4       A   What you mean when it was?

5       Q   In period of time.  I'm not sure I

6   would expect you to remember a specific date,

7   but perhaps a month, or when it happened in

8   terms of relationship to other things at

9   Team.

10      A   I think it had to happen in like

11   late February or March of '04.

12      Q   So Mr. Marcus took you to meet with

13   Mr. Simons because Mr. Marcus thought you

14   were sleeping on the job?

15      A   Yes.

16    Q    What did Mr. Marcus say was the

17    reason he thought you were sleeping on the

18    job?

19    A    He said that he saw me with my eyes

20    shut and that it sounded like I was snoring.

21    Q    Do you deny that you were sleeping

22    on the job?


BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382


86

1    A    Yes.

2    Q    Do you have any reason to believe

3    that Mr. Marcus didn't actually think you

4    were sleeping on the job?

5    A    Do I have any reason to believe

6    that he didn't actually think I was sleeping

7    on the job?

8     Q    Correct.

9     A    I have an opinion.  I guess -- I

10    guess you could say I do.  Yes.

11    Q    What do you mean by that?

12    A    I do have a suspicion of

13    why -- that I believe he knew I was not

14    sleeping on the job.

15    Q    What is that suspicion?

16    A    He -- well, I told him I wasn't.

17    Any further than that, I would prefer to

18    answer in front of the court.

19    Q    Well, Mr. Taylor, just --

20    A    I understand what you're going to

21    say.

22    Q    You'll get your chance in front of

BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382

87

1    the court.

2        A    This is -- I'm only going to answer

3    what I said.  I told him I was not sleeping,

4    and that's why -- and I think he knew I

5    wasn't.

6        Q    Do you have any sort of objective

7    reason to think he knew you were not

8    sleeping?

9        A    I -- say that again.  Ask the

10   question again, please.

11       Q    Well, you, I believe, said you told

12   him you were not sleeping and you had every

13   reason to believe that he didn't think you

14   were sleeping.

15       Is that correct?

16       A    Actually, I can't say because I

17   don't know what he was thinking.  He claims

18   that he saw -- he believes that I was

19   sleeping on the job.  So I can't tell you if

20   he -- you know, what's in his mind.  I don't

21   know what he was thinking.

file:///A|/AATAYLOR.txt

22     Q   Do you know if any other --


BETA COURT REPORTING
www.betareporting.com
202-464-2400                    800-522-2382


88


1     A   It's just my opinion that I believe

2   he knew I wasn't sleeping.

3     Q   Do you know if any other employees

4   thought that you were sleeping on the job?

5     A   Yes.

6     Q   Who are those employees?

7     A   Oh, I can't remember their names.

8     Q   Did they tell you they thought you

9   were sleeping, or did they go to Mr. Marcus?

10     A   They told me they thought I was

11   sleeping.  This was because he had been

12   making such a big deal of it; they were

13   teasing me to this point.  You know, they

14   would come in the room and hit me on the

15    shoulder, are you sleeping?  Look, man, I've

16    got my eyes wide open.  It became type of a

17    joke around -- in master control.

18        Q    Did there come a time when you were

19    disciplined for your alleged sleeping on the

20    job?

21        A    What do you mean "disciplined?"

22        Q    Did you receive a written warning?


                BETA COURT REPORTING
                 www.betareporting.com
          202-464-2400            800-522-2382


                        89


1      A    Yes.

2          MS. HUGHES:  If you could mark this

3    as Taylor 10.

4              (Deposition Exhibit No. 10 was

5              marked for identification.)

6          BY MS. HUGHES:

7      Q    Again, Mr. Taylor, take some time

8    to review this document and let me know when

9    you've completed your review.

10      A    Okay.

11      Q    Do you recognize this document?

12      A    Yes.

13      Q    Is this your signature on this

14    document?

15      A    Yes.

16      Q    Do you remember Mr. Marcus giving

17    this to you?

18      A    Yes.

19      Q    Did he give it to you in person?

20      A    Yes.

21      Q    Did you have a meeting about this?

22      A    Yes.

BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382

1     Q    Was anyone else present at the

2    meeting?

3     A    Not actually present, but there was

4    somebody overhearing -- listening,

5    overhearing the conversation or the meeting.

6     Q    Who was that person?

7     A    She was the scheduler at that time.

8    I can't remember her name.

9     Q    Was she meant to overhear or did it

10    just sort of happen?

11     A    I don't know if she was meant or

12    not.  She was there and she overheard the

13    conversation and she commented on it.

14     Q    Did you get this written warning at

15    the same time that you had the meeting?

16     A    I think it was a few minutes later.

17     Q    But the date is correct, that you

18    had the meeting about this warning on the

19    same day?

20     A    I'm not sure about the date on

21   here.  It could be.  It could be.

22      Q   Do you see where Mr. Marcus writes


BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382


91


1   "I have spoken to you on at least two other

2   occasions when you appeared to be sleeping

3   while at work?"

4      A   Mm-hmm.

5         REPORTER:  Is that a yes?

6         THE WITNESS:  Yes.  I'm sorry.

7         BY MS. HUGHES:

8      Q   Do you recall Mr. Marcus speaking

9   to you previous to giving you this warning

10   about --

11      A   No, these -- the information on

12   this page is incorrect.

13      Q   What is incorrect on this?

14       A    Mr. Marcus approached me about

15    this, and he was trying to establish a time

16    and a date that he saw me sleeping on the

17    job.  The reason I'm telling you about the

18    lady overhearing the conversation, she

19    verified that the dates he claims I was

20    sleeping on the job, I wasn't even on the

21    job, I was -- my day off.  And she verified

22    this.  But he continued on, he ignored her,

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382


92


1    and he gave me this notice anyhow.

2       Q    And you don't recall her name?

3       A    No, I can't.  She quit after that.

4    Closely after that, she --

5       Q    Did you take any notes during this

6   meeting?

7      A   No, I didn't.

8      Q   I guess, though, my specific

9   question to you is prior to getting this

10   warning, do you recall having conversations

11   with Mr. Marcus where he mentioned that he

12   thought you were sleeping on the job?

13      A   Yes, I do.

14      Q   So this was not the first time

15   you'd ever heard of this.  He had spoken to

16   you about it before.

17      A   No -- yes.

18      Q   You denied that the sleeping

19   occurred, it had come --

20      A   At one other time, he -- I remember

21   him -- prior to this letter, one other time,

22   he approached me about it.


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382

93

1    Q   Do you recall him saying that the

2    appearance of sleeping was as bad as sleeping

3    itself?

4    A   He didn't say that.  He didn't

5    mention that at all.  The only thing he

6    approached me about was that he thought I was

7    sleeping -- or he came in the room in master

8    control one day and I was sitting there with

9    my eyes closed, and he thought I was asleep.

10    Q   Why were your eyes closed?

11    A   Because I was -- I had 50 minutes,

12    we were only on the air for 10 minutes at a

13    time initially, and I sat -- I was ordered to

14    stay at my workstation, and I sat there for

15    50 minutes listening to a Arabic language I

16    didn't understand, so I closed my eyes and

17    just thought about things that I had to take

18    care of, domestic duties that I had to take

19    care of.  I wasn't asleep; I was just

20    thinking.  And he says that I was asleep.

21        Now, I understand this to be about

22    this appearance crap that's in the manual.


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


94


1    The professional appearance.  Nobody -- if

2    they -- well, I ain't going -- just go on,

3    you ask the questions.

4      Q    When you had this meeting with

5    Mr. Marcus about this discipline, did you say

6    anything to him about having any problems

7    with being tired or being exhausted?

8      A    Did I ask him what?  Say it again.

9      Q    When you were presented with this

10    written warning, did you say anything to

11    Mr. Marcus that you were particularly tired

12    or having problems with fatigue or

13    exhaustion?

14        A    No, I didn't.

15        Q    Did you mention anything at about

16    your physical health?

17        A    No, I didn't.

18        Q    Did Mr. Marcus ask you if you were

19    having any problems with tiredness, fatigue,

20    or any physical problems?

21        A    Yes.

22        Q    What did you say to him?


BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382


95


1        A    I told him no, I didn't.  He

2    accused me -- he asked me did I have sleep

3    apnea, and I told him no.

4        Q    So he actually used the term "sleep

file:///A|/AATAYLOR.txt

5   apnea"?

6      A   Yes.

7      Q   Had you ever heard that term

8   before?

9      A   Yes.

10     Q   In what context had you heard that

11  term?

12     A   What you mean?  I knew what it was.

13     Q   You knew what it was.

14     A   Yeah.

15     Q   At that point, had you ever been

16  diagnosed with sleep apnea?

17     A   No, I hadn't.

18     Q   So Mr. Marcus thought that you had

19  sleep apnea, and you said that you did not?

20     A   Right.

21     Q   And you denied any other physical

22  problems.

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

96

1    A   Right.

2    Q   Do you recall a time at the

3    beginning of March, approximately March 1,

4    where you were spoken to because you got to

5    the master control room at 11:56 when the

6    broadcast was supposed to begin at noon?

7    A   That happened several times.

8    Q   Was it always Michael Marcus that

9    spoke to you?

10    A   Yes.

11    Q   Is correct that you never received

12    any sort of formal written warning the way

13    you did for this alleged sleeping --

14    A   That's correct.

15    Q   I think you spoke earlier about how

16    you were "forced to take sick leave."

17         Is that correct?

18    A   Uh-huh.

19    Q    Can you explain to me when that

20    happened and how that came about?

21      A    I notified Mike Marcus I had made a

22    doctor's appointment to see whether or not I


BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382


97


1    had sleep apnea.

2      Q    Why?  Were you having problems with

3    being tired?

4      A    No.

5      Q    So was it because Mr. Marcus

6    suggested that you might have it?

7      A    Yes.

8      Q    So based on Mr. Marcus's suggestion

9    at your March 15 or so meeting about the

10    alleged sleep apnea --

11      A    No, it wasn't.  The March 15

12   meeting had nothing to do with me making a

13   doctor's appointment.  On my own, I decided

14   to see whether or not I had sleep apnea, and

15   I made a doctor's appointment and notified

16   Mike Marcus.  He immediately ordered me to

17   stay off from work and use up my leave until

18   I had an appointment.

19      Q   You said on your own, you decided

20   to see the doctor.

21      A   Yes.

22      Q   Were you having any symptoms?


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


98

1      A   No, I was not.

2      Q   So if there were no symptoms, what

3   made you decide to go see the doctor?

4      A    Just his accusations.

5      Q    And at that time, were you under

6    the care of an internist or any kind of

7    general practitioner?

8      A    No, I was not.  Not for anything

9    like that.

10      Q    Before you went to see anyone for

11    any sort of sleep apnea, did you have a

12    regular general practitioner, internal

13    medicine doctor?

14      A    No.

15      Q    So you made an appointment with the

16    doctor because of this accusation of the

17    sleep apnea; correct?

18      A    I made an appointment because I

19    wanted to find out.

20      Q    Okay, you wanted to find out.  What

21    doctor did you make an appointment with?

22      A    Dr. Zonozi.

BETA COURT REPORTING
www.betareporting.com

99

1      Q    Dr. Zonozi.  And how did you get

2    Dr. Zonozi's --

3      A    He was my primary care physician

4    under the plan, under my health benefits.

5      Q    What I was getting at with general

6    practitioner or internal medicine was your

7    primary care provider.

8      A    Yeah.

9      Q    And you had one, and his name was

10   Dr. Zonozi.

11     A    Yes.

12     Q    Is that correct?

13     A    Yes.

14     Q    How long had you been followed by

15   Dr. Zonozi?

16     A    I (inaudible) followed by him.  I

17   signed -- when I signed up for the health

18    benefits, I chose him as my primary care.

19        Q    So he had not been your doctor

20    prior to that?

21        A    Yes, he had.  On another job.  So I

22    can't remember what job it was, though.  When


BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382


100


1    I looked through the book, I recognized his

2    name and I knew I had used him before, so I

3    chose him.

4        Q    When had you first seen Dr. Zonozi?

5        A    I can't remember.  It was on

6    another job.  He was my primary care doctor

7    on another job.  It could have been with TCI

8    District Cablevision.  I just can't remember

9    back that far.

10        Q    So when you made the appointment to

11    go see him in April or May of 2004, prior to

12    that, when was the last time you had seen

13    him?

14        A    I don't remember.

15        Q    Was it more than a year?

16        A    Yes.  It was years.

17        Q    Years.

18        A    Because I -- well, actually -- see,

19    I was never very sick or had any

20    problems -- medical problems that I had to go

21    to the doctor, and that's why I can't

22    remember.


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


101


1        Q    Other than the long-term issues

2    with your back?

3     A    Right.

4     Q    Did you have a doctor that was

5     caring for your back at this time?

6     A    At the time I was working for Team?

7     Q    Prior to the time that you saw

8     Dr. Zonozi, did you have any other doctors

9     that were treating you?

10    A    Yes.  Earlier, before I even got

11    this job, yes.

12    Q    Who were they?

13    A    Dr. Bentt at -- B-e-n-t-t, at GW

14    Pain Management.

15    Q    This was for back pain?

16    A    It was for sciatica.

17    Q    Sciatica.  Related to the back

18    then?

19    A    Yes.

20    Q    But he was not the primary --

21    A    She.  She's a she.

22    Q    She was not your primary care?

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

102

1     A   No, she wasn't.

2     Q   So you selected Dr. Zonozi when you

3   worked at Team because he was on their list,

4   and you had seen him previously; correct?

5     A   Uh-huh.  Yes.

6     Q   Between the time that you saw him

7   previously and then going back to him in

8   April or May of 2004, did you have another

9   primary care physician?

10    A   Yes, I did.

11    Q   Who was that?

12    A   Actually, I was on their public

13   health program again, and I was just going to

14   primary care at Southeast Community Hospital,

15   where you could just -- you ended up seeing

16   any doctor that was on-duty that day.

file:///A|/AATAYLOR.txt

17    Q    Have you ever spoken to any of

18    these doctors, prior to the time you made the

19    appointment with Dr. Zonozi, about having any

20    problems with sleeping or the possibility

21    that you had sleep apnea?

22    A    No.


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


103

1    Q    Had any of them ever asked if you

2    had problems sleeping?

3    A    No.

4    Q    This was an entirely new issue to

5    you?

6    A    Yes.

7    Q    So you made the appointment with

8    Dr. Zonozi, told Mike that you had made the

9    appointment, and at that point, he said well,

10    then you need to be off work and be on sick

11    leave.  Is that what he said?

12        A    Yes, he did.

13        Q    Did you question that at all?

14        A    Yes, I did.

15        Q    What did you say about it?

16        A    I said you're ordering me to stay

17    off from work?  He said yes, I am.

18        Q    Did you ask for anything in

19    writing?

20        A    No, I didn't.

21        Q    Did you put anything in writing?

22        A    No, I didn't.


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


104


1        Q    Did you speak to anyone in human

2    resources about this?

3       A    No, I didn't.  Not at that time.

4       Q    Do you recall how long you stayed

5    off work?

6       A    Until the 21st of May.  It was

7    approximately two weeks.

8       Q    Do you recall that there was a time

9    when you were supposed to return at the end

10   of April, but had to delay that because you

11   had not yet seen the doctor?

12      A    I wasn't off in April.

13          (Pause)

14          BY MS. HUGHES:

15      Q    I'm not going to mark this an

16   exhibit.

17      A    Why not?

18      Q    Just for purpose of my deposition,

19   but I am going to show you this e-mail, and

20   this e-mail was produced to you as part of

21   the discovery.

22          Have you ever seen that e-mail

BETA COURT REPORTING
www.betareporting.com
202-464-2400                    800-522-2382

105

1   before?

2       A   No.  No, I don't remember.

3       Q   Does this refresh your recollection

4   at all about the timing of when you were

5   supposed to return?

6       A   No, it doesn't.

7       Q   Did you ever use the nickname

8   "Wink" were you were at Team?

9       A   That's constantly used.

10      Q   Is that a nickname you had used

11  before you had been at Team?

12      A   I've used it all my life.  In fact,

13  I very rarely -- anybody very rarely calls me

14  Wenzell.

15      Q   Do you know where Wink comes from?

16    A    Yes.

17    Q    Where does it come from?

18    A    My childhood.  My -- a close

19  relative gave me that name as a child.

20    Q    So it has nothing to do with

21  sleeping?

22    A    No.  He couldn't pronounce Wenzell,

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

106

1  and it always came out Wink.

2    Q    You don't hear Wink everyday; I

3  just wanted to get that --

4    A    Right.

5    Q    Again, I'm going to show you

6  another e-mail just to see if this refreshes

7  your recollection as to dates.  And again,

8  this document was produced to you in

9    discovery, so you should have a copy of it.

10       A   Okay.

11       Q   Does that refresh your recollection

12   as to an original doctor's appointment or

13   when you were originally scheduled to return

14   to work?

15       A   No, it doesn't.  It's incorrect.

16   As far as what's going on there, I don't know

17   what -- what they did.  I had nothing to do

18   with that.

19       Q   That's why I'm using it as an

20   exhibit.

21          (Pause)

22          MS. HUGHES:  If you could mark this


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


107

1   as Taylor 11.

2           (Deposition Exhibit No. 11 was

3           marked for identification.)

4       BY MS. HUGHES:

5       Q   Take a moment to review this and

6   let me know when you've completed your

7   review.

8       A   I have.  Okay.

9       Q   Do you recognize this document?

10      A   Yes.

11      Q   Is this the doctor's note that you

12  provided to Team when you returned from your

13  sick leave?

14      A   Yes.

15      Q   And I believe it says -- doctors

16  not having the best handwriting -- "To whom

17  it May Concern, Mr. Taylor is suffering from

18  sleep apnea disorder and will need sleep

19  studies."

20          Is that correct?

21      A   Yes.

22      Q   Did Dr. Zonozi put you on any

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

108

1   medication at this time?

2       A   No, he didn't.

3       Q   Did he restrict your activities at

4   all?

5       A   No, he didn't.

6       Q   So as far as you and Dr. Zonozi

7   were concerned, you could return to work

8   fully able to do your job without any

9   restrictions?

10      A   He did not say that, no.

11      Q   Did Dr. Zonozi have any

12   restrictions for you for work?

13      A   At that time, no, he didn't.  He

14   was more concerned with -- no, he didn't.

15    Q    So no restrictions.

16    A    No.

17    Q    Did you understand yourself to have

18  any restrictions or limitations from work?

19    A    No, I didn't.

20    Q    So when you returned, did you tell

21  Team that you were able to, again, resume all

22  of your job duties and responsibilities?


BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382



109


1     A    No, I didn't.  I didn't tell them

2  that.

3     Q    You didn't tell them that.  All

4  right.  Did they ask if you had any

5  restrictions when you returned?

6     A    No, they didn't.

7     Q    And you did not volunteer any?

8    A    I didn't have any.

9    Q    Didn't have any.  So --

10    A    I didn't know what -- I could --

11    Q    So basically, when you returned, it

12    was your understanding that you could go back

13    to your master control position the same as

14    before?

15    A    As far as I was concerned, yes.

16    Q    Is this the only doctor's note that

17    you provided to Team?

18    A    Yes.  Initially, yes.

19    Q    Was there a later time that you

20    provided more information to them?

21    A    No, because I was fired before I

22    had the opportunity.


BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

1    Q    And it says "need sleep studies."

2    Did you have those "sleep studies?"

3    A    Yes.

4    Q    Did they occur before or after your

5    termination?

6    A    After.

7    Q    Am I correct that after you

8    returned to work, you were assigned to intake

9    or injust?

10    A    Yes.

11    Q    Is that correct?  All right.  And

12    that's in a different physical location than

13    the master control room; correct?

14    A    Yes.

15    Q    Is that room also dark?

16    A    Not as dark, no.

17    Q    Is it as quiet as the master

18    control room?

19    A    No, it's not.  The master control

20    wasn't quiet because all the unnecessary

21    traffic flowing through.

22      Q    Was intake --


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382



111


1       A    Same conditions.

2       Q    Same conditions.  So it was just as

3    loud?

4       A    Yeah.  And unnecessary traffic

5    rolling in and out.

6       Q    Did you ever suggest to anyone at

7    Team that it would be better if you worked in

8    a room that was less dark?

9       A    At intake?

10      Q    No.  At any time at Team, did you

11   say "I think it would be better if I worked

12   in a room that was less dark"?

13      A    No.

14      Q     Did anyone at Team suggest it would

15    be better for you if you worked in a room

16    that was less dark?

17      A    No.

18      Q    I know that you sort of disagreed

19    with how Team classifies master control, but

20    in Team's scheme of things, was injust/intake

21    part of master control?

22      A    I don't think they considered it,


BETA COURT REPORTING
www.betareporting.com
202-464-2400             800-522-2382


112


1    no.  But they considered the intake operator

2    as a master control operator.  They -- they

3    would call him.  They were all under the

4    umbrella of being called master control

5    operators.  Team called everybody their

6    master control operator.

7    Q    And whether Team was right or wrong

8    by how they categorized it, they didn't think

9    that they were putting you in a new job, they

10    were just asking you to do a different aspect

11    of what they considered master control?

12    A    No.  Intake is different from

13    master control.  It's not part of master

14    control.

15    Q    But I thought you just said that

16    Team thought it was part of master control.

17    A    No.  I said Team considered

18    employees in injust as master control

19    operators.  That's what they called

20    everybody.  They called a cameraman a master

21    control operator, but we -- they had 75 of us

22    at the same time, and they called all of us

BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382

1   master control operators, even if you did

2   audio or you worked in the control room or if

3   you were out on the studio floor, they called

4   everybody a master control operator,

5   unless --

6       Q   And I know that you disagree with

7   that distinction.

8       A   That's -- I not only disagree with

9   it, it's incorrect.

10      Q   Okay, that's fine, it's incorrect.

11  But in Team's view, when they asked you to

12  work injust or robotic camera or in master

13  control, they thought they were asking you to

14  do part of the same job all under the

15  umbrella of master control?

16      A   I don't believe so.  I don't

17  believe that's what they thought.  No.

18      Q   But they didn't have a separate

19  position for intake versus master control or

20  robotic camera operator; correct?

21    A   They didn't have a what?

22    Q   Separate job description, because

BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382

114

1   you said they considered everyone master

2   control.

3       A   Yeah.  I didn't see what they

4   consider a job description for injust.  Or a

5   camera operator.  I never saw those job

6   descriptions.

7       Q   You said the first day you reported

8   to work, they had you do injust, though;

9   correct?

10      A   The first day we went on the air in

11  February.

12      Q   In February.

13    A    That wasn't the first day I

14   reported for work.  The first few days

15   we -- the first couple of months we reported

16   for work, we did absolutely nothing but sit

17   in a room every day for eight hours.  Did

18   absolutely nothing.

19    Q    Other than the first couple of days

20   when you went on the air, until they moved

21   you to intake when you came back, did you do

22   intake/injust at all?



BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382




115


1    A    When we went on the air, I was

2   initially in intake.  Intake was the first

3   thing that went -- and it came about.  Intake

4   was first because intake had to receive

5   something for everybody else to do.

6    Q   Exactly.  Okay.

7    A   So -- and I was the second person

8  to do the job, but the first person didn't

9  know what he was doing.  In fact, he didn't

10  do any of the job the first couple of

11  hours (?) when I -- before I got there.

12    Q   But other than that day, did you

13  work in injust again until you came back from

14  your sick leave?

15    A   Repeat the question again.

16    Q   You did that the first day they

17  went on the air.

18    A   That was in February.

19    Q   February.  And then you were placed

20  in intake when you came back from your sick

21  leave; correct?

22    A   That was back in May.

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

116

1    Q    In May.

2    A    That was several months later.

3    Q    And in between those two dates, did

4    you ever work in injust or intake?

5    A    Yes, I worked in intake the first

6    two weeks that it was -- that we went on the

7    air.

8    Q    When you came back from your sick

9    leave, was your rate of pay changed at all?

10    A    No.

11    Q    Did it change who you reported to?

12    A    Did what change?

13    Q    When you were working in intake,

14    did you start reporting to Mr. Marcus?

15    A    I'm not quite sure, because -- in

16    February -- let me give you a chronological

17    order that things happened in.

18        We went on the air in February of

19    '04.  The first two weeks, I worked in intake

20    or injust.  Then I was transferred to video

21    operations, where I continued working until

22    this incident came up with me going to the


BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382


117


1    doctor.  When I came back from the doctor on

2    the 21st, I was transferred back to intake.

3          Now, once I got back to intake, at

4    that particular time, it's my understanding

5    that Mike Marcus's job was being divided

6    between him and another supervisor, a studio

7    manager.

8      Q   Do you remember that person's name?

9      A   Her name is -- I forget her name.

10    Right offhand, I can't remember.  But I

11    understand that she was supposedly in charge

12    of the intake aspect or intake office.  It

13    was kind of confusing because none of them --

14        Q    So did you --

15        A    Team -- go ahead.

16        Q    Did you consider the move to intake

17    to be a demotion?

18        A    No, I didn't.

19        Q    I appreciate you explaining the ins

20    and outs here to me.

21        A    Okay.

22        Q    So after you came back from your


BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382


118


1    period of sick leave and you saw the

2    doctor, was it Mr. Marcus to whom you handed

3    the note that has been marked as Taylor 11?

4        A    Yes.

5     Q    Did he ask you anything further

6    about your medical condition or your health?

7     A    No.  He -- what he -- we discussed

8    what I was going -- what was going to happen.

9    I told him that I had to be treated for it,

10   and that was about it.

11    Q    Did you discuss what the specifics

12   of the treatment were to him?

13    A    No, I didn't.  No.

14    Q    No.  And he didn't ask you?

15    A    No.

16    Q    Whatever the treatment was at that

17   time, it didn't limit you in doing your work?

18    A    Again?

19    Q    So even without the treatment, you

20   could come back and do your job?

21    A    Yes.  I was doing my job before I

22   went to the doctor.  They didn't -- let me

BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382

119

1    say that nobody at Team had any problems with

2    me performing my job.

3        Q    Other than what they perceived to

4    be your sleeping on the job.

5        A    Right.

6        Q    After you handed Michael the note

7    and came back to work, was there a time that

8    you had another conversation with Mr. Marcus

9    in which he told you that sleeping on the

10    job, or perceived sleeping on the job,

11    continued to be a problem for you?

12        A    No, no.

13        Q    Not until the termination?

14        A    Yeah, I didn't -- we didn't hardly

15    speak at all that following week.  Because I

16    was too busy in intake or in injust, and we

17    just didn't have a opportunity to speak.

18        Q    So the next time you really spoke

19    with Mr. Marcus about this problem --

20        A    Was the day he fired me.

21        Q    Do you remember a man named Vernon?

22        A    Yes.


BETA COURT REPORTING
www.betareporting.com
202-464-2400                    800-522-2382



120


1        Q    Who was Vernon?

2        A    I think Vernon was a -- he was like

3    a sub-supervisor under Mike.

4        Q    Are you aware of whether he ever

5    went to Mr. Marcus with complaints that you

6    were falling asleep?

7        A    No, I don't know at all if he did

8    that or not.

9        Q    Did he ever come to you and say

10    that he thought you were sleeping on the job?

11    A    Vernon?

12    Q    Yes.

13    A    I don't recall him ever doing that,

14    no.

15    Q    So Mr. Marcus requested a meeting

16    with you, at which point you were terminated?

17    A    Yes.

18    Q    And how did that come about?

19    A    Just came in and asked me could he

20    speak with me, and we went to a conference

21    room where he and the other lady -- the other

22    studio manager was waiting for us in that

BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382

121

1    room, and we I came -- when we came in, he

2    said you pretty much know what this is about,

3    and we're going to have to let you go.

4    Q    Do you remember a woman named

5  Tracey Thompson from HR being there?

6    A    Yes.  Oh, being at the meeting?

7    Q    Yes.

8    A    No, she wasn't there.

9    Q    She wasn't at the meeting?  Okay.

10    A    No.

11    Q    Did you --

12    A    Only the three of us.  The other

13  studio manager, Mike Marcus, and I were at

14  this meeting.

15    Q    In a conference room?

16    A    Yes.

17    Q    Do you remember how long the

18  meeting lasted?

19    A    Approximately five minutes.

20    Q    Did the other studio manager do any

21  talking, or was it just Mr. Marcus?

22    A    No, she talked, too.

BETA COURT REPORTING

file:///A|/AATAYLOR.txt

Case 1:05-cv-02169-RCL    Document 20-14    Filed 12/18/2006    Page 164 of 249
www.betareporting.com
202-464-2400          800-522-2382

122

1    Q    What did she say?

2    A    Like I said, Mike Marcus stated you

3    pretty much know what this is about, we're

4    going to have to let you go.  I said no, I

5    don't know what's it about, and I would like

6    to have it in writing.  He didn't say

7    anything.  She spoke up and said I will talk

8    to Brad and see what we can get you and we'll

9    get back to you.  I said fine.  And then they

10   asked me did I have anything that I needed to

11   pick up, like a coat or my glasses, anything.

12   I said no, and he said well, I'll escort you

13   to the front door.  And that's all was it.

14   Q    So do you recall anything being

15   said at the meeting about sleeping or

16   appearing to be asleep?

17   A    Nope.

18    Q    And prior to the meeting, do you

19    remember Mr. Marcus saying anything to you

20    about the reports of you falling asleep at

21    work on May 19 and May 20?

22    A    Repeat that, please.


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382



123


1    Q    Before the meeting you had with

2    Mr. Marcus, you don't remember a conversation

3    in which he said he had reports of you

4    falling asleep on the job on May 19 and May

5    20?

6    A    No, I don't.

7    Q    Did you take any notes at the

8    meeting?

9    A    No, I didn't.

10      Q     Do you remember if Mr. Marcus or

11   this other studio manager took any notes?

12      A     No, they didn't.

13      Q     Did you say anything about filing a

14   lawsuit or an EEOC charge?

15      A     No, I didn't.

16      Q     Did you say anything about wanting

17   to talk to anyone in human resources?

18      A     No, I didn't.

19      Q     At any time prior to your

20   termination, did you contact anyone in human

21   resources to discuss your sick leave or

22   making a complaint, or anything about your


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


124


1   employment with Team?

2      A     Would you repeat that, please?

3      Q    Sure.  Prior to your termination of

4    employment, did you contact anyone in human

5    resources to discuss your sick leave, why

6    you're being placed on it, or lodge any sort

7    of complaint?

8      A    Not prior to it, no.  Not prior to

9    my termination, I did not.

10     Q    And after your termination, did you

11    contact human resources?

12     A    Yes.

13     Q    Do you remember who you contacted?

14     A    Yes, Tracey Lee.  Tracey Thompson.

15    Thomas.

16     Q    Did you contact her by phone?

17     A    Yes, I did.

18     Q    Was this shortly after your

19    termination?

20     A    It was -- I was terminated on a

21    Friday, and I contacted her on the following

22    Monday.

file:///A|/AATAYLOR.txt

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

125

1      Q   What did you tell her?

2      A   I asked her -- since I was

3   terminated, did I still have health benefits

4   for -- you know, as most jobs provide for the

5   next 30 days.  She told me yes.  I had health

6   benefits for the next 30 days.

7      Q   Did you make any complaint about

8   Mr. Marcus or how you were treated?

9      A   No, I didn't, not at that time.

10     Q   Did you put anything in writing to

11   Ms. Thompson?

12     A   No.

13     Q   Did you ever get anything in

14   writing from Team about your termination?

15     A   No.  The very next day, which was

16   Tuesday, after I spoke to Tracey -- the next

17    day, Tuesday, I called -- was Brenda -- the

18    other supervisor's name was Brenda something.

19    I contacted her and -- to find out if she had

20    gotten any information from Brad about giving

21    me a -- why I got terminated.

22        Q   Are you aware sitting here today

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

126

1    that it's Team's position that they

2    terminated you for the fact that you

3    repeatedly slept on the job or appeared to be

4    sleeping on the job?

5        A   Would you repeat that?

6        Q   Are you aware sitting here today

7    that it's Team's position that your

8    employment was terminated because you were

9    either sleeping on the job or appeared to be

10    sleeping on the job?

11        A    I'm going to say no.

12        Q    If you could turn to Taylor Exhibit

13    No. 3, that's your petition that you filed

14    for your complaint.

15        A    Turn to what?

16        Q    This is your complaint.  If you

17    could turn to page 2, paragraph 9.

18        A    Okay.

19        Q    It says "Plaintiff was terminated

20    from his job because he suffers from sleep

21    apnea and/or because of his perceived

22    disability."


BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382


127


1        Do you see that?

2     A    Yes.

3     Q    No one ever said that to you,

4   though, at Team; correct?

5     A    No.

6     Q    So that was just your conclusion?

7     A    No.

8     Q    What was the basis for making --

9     A    Part -- let me say this, that part

10   of the reason I don't have representation

11   today is because I had -- I was in conflict

12   with my former representation about his

13   accuracy in these documents.  Especially in

14   my petition.  That was part of the reason I

15   don't have him anymore as my representation.

16     Q    We're going to talk more about that

17   a little bit later, so --

18     A    So what you have here in this

19   petition I may not totally agree with.  But

20   as far as the "Plaintiff was terminated from

21   his job because he suffers from sleep apnea,"

22   and because of perceived to be disability,

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

128

1    that's not what my position is.

2        That's not what I think.

3    Q   What do you think?

4    A   Mike Marcus admitted that he only

5    fired me because I brought a note back

6    stating that I had sleep apnea.  Document

7    number 11.  Go ahead.

8    Q   What did Mike Marcus say to you

9    specifically?

10   A   He was asked directly, is the only

11   reason you fired me because I brought this

12   notice back saying I had sleep apnea?  He

13   affirmed it.  He said yes.

14   Q   You were the one that asked him

15   that?

16    A   No, my representation.  My --

17    Q   When did your representation ask

18  him that?

19    A   In the -- in the formal EEO

20  hearing.

21    Q   Was Mr. Marcus represented by

22  anyone at that hearing?


BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382


129


1    A   Yes.

2    Q   Do you remember who that attorney

3  was?

4    A   The lady you took over for, I

5  believe.

6    Q   Ms. McDonough?

7    A   Yes.

file:///A|/AATAYLOR.txt

8      Q    When you say "hearing," do you mean

9    mediation?

10      A    Yes.

11      Q    But at the time of your

12    termination, Mr. Marcus didn't say anything

13    to that effect?

14      A    He didn't -- he only said to me you

15    pretty much know what this is about; we're

16    going to have to let you go.  And I said no,

17    I don't know what it's about, I'd like to

18    have it in writing.  And he said nothing

19    else.

20      Q    Nothing else?  All right.

21      A    He was -- like he didn't understand

22    what I was saying.


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


130

1    Q    In Taylor 11, you had your doctor

2    state that you suffered from sleep apnea; is

3    that correct?

4    A    Say that again, please.

5    Q    Taylor 11 is a diagnosis of sleep

6    apnea.

7    A    Okay.

8    Q    Do you still suffer from sleep

9    apnea?

10    A    Do you understand what sleep apnea

11    is?

12    Q    I believe I do.

13    A    Well then, yes, I still -- if you

14    understand it.

15    Q    Well, there could be an instance to

16    which sleep apnea was caused by a physical

17    obstruction for which you could have surgery,

18    and once you have the surgery, you would no

19    longer suffer from sleep apnea.

20    A    Not necessarily.

21    Q    I'm saying there are different

file:///A|/AATAYLOR.txt

22    reasons for which you can have sleep apnea;

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

131

1    correct?

2        A    Yeah.

3        Q    And yours is apparently a reason

4    that you still have the sleep apnea?

5        A    You're going to always have sleep

6    apnea.

7        Q    Yes.  But you can also recover from

8    it if you have certain reasons --

9        A    And I have, yes.  I've been treated

10    for my sleep apnea and I no longer am

11    impaired by it.

12        Q    No longer?  Okay.

13        A    I'll say that.

14            MS. HUGHES:  If you could mark this

15    as Taylor 12.

16              (Deposition Exhibit No. 12 was

17              marked for identification.)

18         BY MS. HUGHES:

19       Q   Take a moment to review that

20    document, and let me know when you've

21    completed your review.

22       A   Okay.


BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382


132

1      Q   Do you recognize this document?

2      A   No, I don't.

3      Q   If you'll see at the top, it says

4    patient name, Wenzell Taylor.

5      A   Uh-huh, yes.

6      Q   And it was at the Sleep Disorders

7    Institute of Providence Hospital.

8       A    Okay.

9       Q    Do you remember going to the Sleep

10   Disorders Institute of Providence Hospital on

11   or about June 8, 2004?

12      A    Yes.

13      Q    Was it Dr. Zonozi that referred you

14   to the Sleep Disorders Institute?

15      A    Yes, it was.

16      Q    I'm going to represent to you that,

17   to my knowledge, these were records provided

18   by Dr. Zonozi pursuant to our subpoena, and

19   that you had also signed a release of medical

20   records.  So to my understanding, these are

21   copies of your medical records.

22      A    And Dr. Zonozi sent them to you?

1    Q    Correct.

2    A    You didn't get them straight from

3    Providence?

4    Q    No.

5    A    Okay.

6    Q    This study was done after your

7    termination of employment from Team; correct?

8    A    Yes.

9    Q    Do you see in the section that says

10   "HISTORY OF PRESENT ILLNESS," about a third

11   of the way down, it says "In addition, he is

12   having daytime fatigue and sleepiness."

13   A    Mm-hmm.  Yes, I do.

14   Q    Do you remember reporting that to

15   Dr. Shibli?

16   A    Yes, I do believe.

17   Q    Did you ever report to anyone at

18   Team that you were having "daytime fatigue

19   and sleepiness?"

20   A    No, I didn't.

file:///A|/AATAYLOR.txt

21     Q     Do you see further down, it says

22     "The patient describes that he occasionally

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

134

1    feels drowsy there and he might have fallen

2    asleep a few times during work?"

3        A    Yes.

4        Q    "He thinks that he might have lost

5    his job due to that."

6            Do you see that?

7        A    Yes.

8        Q    Do you remember reporting all of

9    that to Dr. Shibli?

10       A    No, I did not say that to

11   Dr. Shibli.

12       Q    Do you know where Dr. Shibli would

13   have gotten such information?

14    A    He could have assumed that, but I

15    did not tell him that.

16    Q    Did you ever tell him that you

17    occasionally felt drowsy at work and that you

18    might have fallen asleep a few times there?

19    A    Yes.

20    Q    At this time on June 8, did

21    Dr. Shibli perform any tests other than doing

22    a physical examination of you?


BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382


135

1    A    At the time this was done?  This --

2    Q    Yes.  On June 8.

3    A    I don't think so, no.

4    Q    Did he say to you that he agreed

5    with Dr. Zonozi's diagnosis of sleep apnea?

6    A    Yes, he did.

7    Q    Did he offer any other diagnoses?

8    A    Yes, he did.

9    Q    What other diagnoses --

10    A    Was -- I had to come to the

11    hospital to be examined for it.

12    Q    At this time, did Dr. Shibli place

13    you on any medications or other treatment?

14    A    No, he didn't.

15    Q    Did he put you on any restrictions

16    or limitations?

17    A    No, he didn't.

18    Q    Do you remember anything else about

19    this visit with Dr. Shibli?

20    A    Like what?

21    Q    Were there any recommendations

22    about what to do to avoid problems with sleep

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

136

1    apnea, or other general physical health

2    things?

3        A    Yes.  He -- losing weight is

4    part -- would help.  And the treatment that

5    they would prescribe, that's basically which

6    would eliminate my sleep apnea completely.

7        Q    So he described the treatment that

8    they would put you on if the sleep studies

9    confirmed what they thought?

10       A    Exactly.

11       Q    Is that the CPAP titration?

12       A    Yes.  Yes, it is.

13       Q    Did you also report to Dr. Shibli

14   that you had a history of being a smoker?

15       A    Yes.

16       Q    Did Dr. Shibli suggest that you

17   stop smoking?

18       A    Yes.

19       Q    Do you still smoke?

20    A   Yes, I do.

21    Q   Have you cut down at all?

22    A   Yes, I have.


BETA COURT REPORTING
www.betareporting.com
202-464-2400                    800-522-2382


137


1    Q   How much do you smoke?

2    A   Maybe a pack in a week and a half.

3   I've cut down to that.

4    Q   Have you followed Dr. Shibli's

5   suggestion about losing weight?

6    A   Yes.  I've tried to, anyhow.  It's

7   not a easy task.

8    Q   No, I understand that.

9    A   At this age.

10    Q   Is your weight now less than it was

11   when you first visited Dr. Shibli in June?

12    A   I don't think so, no.

13    Q   So you're now about back to the

14   same --

15    A   I could be more.

16    Q   Could be more, but you don't know.

17        All right.

18        MS. HUGHES:  And you could mark

19   this as Taylor Exhibit 13.

20            (Deposition Exhibit No. 13 was

21            marked for identification.)

22        THE WITNESS:  Okay.



BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382



138


1        BY MS. HUGHES:

2    Q   And if you could take a moment to

3   review this document and let me know when

4   you've completed your review.

5     A    Okay, I see it.

6     Q    Have you seen this document before?

7     A    I think I have, yes.

8     Q    I'll also represent to you that

9    this was another one of the documents that

10    was provided in your medical records that we

11    requested pursuant to subpoena by Dr. Zonozi.

12    A    All right.

13    Q    Do you remember having this test

14    done at the Sleep Disorders Institute at

15    Providence Hospital?

16    A    Yes, I do.

17    Q    Was it on June 9, 2004?

18    A    I believe it was.

19    Q    So it was pretty much the day after

20    you saw Dr. Shibli?

21    A    Not the day after, no.

22    Q    Was the night of that you saw

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

139

1    Dr. Shibli?

2        A    No, it was like a week or so.

3        Q    You'll notice that on the Sleep

4    Disorders Institute exhibit that's marked as

5    Taylor 12, the date of admission is June 8,

6    2004.

7            Do you see that?

8        A    Yes.

9        Q    And the date of this study on

10    Taylor 13 is June 9, 2004.

11        A    Okay.

12        Q    Do you have any reason to think

13    that the dates on these medical records are

14    incorrect?

15        A    It could be.  I don't know.  But it

16    wasn't -- the day that I saw Dr. Shibli -- I

17    don't remember the day after seeing

18    Dr. Shibli, that I started this treatment.  I

19    don't remember doing that.  I think it was a

20    couple of days later, or like a week later or

21    something.  Because they had to schedule me

22    in.


BETA COURT REPORTING
www.betareporting.com
202-464-2400                    800-522-2382


140


1        Q    If you can turn to the second page,

2    that says "2 of 2" on Taylor 13.

3        A    Okay.

4        Q    Do you see where it says "Overall,

5    the test results confirm the presence of

6    obstructive sleep apnea syndrome resulting in

7    sleep fragmentation and oxygen

8    desaturations?"

9        A    Yes.

10        Q    So you do indeed have a diagnosis

11    of obstructive sleep apnea?

12    A    Yeah.  Is there some question about

13    that?

14    Q    I just have to confirm it for the

15    record.

16    A    Oh.

17    Q    Did the doctor give you any

18    prognosis for the sleep apnea?

19    A    I don't recall seeing Dr. Shibli

20    again.

21    Q    So you just saw him this one time

22    for the sleep study and consultation --


BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382


141

1    A    Yes.

2    Q    Did you see Dr. Zonozi again?

3    A    I believe -- yes, I did.

4       Q    Did either Dr. Zonozi or Dr. Shibli

5    tell you what could happen if your sleep

6    apnea was not treated?

7        A    Yes, they did.

8        Q    What did they tell you?

9        A    Verbatim, I can't tell you.  I

10    don't -- but I know the symptoms.  I know it

11    can -- it can get worse and you can die.  A

12    lot of things can happen.

13       Q    Was it Dr. Shibli or Dr. Zonozi

14    that told you about the treatment option for

15    the sleep apnea?

16       A    Dr. Shibli told me.

17       Q    And that was the CPAP, which is

18    Continuous Positive Airway Pressure; correct?

19       A    Yes.  Yes.

20       Q    And in fact, one of the things they

21    did during the sleep study was determine what

22    your optimal CPAP pressure was for your

BETA COURT REPORTING
www.betareporting.com

202-464-2400        800-522-2382

142

1    treatment; correct?

2        A    I guess.  I don't know.  I don't

3    know what they got out of it.

4        Q    Is the CPAP treatment -- it's a

5    physical mask that you wear while sleeping,

6    correct, that's hooked up to a machine?

7        A    Yes.

8        Q    Do you have one of those at home?

9        A    Yes, I do.

10        Q    Do you use it to sleep every night?

11        A    Yes.

12        Q    And that resolves the symptoms of

13    your sleep apnea?

14        A    Yes.

15        Q    And you still have that?

16        A    Yes.

17        Q    Did you get that machine shortly

18   after having this consultation with

19   Dr. Shibli in the sleep test?

20       A   I got it after my treatment at the

21   hospital.

22       Q   When was the last time you saw any


BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382


143


1    physician or healthcare provider about

2    continuing your CPAP treatment or about your

3    sleep apnea?

4        A   Well, this was the last.  This --

5        Q   So basically, you were having this

6    issue --

7        A   I was being treated.

8        Q   Treated.

9        A   And abruptly, we discovered Team

10   had cut the insurance benefits off.  Prior.

11    Like I say, I contacted Tracey on the 31st of

12    May, she told me I had 30 days left; then we

13    discovered in the middle of being treated

14    that Team had terminated my health benefits.

15    That's why I no longer saw anybody.

16        Q    But you do have the CPAP machine,

17    and it's your testimony here that it's

18    keeping your sleep apnea symptoms in check;

19    correct?

20        A    Yes.  Yes.

21        Q    So you're now covered under, I

22    think you said earlier, like a public


BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382


144


1    program?

2        A    Yes.

3     Q   Have you had to seek out any

4   continuing treatment or advice about your

5   sleep apnea?

6     A   No.

7     Q   So this treatment is working for

8   you and you haven't seen any need to rock the

9   boat; is that correct?

10     A   Right.

11     Q   Did you report to the neurosurgeon

12   that you use the CPAP machine or that you

13   have sleep apnea?

14     A   Yes.

15     Q   Did he make any comment about that?

16     A   No, he wasn't interested.  That had

17   nothing to do with the sciatica.

18     Q   So it wasn't issue.  All right.

19   And the CPAP machine is the only treatment

20   you've had for the sleep apnea; correct?

21     A   Yes.

22     Q   No medications?

BETA COURT REPORTING
www.betareporting.com
202-464-2400                    800-522-2382

145

1     A    No.

2     Q    No physical therapy?

3     A    No.

4     Q    Nothing else?

5     A    (No audible response)

6     Q    Are you limited in any way by your

7   sleep apnea?

8     A    No.

9     Q    So it doesn't affect any of your

10   daily activities?

11    A    No.

12    Q    Any of your night activities?

13    A    Nope.

14    Q    Ability to work?

15    A    Nope.

16    Q    And we've covered that you just saw

17    Dr. Zonozi and Dr. Shibli.

18        Sitting here today, to your

19    knowledge, did either Dr. Zonozi, Dr. Shibli,

20    or Providence Hospital claim that you owe

21    them any money?

22      A   Yes.


BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382


146

1      Q   Is that part of the damages that

2    you're seeking in this lawsuit?

3      A   Yes.

4      Q   Do you know how much it is they

5    claim that you owe them?

6      A   To the exact penny, I haven't

7    calculated it.

8      Q   Do you know approximately how much

9    it is?

10      A    Approximately -- it's under

11   $10,000.  Medical bills.

12      Q    When you were terminated from

13   employment at Team, were you provided any

14   sort of notice about COBRA rights?

15      A    No, I wasn't.

16      Q    Did you ever inquire with anyone at

17   Team about continuing your health benefits or

18   COBRA?

19      A    Just what I told you, on the 31st

20   of May, I contacted Tracey Thomas to find out

21   whether or not I still had health benefits.

22      Q    For 30 days?


BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382


147


1      A    For 30 days, and she -- as

2    traditionally done, and she said yes.  And

3    that was it.  And then I did not contact her

4    again until in the middle of treatment, or

5    just after I had been -- I had gotten this

6    CPAP machine, I started receiving bills from

7    the hospital that there was no insurance to

8    pay these bills.  So I re-contacted Tracey,

9    who now changes her story, saying that the

10   health benefits had been terminated on the

11   31st of May.

12       Q    Other than the sciatica --

13       A    And then that was on the -- that

14   was July 8 that I re-contacted her.  On

15   July 9, COBRA information shows up in my mail

16   from her.

17       Q    Did you sign up for COBRA?

18       A    No, I didn't.

19       Q    Was that because you couldn't

20   afford it?

21       A    That's correct.

22       Q    At what point did you try to first

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

148

1   register for public health care benefits?

2       A   At what time (inaudible)?

3       Q   So you didn't sign up for the COBRA

4   because you couldn't afford it.  Is that the

5   point in time in which you made an

6   application for the public treatment, or did

7   you wait an additional period of time?

8       A   The public treatment.

9       Q   I believe you said that you were

10  currently covered -- Charter Health/Medicaid.

11      A   Right.

12      Q   At what point did you apply for the

13  Charter Health/Medicaid benefits?

14      A   I don't know.  Sometime later on in

15  the year, but that has nothing to do with

16    this.  I haven't gotten treatment from them

17    for this problem at all.

18        Q    Oh, I know.  I just want to make

19    sure I understand.

20            Other than the sciatica you've

21    described and the sleep apnea for which

22    you're being treated, do you suffer from any

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

149

1    other physical or mental impairments?

2        A    No.

3        Q    And since the time that you have

4    left Team, I just want to confirm, you had

5    the June visit with Dr. Zonozi and

6    Dr. Shibli, and you just recently saw the

7    neurosurgeon.

8            Am I correct that you haven't seen

9    any other doctors or health care providers in

10   that period of time?

11       A   Only my primary care doctor

12   and -- oh, I've seen several doctors

13   in -- since -- see, the neurosurgeon has

14   nothing to do with this problem.

15       Q   Oh, I understand.  I just want to

16   make sure I have a complete list.

17       A   Yeah, I could have -- I mean, I've

18   seen the dentist.  I went to the dentist.

19       Q   Okay, dentist.  Who else have you

20   seen?

21       A   I've been to pain management at

22   Howard University.


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


150

1       Q    But the sleep apnea was never part

2    of that?

3       A    No.

4       Q    Did you report the sleep apnea to

5    them?

6       A    I believe I mentioned it.  I

7    probably mentioned it to everybody, every

8    doctor that I go to.

9       Q    Just giving your medical history;

10   okay.

11      A    Right.

12      Q    So pain management.

13      A    Who else?  I've seen several

14   doctors.  Dermatologist.  I've -- the

15   neurosurgeon had me take some tests, like PFT

16   tests and -- EKG and stuff like that, and

17   I've talked to all of them, and I probably

18   mentioned sleep apnea to all of them, that I

19   suffered from it.

20      Q    But all of the pain management and

21   seeing the neurosurgeon are related to the

22   sciatica; correct?

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

151

1     A   Right.

2     Q   Am I correct that you are currently

3   unemployed?

4     A   That's correct.

5     Q   Have you been employed at all since

6   the end of your employment with Team?

7     A   No, I haven't.

8     Q   Am I correct that you've sought

9   employment since that time?

10    A   Constantly.

11    Q   Did you ever receive unemployment

12   benefits while --

13    A   Yes.

14    Q   After you were --

15    A    Terminated.

16    Q    Terminated.

17    A    Yes.

18    Q    And those have exhausted at this

19    point; correct?

20    A    Yes.

21    Q    Am I correct that D.C. unemployment

22    requires you to keep a log of your job search

BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382

152

1    efforts?

2    A    Yes.

3    Q    Do you still have a physical copy

4    of that log?

5    A    I believe I can -- yeah, I think

6    so.

7    Q    I will tell you that was one of the

8    things that was requested in our document

9    requests which we don't have, so --

10    A    Okay.

11    Q    If you can forward us a copy of

12    that, we would appreciate it.

13    A    A copy of the logs?

14    Q    Yes.

15    A    Oh, okay.

16    Q    The job requests.

17    A    Okay.

18    Q    It just makes it easier because I'm

19    going to ask you --

20    A    Okay.

21    Q    Where you recall applying at, but

22    it's certainly much easier if you have the


BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382


153

1   document in front of you to refresh your

2   recollection.

3       A   All right.

4       Q   Putting that aside, do you remember

5   some of the places where you've applied?

6       A   Everywhere.

7       Q   Everywhere.  Have they all --

8       A   Anybody that has something to do

9   with television broadcasting, I've applied

10  there.

11      Q   So has it all been in the

12  television field?

13      A   Yes.  A lot of -- most of it has.

14  90 percent of it has.

15      Q   Do you remember any other fields

16  for jobs that you've applied?

17      A   Oh, just about everything.

18  Shuffling cars at the airport, you know, for

19  the different car rental places.  I tried to

20  get with the Red Cross.

21      Q   Do you remember what kind of

22    position it was with the Red Cross?


BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382



154


1      A    Anything I could find there.  Or

2    anything I was qualified for.  Dozens of

3    places other than television, yes.

4      Q    And would those efforts be recorded

5    in your job log for D.C. Unemployment?

6      A    Probably -- well, I don't think

7    those, no, because after -- you know, after

8    the unemployment benefits exhausted, what was

9    the purpose of keeping a log?

10      Q    So you were never instructed by

11    previous counsel or anyone to keep a log or a

12    written record of your job search?

13      A    No.

14     Q   Is it correct that you don't have a

15   written documentation of all the places?

16     A   Not after the unemployment benefits

17   exhausted, no.

18     Q   Any place for which you've applied

19   for employment have you had an interview?

20     A   No.

21     Q   So all of your efforts have ended

22   at the submitting applications and you've not


BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382


155


1   been contacted subsequently?

2     A   I've not been contacted, period.

3     Q   So it's correct that you have not

4   turned down any job offers?

5     A   That's correct.

6     Q   And you've not returned to school

7    in any way; correct?

8        A    No.  I -- yes, I did.  During the

9    time that I was on the unemployment, I did

10   return to school for a Microsoft course.

11       Q    Did you --

12       A    Computer.

13       Q    Did you complete that course?

14       A    No, I didn't.  I didn't take the

15   test, the final test.

16       Q    Sitting here today, other than the

17   not able to lift more than 50 pounds or stand

18   or walk excessively, are there any

19   limitations in your ability to hold any of

20   the jobs or positions that you've sought?

21       A    No.

22       Q    In any of your applications to any

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

1    potential employer, have you disclosed this

2    lawsuit to them?

3        A    No.

4        Q    Have you disclosed that you suffer

5    from sleep apnea or sciatica?

6        A    No.

7        Q    Sitting here today, do you have any

8    source of income?

9        A    Yes, I do.

10        Q    What is the source of income?

11        A    Workman's compensation.

12        Q    Is that a monthly payment?

13        A    It's a bi-weekly payment.

14        Q    Bi-weekly.  And how much is that?

15        A    $36.

16        Q    Is that your only source of income?

17        A    Only.

18        Q    All right.  Do you receive any

19    Social Security benefits?

20        A    No.

21    Q    Have you applied for Social

22    Security?


BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382


157


1    A    No.

2    Q    Do you receive any food stamps?

3    A    No.

4    Q    I believe you said earlier that

5    your complaint was not, in your estimation,

6    completely accurate; is that correct?

7    A    That is correct.

8    Q    You said the unpaid medical bills

9    were part of the damages you're claiming in

10    this lawsuit; correct?

11    A    Yes.

12    Q    What are the other damages that

13   you're seeking in this lawsuit?

14       A   Other damages?

15       Q   Yes.  What are you seeking to get

16   out of this lawsuit, and what's your basis

17   for claiming that?

18       A   I prefer to answer that in front of

19   a judge or a jury.

20       Q   Well, it needs to be in your

21   complaint --

22       A   I understand.


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


158


1       Q   And I'm just asking you to

2   elaborate on that so I can understand fully

3   what it is you're seeking.

4       A   When I answer that in front of a

5   judge and jury, you will understand it.

6    Q    Are you claiming back pay?

7    A    When I answer that in front of a

8  judge or and a jury, you'll know.

9    Q    All right.  Well, I'll just have to

10  say for the record --

11    A    I'll refer it --

12    Q    That you need to answer those

13  questions and --

14    A    And I'm saying that I prefer to

15  answer them in front of a judge and a jury.

16    Q    All right.  I'm going to assume

17  that you're probably going to refuse to

18  answer this, but I have to ask you, are you

19  claiming any damages for emotional distress?

20    A    Same answer.

21    Q    In addition to the physical

22  impairments for which you've sought treatment

BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382

159

1    over the last few years, have you had any

2    treatment for any mental impairment or

3    stress?

4        A    No, I haven't.

5        Q    Let's return to your complaint,

6    which I believe we've marked as Taylor 3.

7        A    Uh-huh.  Yes.

8        Q    Is it correct that your prior

9    counsel drafted this document?

10       A    As far as I know, yes.

11       Q    And you did not draft it?

12       A    No.

13       Q    Do you see in number 4, it says

14   "Plaintiff suffers from sleep apnea, a

15   chronic medical condition that substantially

16   limits one or more major life activities,

17   including the ability to sleep and stay

18   awake"?

19       A    Yes.

20    Q    Am I correct that with the CPAP

21    treatment, that you are able to sleep and

22    stay awake properly?


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


160

1    A    Yes.

2    Q    In number 6, it says "Plaintiff was

3    formerly employed by Defendant as a video

4    operator."  That should be master control

5    technician; correct?

6    A    No, that's correct as it is.

7    Q    A video operator?

8    A    I was a video operator.

9    Q    And are those dates of employment

10    correct?

11    A    Yes.  Should be May 28.

12      Q    May 28?  All right.  In number 8,

13    it says "On or about May 21, 2004, Defendant

14    transferred Plaintiff to a different job, and

15    terminated his employment."

16          And that's the transfer to injust;

17    correct?

18      A    That's correct.

19      Q    You disagree with the statement in

20    number 9 that you were terminated from your

21    job because of sleep apnea and/or because of

22    this perceived disability.


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


161


1      A    No, not -- I don't disagree with it

2    as total.  That's part of the reason.

3      Q    Part of the reason.  You think

4    there was an additional reason?

5    A    Yes.

6    Q    What is that reason?

7    A    And I said before, Mike Marcus was

8    directly asked, is the only reason you fired

9    this man because he had sleep -- he brought a

10    note back from the doctor stating that he has

11    sleep apnea?  Mike Marcus responded yes.

12    Q    And that was at the mediation that

13    you attended with your former counsel and

14    another former colleague of mine?

15    A    Yes.

16    Q    Number 10 says "Plaintiff has

17    suffered, and continues to suffer, lost pay,

18    lost benefits, pain and injury, mental

19    anguish, and emotional distress as a result

20    of the unlawful conduct of the Defendant."

21        Do you see that?

22    A    Okay.

BETA COURT REPORTING
www.betareporting.com
202-464-2400          800-522-2382

162

1    Q   Are those the damages for what

2    you're seeking in this complaint?

3    A   Yes.  Partially, yes.

4    Q   And it's correct in terms of the

5    "mental anguish and emotional distress," but

6    you've not actually sought mental health

7    treatment because of that.

8    A   Correct.

9    Q   Has the mental anguish and

10   emotional stress you allege to have suffered

11   changed any of your daily activities?

12   A   Yes.

13   Q   How has it changed your daily

14   activities?

15   A   I prefer to answer that in front of

16   a judge and jury.

17   Q   Okay.  Do you see number 13?  It

18   says "By and through its conduct, Defendant

19    violated the Federal Americans with

20    Disabilities Act by discriminating against

21    Plaintiff on the basis of his disability

22    and/or perceived disability."


BETA COURT REPORTING
www.betareporting.com
202-464-2400                    800-522-2382


163


1      A    Yes.

2      Q    And so you understand that this

3    lawsuit is brought pursuant to the Americans

4    with Disabilities Act?

5      A    Yes.

6      Q    Are there any other laws which you

7    claim Defendants have violated with respect

8    to you?

9      A    I have made no formal claim of any

10   other violations, but I do think that there

11  have been other violations.  But I haven't

12  made any claims, no.

13      Q   Is there anything in that complaint

14  which you contend is factually incorrect?

15      A   In my petition?

16      Q   Correct.

17      A   Let -- let me take a second and

18  read this again thoroughly.

19          Number 7 should be May 5th.

20          That's it.

21      Q   If you could turn to what we have

22  marked as Taylor 2, which is your Plaintiffs

BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382

164

1   Response to Defendants Set of Interrogatories

2   and Request for Documents.

3       Do you see that?

4      A   Yes, I have it.

5      Q   Am I correct that you were the one

6   that drafted these?

7      A   No.

8      Q   Who drafted --

9      A   Oh, wait a minute.  Yes, I was.

10     Q    Because this was submitted --

11     A   Yes.  Yes, I --

12     Q    After Mr. Lescht was no longer your

13   counsel.

14     A   Yes.

15     Q    In Interrogatory number 3, which is

16   on page 2, the interrogatory asked "If you

17   allege that you were denied a reasonable

18   accommodation, identify each and every fact

19   supporting" your allegation.  And you speak

20   to having issues with cold air being blown

21   from the air conditioning.

22     A    Mm-hmm.

BETA COURT REPORTING

file:///A|/AATAYLOR.txt

Case 1:05-cv-02169-RCL    Document 20-14    Filed 12/18/2006    Page 222 of 249
www.betareporting.com
202-464-2400              800-522-2382

165

1    Q    And so the air conditioning was on

2    even though it was the winter; is that

3    correct?

4    A    Yes.  And I'd like to also

5    interject here that you asked me about other

6    doctors that I had seen.  I have seen a

7    rheumatologist.

8    Q    A rheumatologist.

9    A    Yes.

10    Q    Who was that rheumatologist?

11    A    His name is -- he's at GW Medical

12    Faculties building, and his name is --

13    Q    That's okay.

14    A    I forget.

15    Q    Do you remember approximately when

16    you consulted with this rheumatologist?

17    A    Yes.  It's been -- last year.

18     Q    Last year.

19     A    Yeah.

20     Q    Was this related to either your

21    sciatica or your sleep apnea?

22     A    No, it was related to arthritis.


BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382


166


1     Q    Arthritis in what part of your

2    body?

3     A    I have it everywhere.

4     Q    Is it rheumatoid arthritis or

5    osteoarthritis?

6     A    I'm not sure what it is.

7     Q    Did you undergo any blood work for

8    the arthritis?

9     A    No.  Yes, I did.  Yes, I did blood

10   work.  He --

11       Q    Did the rheumatologist ever tell

12   you whether you had --

13       A    He may have.

14       Q    Any positive or any kind of

15   specific arthritic diagnosis?

16       A    I don't remember hearing any of

17   that -- any of that.  What he did say to me

18   that there is no cure for arthritis.  So you

19   know, what was the purpose of continuing to

20   go?

21       Q    So did he put you on --

22       A    He put me on nothing.


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


167


1       Q    No drug treatment.

2       A    No drugs at all.

3      Q    Did he say that your arthritic

4    condition was degenerative in any way?

5      A    He didn't say.

6      Q    Did he put you on any physical

7    limitations?

8      A    No, he didn't.

9      Q    And he didn't recommend physical

10   therapy?

11     A    Yes, he did.  And I did take it.

12     Q    PT.  What part of the body was the

13   physical therapy for?

14     A    Shoulders and neck.

15     Q    But you're actually not limited by

16   your arthritis, other than it's painful?

17     A    What it did -- when it kicks in,

18   you can't do anything.

19     Q    Did you ever have a problem with

20   this while you working for Team?

21     A    No, I didn't.

22     Q    Going back to Interrogatory number

BETA COURT REPORTING
www.betareporting.com
202-464-2400                    800-522-2382

168

1   3, and I appreciate you interjecting about

2   the doctor.  That's exactly what I was

3   speaking to you at the beginning of the

4   deposition --

5        A    Okay.

6        Q    Because I'm trying to complete a

7   thorough record as possible.

8        A    Okay.

9        Q    So I do appreciate that.

10       A    All right.  We're talking about

11   number 3?

12       Q    Number 3.  So you made a complaint

13   about the cold air.

14       A    Yeah.

15       Q    And nothing was done about that.

16   Did you ever ask for any sort of

17   accommodation because you worked in the dark

18   or you were sleepy or you were having

19   problems staying awake?

20      A   No.  Let me say again that master

21   control is traditionally dark.  And so any

22   accommodation -- there is no accommodation.


BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382


169

1   They're not going to put lights in there

2   because I asked.  It's traditional.

3      Q   Because then you couldn't see the

4   equipment; correct?

5      A   Exactly.  Exactly.

6      Q   In interrogatory number 5, your

7   answer says "Defendant officially made

8   charges against me of sleeping on the job,

9    even after confirmation that I was not even

10   at work on that day."

11        A    Uh-huh.

12        Q    "He claims" --

13        A    Yes.

14        Q    And "he" is Michael Marcus;

15   correct?

16        A    Yes.

17        Q    "Claims a company consultant saw

18   and reported me sleep at the workstation.

19   When I confronted the consultant about the

20   allegations, he denied making any such

21   statement or accusation."

22        Do you remember the name of the


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


170


1    consultant?

2    A    No, I don't.  But I can see his

3    face plainly.  I'd have to think about it.

4    Q    If you remember his name, let me

5    know.

6    A    Okay.

7    Q    Next, you go on to say, "Also,

8    several times other supervisors 'ordered' me

9    away from my workstation in the guise that a

10    supervisor would replace me at the station.

11    Defendant (manager)," again, Michael Marcus;

12    correct?

13    A    Yes.

14    Q    "Would come alone and find the

15    station unattended and reprimand me for not

16    being at my workstation without regard of any

17    explanation."

18    A    That's correct.

19    Q    Do you remember the names of these

20    other supervisors?

21    A    Yeah, Vernon that you talked about

22    was one of them, and one was the newer

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

171

1   scheduler.  Kenny -- Kenny and Vernon.  I

2   just can't remember their last names.

3       Q   Is it correct that you never

4   received any sort of written warning for

5   being away from your workstation?

6       A   That's correct.

7       Q   And then the next paragraph.  "Even

8   though the primary business of the company

9   was to receive various news feeds from around

10  the world and report the news, as far as I

11  know, I was the only person eventually

12  prohibited from watching or listening to news

13  feeds in the English language during down

14  time when not on the air."

15      A   That's correct.

16    Q    But you were never given any

17    written discipline about this; correct?

18    A    Not written.  Verbal.

19    Q    Verbal.  When was that?

20    A    Constantly.  Mike Marcus would just

21    harass me constantly.

22    Q    Was this before or after you


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


172


1    submitted the doctor's note?

2    A    This was before and after.  Let me

3    tell you, Mike Marcus was aware that he

4    didn't have the skills and knowledge I had

5    about this business, and I believe he was a

6    little jealous of me.  So he used -- he

7    focused on me as a target.  He just harassed

8    me constantly about this same issue.  There

9    was no other issues that he talked about.

10    And he only came around -- he only came into

11    master control to see if I was sleeping.  If

12    we had problems in there, he couldn't be

13    found.

14        Q    If you could turn to page 5 of

15    these answers.

16            Is Dr. Curiel the rheumatologist

17    that you saw?

18        A    Yes.  Yes.  I'm sorry.

19        Q    And Dr. Merzer is the --

20        A    She's my primary -- she's my

21    primary care.

22        Q    Primary care?  Okay.  And Dr. Osie

BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382

173

1    is Pain Management Clinic at Howard

2    University Hospital.

3        A    That's correct.

4        Q    And then Dr. Dennis is the

5    neurosurgeon.

6        A    Yes.

7        Q    And you were the one that compiled

8    these responses?

9        A    Yes.

10       Q    Are there currently any documents

11   in your possession that tend to support the

12   allegations that you've made in your

13   complaint that you have not turned over to

14   us?

15       A    I really don't know.  I'll look and

16   see.  I don't know.  Is this all you have?

17       Q    I'm almost finished, actually.

18       A    I mean, these are the only

19   documents that you have?

20       Q    The documents that I have --

21       A    What was your last question?

22    Q    I said do you have any documents in

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

174

1    your possession that you feel support your

2    allegations against Team that you have not

3    turned over to us?

4        A    I don't know what I've turned over

5    to you, because my former counsel turned

6    everything over to you, and I don't know what

7    he sent you.

8        Q    Here is what I'm going to do.  I'm

9    going to finish up.  I have one last document

10    I want to question you about.

11        A    Okay.

12        Q    I will tell you that your former

13    counsel never turned over to us any

14    documents.

15     A   Okay.

16     Q   In fact, you were the one that

17   finally responded to the document request,

18   and the interrogatories, by submitting what

19   we just discussed as number 2.

20     A   Okay.

21     Q   And along with that, you submitted

22   some documents.


BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382


175


1     A   Okay.

2     Q   So what I'm going to do, I'm going

3   to finish asking about this one

4   document -- we're going to go off the record

5   briefly so I can go get the documents which

6   you provided --

7       A   Okay.

8       Q   Let you look at those, and then we

9   can make a better determination if there's

10   anything still outstanding.

11      A   Okay.

12      Q   All right.

13          MS. HUGHES:  If you could mark this

14   as Taylor 14.

15          (Deposition Exhibit No. 14 was

16          marked for identification.)

17      BY MS. HUGHES:

18      Q   And then after that, I believe

19   we'll be done.

20      A   Okay.

21      Q   If you can take a minute to review

22   this document, let me know when you've

BETA COURT REPORTING
www.betareporting.com
202-464-2400            800-522-2382

1   completed your review.

2       A   Okay.

3       Q   Do you recognize this document?

4       A   Yes, I think I've seen it before.

5       Q   Are you the addressee of this

6   document?

7       A   Yes, I am.

8       Q   Do you remember speaking to a

9   Hyacinth M. Clarke at any time about your

10   EEOC claim against --

11      A   No, I've never spoken to her.

12      Q   Do you remember dealing with any

13   investigator or employee at the EEOC

14   regarding your EEOC charge?

15      A   Other than the hearing that we had,

16   the little hearing that we had.

17      Q   The mediation?

18      A   Yes, the mediation.

19      Q   And Ms. Clarke was not the one

20   present there?

21    A    No.

22    Q    Do you see where it says "Under the

BETA COURT REPORTING
www.betareporting.com
202-464-2400                800-522-2382

177

1    Commission's Priority Charge Processing

2    procedures, charges are dismissed when it is

3    determined that further investigation is

4    unlikely to disclose a violation of the law"?

5    A    Yes.

6    Q    "The Director has decided to

7    dismiss your charge and issue you a right to

8    sue."

9        Do you see that?

10    A    Yes.

11    Q    Later on, it says "Your charge is

12    being dismissed because it is unlikely that

13    the EEOC would be able to prove that you were

14    discriminated against on the basis of your

15    disability."

16        A    Yeah.

17        Q    Do you see that?

18        A    Yes.

19        Q    "Specifically, the adverse actions

20    you allege fails to indicate how your

21    disability was the basis for the Respondent's

22    actions."

BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382

178

1        Do you see that?

2        A    Yes.

3        Q    "It is highly unlikely that further

4    investigation would result in a violation of

5    the statute.  This determination concludes

6    the investigation of this charge."

7        Do you see that?

8    A   Yes, I do.

9    Q   Did you challenge this finding by

10   the EEOC at all?

11   A   Again, my representation did not

12   challenge it, but I had -- I questioned it.

13   Yes, I did.

14   Q   Did you submit any documentation to

15   the EEOC to challenge it?

16   A   Not me personally, I did not.

17   Q   Did you believe that Mr. Lescht was

18   doing so?

19   A   I didn't think he was doing so, no.

20   Q   So your reaction then was to file

21   this lawsuit?

22   A   Actually, I am 99 percent sure that

BETA COURT REPORTING
www.betareporting.com
202-464-2400                    800-522-2382

179

1    EEO did not do an investigation like they say

2    they did in this letter.  And it was just a

3    waste of time going to EEO.  They did

4    absolutely nothing.  They did a poor job in

5    investigating this case.  That's -- my

6    opinion.

7          The EEO is a joke.  Let me say

8    that.

9      Q   Other than this charge, have you

10   filed previous EEO charges?

11     A   Say that again, please.

12     Q   Other than this charge that we're

13   discussing here, have you previously filed

14   any other EEO charges?

15     A   No, I haven't.

16     Q   So this was your first dealing with

17   the EEOC?

18     A   Yes.

19          MS. HUGHES:  Let's go off the

20    record.

21          (Recess)

22          BY MS. HUGHES:


BETA COURT REPORTING
www.betareporting.com
202-464-2400                    800-522-2382




180


1     Q    Mr. Taylor, you understand you're

2     still under oath; correct?

3     A    Yes.

4     Q    I'm going to show you a series of

5     documents that I received from you in

6     confection with this case and let you take a

7     brief look at them.

8     A    Okay.

9     Q    I believe they're mostly tax forms

10    and a medical authorization.

11    A    Okay.

12    Q    Are there any other documents,

13    seeing those, that you have in your

14    possession or control that you think support

15    the allegations you've made in this case?

16        A    I don't think so.

17        Q    Okay.  Just wanted to check.

18            MS. HUGHES:  I have no further

19    questions.  I am going to keep the deposition

20    open because you refused to answer some of my

21    questions because you --

22            THE WITNESS:  Okay.


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382



181


1            MS. HUGHES:  Wanted to do it before

2    a judge and jury, so I'm going to keep it

3    open.  You do have the right to read and sign

4    your deposition.  And what that means is that

5    you have a chance to review how the court

6    reporter has taken down your testimony and to

7    make any changes.

8         If you make any changes that are

9    substantive, I have the right to challenge

10   it.  I'm not your attorney, but normally when

11   people make changes, they're typographical or

12   grammatical errors --

13        THE WITNESS:  Okay.

14        MS. HUGHES:  And if you change the

15   substance of your testimony, I will challenge

16   that.

17        If you chose not to read and sign,

18   or if you do not submit any changes within 30

19   days of your receipt of the deposition, you

20   will have waived that.

21        Do you understand?

22        THE WITNESS:  Okay.  You're going

BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382

182

1   to send it to me by mail to go over?

2       MS. HUGHES:  Well, the court

3   reporter is going to send it to you directly,

4   and then you will have to submit any changes.

5   It will come with a form that will indicate,

6   like page 23, line 8 should say "Mr. Jones,"

7   not "Mr. Smith."

8       And you would send that back to the

9   court reporter, who would forward it along to

10  me.

11      THE WITNESS:  Okay.

12      MS. HUGHES:  And if it's not done

13  within 30 days, that right is waived.  And,

14  as I said, if you change the substance of

15  your testimony, I have the right to challenge

16  the substance of that change.  And that's

17  all.  Do --

18      THE WITNESS:  What do you mean by

19   "challenge" the --

20        MS. HUGHES:  Well, if you were to

21   change the substance of your answers, I would

22   challenge it, saying that the testimony that

BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382

183

1    you gave under oath was really this, and that

2    you're not changing a spelling or grammatical

3    error, you're changing the substance of what

4    you testified here.

5        And then I would have the right to

6    challenge that and perhaps re-depose you

7    about it.

8        THE WITNESS:  Do I keep these or

9    you?

10       MS. HUGHES:  The court reporter

11   keeps this.

12          While we're on the record, are you

13   going to read and sign then?  Do you want to

14   review your deposition and sign it?

15          THE WITNESS:  Now?

16          MS. HUGHES:  No.  Well, you're not

17   going to do it right now, but you're going to

18   tell her whether that's what you wish to do

19   or if you're waiving it.

20          THE WITNESS:  Oh, yes, I want to

21   review it.

22          MS. HUGHES:  Okay.  He wants to


BETA COURT REPORTING
www.betareporting.com
202-464-2400              800-522-2382


184


1   read and sign.

2          With that, I believe we are off the

3   record.

4          (Whereupon, at approximately

5          12:37 a.m., the deposition of

6          WENZELL O. TAYLOR was adjourned.)

7            *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

BETA COURT REPORTING
www.betareporting.com

202-464-2400          800-522-2382